**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x

HDI GLOBAL SE, f/k/a HDI-GERLING
INDUSTRIE VERSICHERUNG AG,

                          Petitioner,

v.

PHILLIPS 66 COMPANY,

                          Respondent.

Civil Action No. 1:20-cv-631

------------------------------------------------------------------x

## PETITION TO VACATE ARBITRATION AWARD

Petitioner HDI Global SE, f/k/a HDI-Gerling Industrie Versicherung AG ("Petitioner"), hereby petitions this Court pursuant to 9 U.S.C. § 10 to vacate an arbitration award entered in favor of Phillips 66 Company ("Respondent"), and in support of such petition states as follows:

### SUMMARY OF THE ACTION

1.      Petitioner brings this action to vacate the award rendered in favor of Respondent because the Award was issued in manifest disregard for the law and because the Award exceeded the authority of the arbitrators in violation of 9 U.S.C. § 10(a)(4). A Memorandum of Law and Declaration in Support of the Petition to Vacate Arbitration Award is filed herewith.

### PARTIES

2.      Petitioner is an insurance company organized and existing under the laws of Germany.

3.      Upon information and belief, Respondent is a diversified energy company organized and existing under the laws of Delaware and has its principal place of business in Houston, Texas.

## JURISDICTION

4. This Court has personal jurisdiction over Respondent because Respondent continuously and systematically does business within this jurisdiction, and the arbitration took place in New York pursuant to the parties' agreement.

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), as the amount in controversy exceeds $75,000.00 and there is complete diversity between the parties.

6. Venue is proper in this Court pursuant to 9 U.S.C. § 10, because this is the district in which the arbitration award was made. Venue is also proper pursuant to 28 U.S.C. § 1391(a) as this is the district agreed to by the parties in their arbitration agreement.

## FACTUAL BACKGROUND

7. Petitioner issued excess liability insurance policy No. 509/DL253098 to the Tosco Corporation ("Tosco") effective August 1, 1998 through July 31, 1999 (the "Policy"). *See* Exhibit 2 to January 22, 2020 Declaration of Michael A. Knoerzer ("Knoerzer Declaration").[1] At the time the Policy was issued, Tosco was a refiner of gasoline and a seller of other petroleum products with over 5,000 retail marketing locations. Tosco was purchased by Phillips Petroleum Company in 2001, and (as Petitioner understands) is now controlled by Respondent Phillips 66, its successor-in-interest (hereinafter, Tosco and its successors are referred to as "Respondent").

8. The Policy provides for coverage for bodily injury, property damage and advertising liability losses which are above a coverage attachment point of $102,000,000. For purposes of calculating when Respondent's losses reach this attachment point, the Policy allows Respondent to aggregate related losses which arise from the same event, condition, cause, defect, hazard or failure to warn.

---

[1] All exhibits referenced herein are attached to the Knoerzer Declaration.

9. The Policy also contains an exclusion (the "Pollution Exclusion") which broadly excludes coverage with respect:

> (a) to any liability for Personal Injury, Property Damage or Advertising Liability arising out of the discharge of pollutants into or upon land or real estate, the atmosphere, or any watercourse or body of water whether above or below ground or otherwise into the environment, or
>
> (b) to liability, loss, cost or expense of any Insured or others arising out of any direction or request, whether governmental or otherwise, that any Insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants.

Exhibit 2 at Exclusion (k).

10. Within the Pollution Exclusion is a provision which unambiguously provides that the Respondent shall have no coverage for pollution losses, whether the loss is due to its own pollution activities or the pollution activities of another person:

> This Exclusion (k) applies whether or not such discharge of pollutants: (i) results from the Insured's activities or the activities of any other person or entity; (ii) is sudden, gradual, accidental, unexpected or unintended; or (iii) arises out of or relates to industrial operations or the waste or by products thereof.

11. The Policy also contains an "Exception" to the broadly worded Pollution Exclusion:

> (1) Paragraph (1) of this Exclusion (k) does not apply to:
>
> a. product pollution liability . . .

12. In interpreting the Policy, the Panel defined "product pollution liability" to mean:

liability for personal injury or property damage arising out of the end-use of goods or products manufactured, sold, tested, handled or distributed by the Insured or others trading under its name if such use occurs after possession of such goods or products has been relinquished to others by the Insured or by others trading under its name and if such use occurs away from premises owned, rented or controlled by the Insured; provided such goods or products shall be deemed to include any container thereof other than a vehicle, watercraft or aircraft.

13. The Policy also contains an arbitration provision which provides, in relevant part:

3

> Any dispute arising under this Policy shall be finally and fully determined in London, England under the provisions of the English Arbitration Act of 1950, as amended and supplemented, by a Board composed of three arbitrators . . . .

Ex. 2, § V(o).

14. Beginning in the late 1990s, Respondent began to be named as a defendant in a number of suits brought nationwide by states, cities, municipalities and other public entities (hereinafter, "the MtBE Plaintiffs") alleging that Respondent and other manufacturers, refiners, distributors, and sellers of gasoline (hereinafter, "the MtBE Defendants") caused damage to groundwater by allowing an additive to their gasoline, methyl tertiary butyl ether, or "MtBE" to leak into the local groundwater. MtBE is a man-made oxygenate which was added to gasoline in the 1990's to reduce carbon monoxide emissions from vehicle exhaust. While MtBE-infused gasoline may have been cleaner for the air, the MtBE Plaintiffs alleged that discharges of such gasoline had a deleterious effect upon groundwater, with small amounts of MtBE capable of rendering large amounts of drinking water non-potable. Worse still, according to the MtBE Plaintiffs, MtBE-infused gasoline migrated more quickly and over greater distances than did gasoline without MtBE.

15. By letter dated July 8, 1999, Tosco notified Petitioner of its potential MtBE-related liabilities and further notified Petitioner that Tosco considered these liabilities to constitute a single occurrence under the Policy such that Tosco's losses and settlements for its MtBE related exposures could be combined as a single occurrence under the Policy. Given the $102,000,000 attachment point of the Policy, Respondent did not immediately request that Petitioner contribute any indemnity or defense payments for its MtBE liabilities, but instead pursued coverage from its other insurers whose policies attached at lower levels.

16. As the MtBE litigations multiplied, a Multi-District Litigation was established in the United States District Court for the Southern District of New York (Scheindlin, J.) to provide uniform and efficient judicial management. At the outset of the MDL, it became apparent that the fungible nature of MtBE-infused gasoline made it difficult for the MtBE Plaintiffs to identify which particular MtBE Defendant's gasoline was found at a specific pollution site. Seeking to capitalize on the MtBE Plaintiffs' difficulty, the MtBE Defendants moved to dismiss MtBE Plaintiffs' claims in the MDL on the grounds that the MtBE Plaintiffs could not prove causation.

17. Subsequently, in August 2006, Judge Scheindlin issued a decision permitting MtBE Plaintiffs to pursue market share liability. *See In re Methyl Tertiary Butyl Ether Prod. Liab. Litig.*, 447 F. Supp. 2d 289, 293 (S.D.N.Y. 2006). This was a seismic event for the oil and gas industry, resulting in potential liability to the MtBE Defendants not because they polluted a particular site, but upon the allegation that MtBE was a defective product and that their sales of that product created strict liability and damages based upon each defendant's share of the market (*i.e.*, "market share liability"). Not long after Judge Scheindlin's decision, the MtBE Defendants, including Respondent, settled the MDL litigation as a group.

18. After this settlement, Respondent notified Petitioner that its other available insurance was close to exhaustion and that Respondent would soon be seeking coverage under the Policy issued by Petitioner for Respondent's MtBE-related losses. Petitioner and Respondent thereafter engaged in discussions regarding various coverage issues relevant to the claim and, after it became apparent that the parties had disagreements about certain coverage provisions of the Policy, the parties mutually agreed to refer the matter to arbitration.

19. As part of their mutual agreement to refer the matter to arbitration, the parties modified certain terms of the arbitration agreement contained in the Policy. On November 8,

2011, the parties executed a Confidential Agreement for Alternative Dispute Resolution of MTBE Claims (the "ADR Agreement"), which modified the arbitration provision in the Policy in certain important ways. *See* Exhibit 3, ADR Agreement. The ADR Agreement established that arbitration would take place in New York and be governed by New York law. The ADR Agreement also contained a provision in which the parties explicitly set forth the standard that would apply with respect to enforceability of any arbitration award:

> The parties expressly agree that the decision and award shall be non-appealable, final and binding as to coverage for alleged MTBE liabilities of Tosco for all current claims which have been asserted **absent** fraud or **manifest error**.

Ex. 3, ¶ 17. The ADR Agreement also expressly contained the parties' agreement to jointly prepare "Terms of Reference" which would instruct the arbitration Panel as to the issues to be addressed and the manner in which they would be addressed.

20. The Terms of Reference repeated the parties' agreement in the ADR Agreement that the Panel's awards would only be non-appealable, final and binding in the event that they were without "manifest error." *See* Ex. 4, Terms of Reference.

21. The parties executed the Terms of Reference on February 6, 2013, listing the specific issues to be determined by the Panel – including whether and to what extent Respondent's losses were excluded by the Pollution Exclusion or restored by the End Use Exception to the Pollution Exclusion.

22. The Arbitration was commenced on January 25, 2013. A three member arbitration panel was constituted (the "Panel") which was comprised of a retired federal judge sitting as umpire, a practicing lawyer, and a lawyer who had formerly been a senior executive officer of a large insurance company.

23. Before any discovery could be conducted or evidence adduced, Respondent sought a preliminary award from the Panel concerning five legal issues, including a ruling

6

concerning the interplay between the Pollution Exclusion and the End Use Exception. In making that motion, Respondent did not deny that the Pollution Exclusion would apply in the first instance to its claim under the Policy. As the Panel described in its decision on the motion, "[Respondent] makes no effort to claim its MTBE liabilities fall outside the pollution exclusion. It argues, rather, that the [End Use] exception applies to all its otherwise covered liabilities, without any qualifications as to where, when and by whom the pollution took place."

24. In response to this argument, Petitioner contended that Respondent's interpretation of the End Use Exception was so overbroad as to rewrite the Policy such that the Pollution Exclusion would be written out of the Policy. The Panel agreed with Petitioner's position in its decision, stating that "[Petitioner] correctly argues that the [End Use Exception] cannot be read so broadly as to encompass all liabilities covered by the pollution exclusion. It is fair to say that [Respondent's] reading comes close to doing just that."

25. After briefing by both parties, the Panel denied Respondent's motion with respect to the Pollution Exclusion, but deferred until after discovery was complete the question of what Respondent need prove in order to establish the applicability of the End Use Exception. *See* Ex. 5, Panel's June 11, 2013 Summary Judgment Decision.

26. The arbitration thereafter proceeded in multiple phases, with each phase addressing claims around the United States as they were being settled by Respondent.

27. In Phase I, the Panel considered coverage of Respondent's settlement of the MDL litigation and other lawsuits settled by multiple defendants globally. Based upon the evidence that Respondent's liability in the MDL was derived not based on its polluting activities, but rather on the volume of the business it conducted in various markets, the Pollution Exclusion was not deemed to apply to bar coverage: "[t]here was no discussion about particular retail stations

7

or particular releases of gasoline; the [MDL] settlement was based on market share." However, on other grounds, the Panel unanimously denied in substantial part Respondent's claim under the Policy as respects the MDL settlement.

28. Phase II dealt with other of Respondents' settlements in which, as Petitioner understood, Respondent had again resolved on the basis that damages were predicated, not on Tosco having polluted particular sites, but because Respondent had introduced an allegedly defective product into various markets. Again, the Pollution Exclusion was on this basis not deemed to apply. After a hearing and discovery in Phase II, the Panel, again unanimously, granted in part and denied in part Respondent's claim for coverage of the Phase II MtBE cases.

29. Respondent's Phase III claims involved three MtBE lawsuits that Respondent settled in three different markets: the State of New Jersey, the State of Vermont, and the Orange County Water District (the "Phase III claims").

30. Two of these three matters (State of New Jersey, and Orange County Water District) undeniably sought to impose liability upon the Respondent based on the polluting activities of the Respondent and/or based on the polluting activities of persons to whom the Respondent had distributed MtBE-infused gasoline. In other words, Respondent could be held liable if distributions and transfers of its MtBE gasoline could be traced to a contaminated site such as a plume from a leaking underground storage tank.

31. Similar to the proceedings on the summary judgment motion, Respondent did not deny that the Pollution Exclusion applied to the Phase III claims, but (also as on the summary judgment motion) Respondent argued that the End Use Exception should be applied so broadly as to render the Pollution Exclusion ineffective in any instance where a claim arose after the

MtBE gasoline had left Respondent's possession – that is, where the pollution of Respondent's MtBE product was caused not by Respondent, but by the actions of third parties.

32. Petitioner responded to Respondent's argument just as Petitioner had successfully done when the Panel had rejected Respondent's summary judgment motion. Petitioner pointed out that the Pollution Exclusion contains an unambiguous provision which excluded from coverage any liability of the Respondent for pollution "whether or not such discharge of pollutants: (i) results from the Insured's activities or the activities of any other person or entity." Ex. 2 at Exclusion (k).

33. Petitioner quoted governing New York law to the Panel which required that this provision (which neither party argued was ambiguous) must be enforced as written.

34. Petitioner also argued – as it had successfully done on Respondent's summary judgment motion – that Respondent's interpretation of the End Use Exception was so overbroad as to result in the nullification of that portion of the Pollution Exclusion which made the identity of the actual polluter irrelevant.

35. On October 28, 2019, two of the three members of the Panel (hereinafter, "the Majority") issued its Third Partial Final Award (the "Award").

36. In a ruling that cannot be considered consistent with its prior decision on Respondent's summary judgment motion, the Majority declared that the End Use Exception applies to Respondent's liability because that liability was not based upon Respondent's own pollution activities, but upon the activities of third parties, who polluted with MtBE gasoline which was traced back to Respondent as the manufacturer:

> The Policy's Product Exception applies . . . to the entire settlement amount in *New Jersey*, **because that settlement released only claims based on Tosco's product liability for manufacturing MTBE gasoline traced to third parties responsible for the pollution alleged.**

9

Ex. 1, ¶ 93.c.

37. By this ruling in the Award, the Majority completely nullified the provision of the Pollution Exclusion which excluded Respondent's liability for pollution irrespective of "whether or not such discharge of pollutants: (i) results from the Insured's activities or the activities of any other person or entity." Ex. 2 at Exclusion (k).

38. To the Majority, the fact that the MtBE gasoline pollution was caused by the activities of third parties meant the Pollution Exclusion could never apply. Contradicting its own prior ruling on the summary judgment motion, the Majority ruled that the End Use Exception effectively nullified that part of the Pollution Exclusion which declared that it was irrelevant whether it was Respondent or some other party that did the polluting, finding that the End Use Exception applied once Respondent had relinquished control over the MtBE-infused gasoline.

39. The Majority did not base its nullification of part of the Pollution Exclusion upon contract interpretation, but expressly justified its award based upon its own view of public policy and notions of economic efficiency.

40. According to the Majority, its nullification of a portion of the Pollution Exclusion by ruling that the Exclusion barred coverage only where Respondent did the actual polluting served a public policy ground. Specifically, the Majority stated that its holding in the Award is "consistent with New York's Policy of encouraging polluters to exercise care in commercial activities having a potential to cause pollution," under which policy the Pollution Exclusion should only bar coverage for "forms of liability that are within the control of the manufacturer to control." Ex. 1, ¶ 82.

41. Thus, on grounds of public policy, the Majority determined to give no effect to (and thus read out of the Policy) that part of the parties' agreement which provides that

Respondent's coverage for pollution liability is excluded "whether or not such discharge of pollutants: (i) results from the Insured's activities or the activities of any other person or entity."

42. The Majority further supported its nullification of part of the Pollution Exclusion on the ground of economic efficiency. In the Majority's view, it would be "wholly impractical" for the Respondent to be forced to meet its burden of proof under the End Use Exception. As the Majority put it: "It is wholly impractical, moreover, to require a refiner [such as the Respondent] to prove an end use that occurs out of its control and off its property." Ex. 1, ¶ 82.

43. On this ground too, the Majority determined that no effect should be given to that part of the parties' agreement which says that Respondent's coverage for pollution liability is excluded "whether or not such discharge of pollutants: (i) results from the Insured's activities or the activities of any other person or entity." Ex. 2 at Exclusion (k).

## RELIEF REQUESTED

44. The Award must be vacated because the Panel manifestly disregarded the binding terms of the parties' contract, Panel manifestly disregarded black-letter New York law in failing to apply the terms of the parties' contract and therefore issued an arbitration ruling in derogation of 9 U.S.C. § 10(a)(4) in that they exceeded their powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made.

WHEREFORE, for the reasons set forth herein and in papers accompanying this petition, Petitioner requests an Order of the Court;

    a. vacating the Award; and

    b. granting such further relief as the Court deems just and appropriate.

Dated: New York, New York
January 22, 2020

Respectfully submitted,

CLYDE & CO US LLP

By: /s/ Michael A. Knoerzer
Michael A. Knoerzer
Thomas Carruthers
Alex Bein
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
T: (212) 710-3900
F: (212) 710-3950
Michael.Knoerzer@clydeco.us

*Attorneys for Petitioner*