# EXHIBIT 1

IN THE MATTER OF AN ARBITRATION BETWEEN

CONOCOPHILLIPS COMPANY, FORMERLY KNOWN AS TOSCO CORPORATION (hereinafter "Tosco"), Petitioner

-- and –

HDI-GERLING INDUSTRIE VERSICHERUNG AG, FORMERLY KNOWN AS GERLING KNOZERN ALLGEMEINE VERSICHERUNGS – AG (hereinafter "Gerling"), Respondent.

---

## THIRD PARTIAL FINAL AWARD

---

## I.    **Introduction**

1. Tosco filed its claim commencing this arbitration on July 25, 2013.  (Joint Exhibit (hereinafter "JX") 75.) The claim was revised on January 10, 2014, and again on February 25, 2014.  (JX 700 & 644.) In its most recent form, the claim seeks indemnity and defense costs of $16,741,266.93 from Gerling under its Policy No. 509/DL253098 (hereinafter "the Policy"), issued by Gerling's London office to Tosco which was bound on July 30, 1998, and effective August 1, 1998 through July 31, 1999.  (JX 1 & 70-71.) The Policy provides Tosco with $100,000,000 of coverage excess of a $100,000,000 over Tosco's retention of $2,000,000. Gerling's share of this $100,000,000 layer is 50%.

2. <u>The Parties.</u> Claimant Tosco was at the time the Policy became effective in 1998 a refiner of gasoline and seller of other petroleum products with over 5,000 retail-marketing locations. (JX 8.) In 2001, Tosco was purchased by Phillips Petroleum Company (hereinafter "Phillips"), which in 2002 merged with Conoco, Inc. (hereinafter "Conoco") to become ConocoPhillips Company (hereinafter "COP"). (JX

1

600 & 601.) Tosco is represented in this arbitration by the law firm of Reed Smith, LLP, specifically John Ellison, Esq., Richard Lewis, Esq., and Shruti Engstrom, Esq. Respondent Gerling was at the time the Policy became effective a German insurance company providing coverage to global entities in several sectors, including oil refining. The current company is the product of a merger in 2006 of two related entities, followed in 2007 by an agreement with National Indemnity Company (hereinafter "NICO"), a Berkshire Hathaway entity, pursuant to which NICO agreed to provide 100% reinsurance to Gerling for certain risks, including the Policy. NICO assigned responsibility for handling Tosco's claim against Gerling to Resolute Management, Ltd. (hereinafter "Resolute") commencing on September 30, 2007. (Witness Statement of Kevin Lewis (hereinafter "Lewis Statement"), Paras 3-4.) Gerling is represented in this arbitration by the law firm of Clyde & Co US LLP, specifically Michael A. Knoerzer, Esq., Thomas Carruthers, Esq., and Alex Bein, Esq.

3. <u>First Partial Final Award.</u> The present Review Board (hereinafter "Board") issued a Partial Final Award (hereinafter "PFA") in this arbitration on September 16, 2014, determining the allocation of liability and available insurance coverage for the amounts paid in four Global Settlements (the "MDL" settlement) concerning damages caused by the distribution of gasoline containing MTBE. The Board held that the portion of the $53,459,995 paid by COP in the MDL settlement that was properly allocable under New York law to the insurance policy Tosco had with Gerling was 33.4% of the total amount contributed by COP, or $17,854,076.76. The Board also ruled that the same percentage of expenses incurred would be considered allocable to Tosco. On October 17, 2014, Tosco moved for partial reconsideration of the PFA, and

Gerling responded by seeking denial of Tosco's motion or in the alternative partial reconsideration on its own behalf. The Board denied reconsideration in an Order dated April 5, 2015.

4. <u>Second Partial Final Award.</u> The Board issued a Second Partial Final Award on August 24, 2017 (hereinafter "PFA2"). A majority of the Board declined to modify the PFA to include a deduction based on evidence that spill liability was a factor relied on in the Baron-Weitz settlements; agreed to consider motions by either Party at an appropriate time regarding sanctions based on untimely discovery by Tosco or unfounded accusations by Gerling in the *New Hampshire* litigation*;* awarded indemnity and expenses to Tosco in the total amount of $51,717,051.92 based on six categories of cases; permitted certain motions; required Tosco to comply with Policy Conditions (d), (e) & (g) in all ongoing claims; and retained jurisdiction to hear and decide additional disputes that are part of the single occurrence under the Policy at issue.

5. <u>Procedural Orders.</u> The Board resolved several disputes between the Parties before and after issuing PFA2 which are relevant to this Third Partial Final Award (hereinafter "PFA3"). These are described and discussed below.

6. The Board hereby incorporates into this PFA3 both prior PFAs and all its Procedural Orders referred to herein, including its Order No. 1 Concerning Cross-Motions to Compel and Tosco Motions for Partial Summary Judgment, issued on June 11, 2013 (hereinafter "Order No. 1").

7. <u>Pending Disputes.</u> The current stage of this proceeding involves claims for coverage based on three settlements entered into by Tosco, for which coverage has been denied

by Gerling: (1) claims by the State of New Jersey Department of Environmental Protection (hereinafter *"New Jersey"*) settled for $39 million; (2) claims by the Orange County of California Water District (hereinafter *"OCWD"*) settled for $4.8 million; and (3) claims by the State of Vermont (hereinafter *"Vermont"*) settled for $316,666.66. Gerling argues that Tosco is not entitled to coverage under the Policy for these settlements, because Tosco failed to provide Gerling with sufficient information for Gerling to determine whether to consent to the settlements; because Tosco failed to seek or secure Gerling's consent to the settlements; because the *New Jersey* and *OCWD* settlements are excluded from coverage by the Policy's Pollution Exclusion; because coverage of the *OCWD* settlement is barred by a statute of limitations; and because Gerling's failure to grant its consent to Tosco's claims based on the *New Jersey* and *OCWD* settlements is reasonable given Tosco's failures to satisfy the Policy's requirements. As to the *Vermont* settlement, Gerling contends it should be allocated equally among Tosco, Conoco, and Phillips, because it was agreed on a cost-of-defense basis.

8. Tosco responds that it provided adequate information to enable Gerling to exercise its right to consent to Tosco's claim for recovery of the full sums paid pursuant to the three settlements but that Gerling failed to respond to Tosco because Gerling was determined unreasonably to deny coverage; it also argues that the *New Jersey* and *OCWD* settlements are not excluded from coverage by the Pollution Exclusion due to the Product Liability exception, that coverage of the *OCWD* settlement is not barred by a statute of limitation, and that Gerling's failure to consent to Tosco's claims under those two settlements is unreasonable in light of the risks faced by Tosco of far more

costly judgments. As to the *Vermont* settlement, Tosco notes that the Board has in PFA2 rejected the argument that settlements made on a cost-of-defense basis should be allocated equally to the three COP entities where the evidence before the Board indicates that only Tosco could have faced potential liability in the suit at issue.

9. <u>Rules of General Applicability.</u> The Board will continue to use the name "Tosco" to signify that it is the company whose insurance coverage is at issue, but will use the name "ConocoPhillips" or the abbreviation "COP" when necessary to make clear that COP has owned Tosco through Phillips since 2001, and has been the legal entity that has been sued and has reached settlements in the pending cases. While the issue of what portion of a settlement is allocable to each of the three entities making up COP has been significant at prior stages in this arbitration, Gerling has advanced no evidence to support an allocation of any of the potential liability faced by Tosco to Conoco or Phillips in any of the three settlements at issue.

10. The Parties have agreed that the Policy at issue is to be construed in an evenhanded fashion. See Order No. 1, p.2. Tosco bears the burden of proof under New York law to establish coverage, whereas Gerling bears the burden of proof to establish exceptions to coverage. See, e.g., *Consolidated Edison Co. of New York, Inc. v. Allstate Ins. Co.,* 98 N.Y.2d 208 (2002). The Parties have agreed since the outset of this arbitration "that Tosco is entitled to recover for 'reasonable' settlements reached in good faith of claims posing 'potential' liability covered by the Policy. Actual liability need not be established." The Board has also previously ruled that the reasonableness of settlements under New York law "must be judged on the basis of the facts known to and conclusions reached by the insured at the time it settled. See, e.g., *Luria Bros. & Co.*

5

*v. Alliance Assurance Co., Ltd.,* 780 F.2d 1082, 1091 (2d Cir. 1986)." Order No. 1, p.12. This may include, the Board has noted, Tosco's "judgments, 'opinions', and estimates, for example, as well as such considerations as the manner and methods by which Tosco went about making its judgments." Id. at 13.

11. Tosco argues that it has produced "a great deal of discovery" about the cases at issue in this proceeding, and that its understanding is that discovery was "complete" and that therefore Gerling should have no possible argument that Tosco failed to provide sufficient information. Tosco Initial Submission, p.4. The Board believes, however, that completion of the discovery process prior to the hearing of this matter does not preclude Gerling from arguing that Tosco failed to provide information sufficient to enable Gerling to exercise its right to consent to the settlements in that Tosco failed to provide, in response to requests by Gerling, information Gerling contends was necessary for Gerling to exercise its right to consent.

12. Gerling notes in the present proceeding that it did not refuse to consent to any of the three settlements at issue, and did not deny coverage, but only reserved its rights. This statement appears to be accurate, but the Board notes that Gerling repeatedly asserted that Tosco had failed to satisfy its obligations to provide information sufficient for Gerling to determine whether to consent, and at this point Gerling has clearly asserted that Tosco is not entitled to coverage of any part of the *New Jersey* or *OCWD* settlements, and to at most one-third of the *Vermont* settlement.

II.   **Alleged Failure by Tosco to Provide Necessary Information and to Seek or Obtain Gerling's Consent.**

    A.   *Tosco's Position on Information and Consent.*

13. Tosco continues to regard Gerling's conduct in this litigation as sufficient to justify a ruling that Gerling lost its rights under the Policy. The Board has rejected that position, however, and Tosco does not rely on it in Phase 3. Rather, Tosco contends that it has complied with the Policy's obligation to provide Gerling with information adequate for Gerling to exercise its right to consent to coverage of Tosco's claims under the settlements, and that Gerling acted unreasonably in failing to consent to Tosco's claims. Tosco rejects the notion, advanced by Gerling, that it has deliberately failed to recognize that the claims in the three cases at issue are "different" from the claims in the earlier phases of this arbitration, in that these are not "market share" cases but "spill liability" cases; Tosco notes that it has never claimed these are market share cases, and that the record establishes that the cause of action pursued in these cases is the same as the Duane Miller firm has pursued in many of the cases in Phases 1 & 2, specifically for product liability on the basis of tracing Tosco's MTBE gasoline to third parties responsible for spills.

14. Tosco notes that, in determining Tosco's responsibility to provide information to Gerling, the Board should take into account that, while it has ruled that the Policy's rights and duties remain in effect, those rights and duties were modified on April 7, 2018, in Phase 3, PO No.1 (pp.9-10). That ruling, which was issued after the settlements in the three cases at issue had been reached, established that Gerling had no right to "associate" with Tosco in litigation and had the following rights to information regarding settlement negotiations:

> Tosco must, therefore, in addition to informing Gerling of all significant developments in the remaining MTBE cases on a quarterly basis, provide Gerling within four business days with information, correspondence, or documents Tosco obtains that are potentially relevant to any of the issues still being litigated in this

proceeding or other issues that could properly be raised; in particular it must advise Gerling of any plans for settlement negotiations before such negotiations commence.

15. *New Jersey.* Tosco states that its production of information related to *New Jersey* began in 2013, and included Mr. Lyons' letter dated November 20, 2014 giving Gerling a detailed update on *New Jersey*, pointing out that the case was brought by the same lawyer who had brought the *OCWD* case, Mr. Miller, who Gerling knew preferred to sue on the basis of "product tracing" as opposed to "market share". Tosco argues that Gerling was well aware that the *New Jersey* and *OCWD* cases were not "market share" cases, but rather were product liability cases based on the tracing of MTBE gasoline made by Tosco to third parties, like the *South Tahoe* case in which Duane Miller attempted to trace Tosco's product from its refinery to a station not owned or operated by Tosco. As John Lyons testified: "The evidence was going to involve delivery records to jobbers or wholesalers from refiners; and delivery records from those jobbers or wholesalers to gas stations." Judge Scheindlin had "distinguished product liability and leaker liability: 'negligence claims against manufacturers are distinct from negligence claims against the retailer who spilled gasoline – **the manufacturer's breach would be distributing a dangerous product, or failing to provide warnings as to the use of a product,** while a spiller's breach would be failing to prevent leaks on its property." Phase 3 Supplemental Witness Statement, pp.2&4 (emphasis in original).

16. Tosco reported in a letter dated November 23, 2016 that the New Jersey action had been stayed as the parties were engaged in mediation. A letter from Mr. Ellison to Gerling dated December 15, 2016, after the Board's Phase 2 PO No.4 requiring Tosco

to provide certain information, stated that the November mediations had been "fruitless", but that on December 12 "there was a further discussion with the mediator related to the State's demand to [COP], which resulted in an understanding between the parties in principle." Gerling responded to this letter on December 16, 2016 that "as we have told you repeatedly, COP is in breach of its obligations to Gerling [in that] COP had failed [to] provide the information Gerling has requested concerning the NJDEP matter and its settlement . . . and until COP addresses these failures, COP should assume that Gerling will not be obligated to cover the settlement under the Policy."

17. This exchange was followed by the letter from Mr. Lyons to Mr. Knoerzer dated January 26, 2017 informing Tosco that COP had reached a "potential" settlement with New Jersey (a draft of which was included with the letter) whereby COP would pay $39 million "for a full release of all claims regarding injury to the waters and other property of the State caused by MTBE." Tosco contends that Mr. Lyons provided Gerling in this letter several reasons and facts that made clear that the $39 million amount was reasonable in light of the risks faced by COP. In particular Mr. Lyons noted that Tosco faced potential liability for producing MTBE gasoline that could be traced to some 450-500 stations, among the 5000 or so stations claimed by New Jersey to have been responsible for damaging spills. This claim would be difficult to overcome, Mr. Lyons stated, and based on other outcomes in MTBE litigation could lead to liability far in excess of the $39 million. Mr. Lyons also noted in the letter Tosco's position that the settlement amount was based entirely on Tosco's potential liability for sales of MTBE gasoline to third parties stating (p.1): "in this JCO [Judicial

Consent Order] the State acknowledges that prior to this litigation ConocoPhillips entered into a valid and enforceable settlement and release of all damages relating to sites owned, operated or affiliated with ConocoPhillips. Hence, this JCO specifically settles only claims related to the sales of MTBE gasoline to third parties."

18. Gerling responded to Mr. Lyons' letter on February 10, 2017, with many demands for information, including specifics as to why Mr. Lyons had become involved in the MTBE litigation after retiring, as well as other matters including the 450-500 sites to which he claimed Tosco may be "connected," specifically: "Please (i) identify these sites; (ii) explain how each is 'connected' to any activity of Tosco, COP, or any COP entity; and (iii) identify which of these sites have been (at any time) owned, operated, controlled, affiliated with or leased by COP and the dates of such ownership, operation, control, or lease." Mr. Lyons responded adequately to these requests, Tosco contends, by explaining that he had resumed the representation of Tosco after his partner who had taken charge died, and that identifying the 450-500 sites and why they were potentially connected to Tosco was too "difficult to determine." Tosco contends the request for identification of specific sites was unnecessary in that the analysis adopted by Tosco was obviously based on its sales to wholesalers and its estimate of the number of sites likely to be shown to have bought and sold Tosco MTBE gasoline out of the 5000 or so sites targeted by New Jersey. Mr. Lyons did agree to provide the Master Site List prepared by New Jersey of the 5000 sites at issue in the litigation, as well as other specific information. This information was sufficient to permit informed consent, Tosco contends.

19. Tosco recognizes that it originally faced potential liability in New Jersey for spills for which it was directly responsible, both from Tosco-owned, operated, or affiliated gas stations in New Jersey, as well as from Tosco's Bayway refinery in Linden, New Jersey. Tosco contends, however, that it faced no potential liability for spills from Tosco-owned, operated or affiliated stations by the time of its settlement with New Jersey, because COP had been released by the New Jersey Department of Environmental Protection ("NJDEP") on November 21, 2005 from all such liability in the Natural Resource Damage Settlement Agreement ("NRDSA"), subject to certain conditions that were deemed satisfied in the 2006 Natural Resource Damages Release ("NRDR"). These documents, in Tosco's view, which Tosco provided to Gerling, establish that Tosco received a full release from spills for which Tosco was directly responsible, except for spills on the property of the Bayway refinery for which Tosco claims it has neither paid nor received a release.[1] The NRDSA, Tosco notes, explicitly excepted Bayway from that settlement, and nothing in the settlement at issue altered that conclusion. Tosco contends that, since it faced no liability for spills from sites for which Tosco was responsible, no part of the settlement amount is attributable to such potential liability, and that it follows from that conclusion that Tosco had no obligation to provide information related to such potential liability.

---

[1] Tosco stated in its initial submission (p.5) that Bayway was not one of the sites at issue in New Jersey. Gerling established, however, that Bayway was included among the sites for which New Jersey might seek damages. Tosco responds that the spills at Bayway pose no significant potential liability for Tosco. See Lyons Supplemental Affidavit, pp.5-7, contending that Duane Miller "never included any alleged liability for pollution at Bayway because the State's case against Tosco was based on the large supply of gasoline from Bayway to wholesalers and independent retailers."

20. The Parties strongly dispute the scope and meaning of the 2005 and 2006 agreements on which COP relies in contending that Tosco liability for spills at its own sites was fully released.[2] Tosco notes that the 2017 settlement agreement at issue here – the Judicial Consent Order ("JCO") – "specifically references the all-inclusive downstream releases which had previously been given in the NRDSA" and then releases COP for all Natural Resources Damage caused by MTBE gasoline supplied by Tosco to third parties, or its "Upstream Activities". Phase III Post-Hearing Submission, p.2. Tosco refers in this respect to the definition in the JCO of "Upstream Activities", which "do not include a discharge of an MTBE Product at or from a facility . . . in New Jersey that occurs at a time that the facility is owned or operated by a Settling Defendant while the Settling Defendant is engaged in the manufacture, sale, supply, distribution, exchange, transfer, purchase, trading, marketing, and/or branding of MTBE or gasoline with MTBE." JCO, p.10. The broad release issued in Paragraph VI(a) of the JCO, Tosco contends, is limited (i.e., "premised upon") "Settling Defendants' Upstream Activities." JCO, p.12. The Tosco activities excluded from the JCO's release, Tosco contends, are recognized in the JCO (p.4) as having been settled and released in the NRDSA:

> The 2005 NRDSA remains in force as written and nothing in this JCO shall be construed to limit or narrow any of the matters released in the 2005 NRDSA which apply to all sites which have been owned, leased, affiliated with and/or operated by the Settling Party . . . .

---

[2] Gerling relies on Tosco's payment of a settlement concerning the HP Delta Service Station as a "tacit acknowledgement that it [Tosco] maintained exposure for 'leaker pays' liability" after the NRDSA, but Tosco notes that the station was never owned by Tosco or any other COP entity and that its payment in connection with that station was based on potential liability for supplying MTBE gasoline that it had produced. Initial Submission, p.5.

21. Tosco refers specifically to the NRDSA's broad language, which states: "This Settlement Agreement covers sites including known and unknown," petroleum related facilities, "and all environmental media affected by a discharge of any hazardous substance including petroleum hydrocarbons . . . from any known or unknown site . . . located in the State of New Jersey, which have been owned, leased, affiliated with and/or operated by the Settling Party . . . ." Para. 2. Tosco acknowledges that this release was conditioned on compliance by COP with Paragraph 14 of the NRDSA, but it argues that COP fully complied with those requirements, and that the 2006 NRDR expressly confirms such compliance in Paragraph 6: "ConocoPhillips Company has complied with paragraph 14 of the" NRDSA.

22. Tosco rejects Gerling's position that the NRDR had the effect of narrowing the release granted COP in the NRDSA. Its position is that the Attachments to the NRDSA, A-1 and A-2, listed the "known" contaminated sites for which Tosco was responsible, and that the reference to them in the NRDR was solely for the purpose of making clear that COP had satisfied all its responsibilities regarding the sites listed on those Attachments, and was not for the purpose of limiting the release provided in the NRDSA to those "known" sites, as Gerling contends. Tosco maintains, therefore, that it had a full release from New Jersey by 2006 for all its spill liability based on stations that it owned, operated or with which it was affiliated; that it has never obtained from New Jersey a release concerning spill liability from its Bayway refinery, which is explicitly excluded from the NRDSA; and that therefore the settlement it paid to New Jersey was entirely for its "Upstream" liability, i.e., its product liability based on

tracing its MTBE gasoline to spills from third party sites.[3] The information it provided Gerling regarding the Upstream product liability for which it was released in the JCO, Tosco contends, was ample to enable Gerling to consider and consent to the settlement, and Gerling acted unreasonably in failing to consent given that Tosco's potential liability could have ranged from $250 million to $600 million.

23. *OCWD.* Tosco contends that it provided Gerling ample information regarding the *OCWD* settlement. Mr. Ellison's letter of November 20, 2014, for example, informed Mr. Knoerzer that it was difficult to estimate the potential liability and cost of litigating *OCWD*, because the court had not determined how many trials would be held concerning the 100 or so sites involved. "Settlement discussions are currently at a standstill," he wrote. OCWD had demanded $14 million "last year," and Phillips 66 had offered $4 million, which Mr. Miller rejected. In a letter dated November 23, 2016 Mr. Ellison informed Mr. Knoerzer that a negotiation between the parties had taken place on October 14, 2016 but that no progress was made. On June 26, 2017 Mr. Lyons wrote to Mr. Knoerzer that OCWD's counsel had indicated that his client would "release Tosco and its successor entities from all claims related to product liability for MTBE gasoline sold and delivered to customers for $4.8 million." He said terms were being drafted and that he expected to send Gerling "a version of an agreement which would be acceptable to claimant's counsel next week. Let us know if you have any questions."

---

[3] Mr. Lyons states that COP acted consistently with this position in rejecting a demand from LukOil for indemnification for spill liability from one of Tosco's previously owned gas stations, on the ground that all such liability had been released by New Jersey. See Letter of Thurlow to Socolow, November 26, 2016, Exhibit 2, Lyons Reply Affidavit.

24. About five months later, on November 2, 2017, Mr. Lyons wrote to Mr. Knoerzer that the parties in *OCWD* had finalized a settlement agreement for $4.8 million, a copy of which would be supplied by Reed Smith "for your records." The letter then provides information about the case, and specifically that the trial was to involve 16 sites from seven focus plumes out of the more than 100 sites alleged by OCWD "(Non-Focus Plume Sites"), two of which had been purchased by Tosco from Unocal in 2000. It then described Tosco's potential liability as follows (pp.1-2):

> Tosco's position is it had no liability at these two Unocal sites, which involved releases prior to Tosco's acquisition of Unocal assets. As to the Non-Focus Plume Sites, Tosco had potential liability related to the supply of MTBE gasoline from Tosco's Los Angeles Refinery . . . .  Despite these strong defenses, the settlement was the most reasonable course of action given recent unfavorable trial court rulings, the uncertainty surrounding Tosco's potential liability arising from the sale of MTBE gasoline to third parties, the potential for damages surrounding claims for the failure to warn these customers, the potential for Tosco to be implicated in a portion of the 100 sites alleged to be at issue, the significant defense costs that would be incurred at trial for the Focus Plume Sites, and the risk of an adverse verdict if P66 proceeded to trial. . . . Please contact Reed Smith if you need further information.

25. Gerling made further requests for information, and Tosco supplied substantial amounts of litigation documents and other materials regarding *OWCD* to Mr. Knoerzer, as reflected in letters dated January 19 and 30, 2018. These materials, Tosco contends, and the analysis that accompanied them, were sufficient to enable Gerling to exercise its authority to consent to the settlement. Tosco contends that the only liability it faced was its product liability for manufacturing MTBE gasoline that was traced to third parties responsible for causing spills and other damage to water resources. It contends that it faced no liability for spills from the UNOCAL sites it bought in 2000, because by that time MTBE spills were much more efficiently avoided and managed.

26. *Vermont.* Tosco contends that it "did everything in its power to keep Resolute apprised of the negotiations and settlement in <u>Vermont.</u>" COP Reply, p.18. In addition to providing all the basic litigation documents in the case, Tosco provided periodic updates, including as to the start of negotiations. It did not have much to report, other than some procedural victories that reduced the defendants' potential liability. No mediation took place, and no discovery was taken.

27. COP informed Gerling on September 7, 2018 that COP had recently been approached by Exxon with a request that it participate on a pro rata basis in a group effort by refiners to settle the pending MTBE litigation in Vermont. Gerling responded by letter dated October 3, 2018 requesting eleven categories of information related to any mediation and any discussions concerning liability. On October 8, 2018, Mr. Ellison wrote in response explaining that no discovery had occurred, and that Exxon's proposal was that each defendant pay an equal amount towards a settlement and stating that no allocation of liability among the COP entities would be made, since only Tosco faced any potential liability in New England based on the gasoline distribution system in that region. COP provided Gerling a draft settlement agreement on November 26, 2018, a revised draft on January 24, 2019, and the final agreement on March 5, 2019 requiring the payment of $316,666.66.

B. *Gerling's Position on Information and Consent.*

28. Gerling contends that Tosco failed to provide adequate information regarding the three settlements, or to seek or secure consent, because Tosco was determined to relieve itself of any obligations under the Policy. It argues that Tosco deliberately disregarded its obligations. It refers to Phase 2 Procedural Order ("PO") No.4, issued

by the Board on November 25, 2016, which described some of Tosco's discovery shortcomings and instructed Tosco to provide specific information to Gerling concerning negotiation of potential settlements. Gerling states that COP also allegedly "called Mr. Lyons out of retirement so that he could recast the settlement agreements and mischaracterize the facts and exposure confronting COP when it negotiated settlement." Gerling's Phase III Submission (hereinafter "Gerling"), p.4.

29. Gerling argues that Tosco faced liability at the time of the *New Jersey* and *OCWD* settlements, not only for product liability for damages from spills at third-party sites to which Tosco-made MTBE gasoline could be traced, but also for spills from Tosco-owned, operated, or affiliated sites. Id. at 6. It contends that the evidence demonstrates that Tosco failed to provide sufficient information to enable Gerling to determine whether to consent to any of the three settlements at issue.

30. *New Jersey.* Gerling contends that the information provided by Tosco prior to its settlement with New Jersey, along with the materials provided by Tosco subsequently pursuant to Gerling requests, was insufficient for Tosco to satisfy its obligation to provide Gerling the information it needed to decide whether to consent to the settlement, or to satisfy its obligation to seek and obtain Gerling's consent. It notes that the January 26, 2017 letter from Mr. Lyons announcing the settlement in principle does not explicitly request Gerling's consent; that the settlement described was "contingent' on the approval of senior management at COP, as well as of the NJDEP; and that, contrary to Mr. Lyons' description of the settlement's scope, the settlement on its face covered "all claims," including New Jersey's claim for damages caused by spills from the COP (i.e., Tosco)-owned, operated, or affiliated stations, as

17

well as from Tosco's Bayway refinery. It stresses that Paragraph K of the draft JCO provided with the January 26, 2017 letter, in language which is included in the final settlement, states: "The releases and covenants not to sue and reservations contained in the JCO apply to certain liabilities including those for discharges of MTBE products that occurred at sites while they were owned, leased, branded and/or operated by Settling Defendants." This provision, Gerling contends, establishes that the $39 million settlement covered *all* Tosco's potential liability, including for direct spills from Tosco-owned sites subject to the Policy's Pollution Exclusion. While Tosco provided some information about its liability for third-party spills, Gerling argues, it provided no information relevant to potential liability for its own spills based on the erroneous premise that it faced no such liability. Based on this conclusion Gerling, on February 10, 2017, requested among other disclosures various categories of information related to the 450-500 sites Lyons had estimated in his January 26th letter may be "connected" to Tosco activities, including a list of those sites, and "all documents reflecting any [evidence] concerning COP's alleged or potential liability for MTBE leaked from a specific site." Exhibit G12, pp.5-6. Gerling reasoned that, "if COP was settling liability for MTBE at sites that it owned, leased, or operated, then it was settling liabilities that were likely subject to the Pollution Exclusion." Phase 3 Summation, p.38.

31. On May 9, 2017, Tosco (through Mr. Lyons) offered to disclose the "Master List" of 5000 sites and other information, but refused to provide a list of or to identify the 450-500 sites Lyons had estimated could be "connected" to Tosco, or to provide evidence related to the potential liability for leaks from any specific Tosco-connected

site. Mr. Lyons wrote that the identity of such sites would be "difficult to determine," that Gerling's requests were overly burdensome, vague, and oppressive, and that the evidence of liability was "non-existent and/or privileged." Id. at 39. Gerling notes, moreover, that Mr. Lyons failed to disclose in his May 9 letter that Tosco had executed the New Jersey settlement four days earlier on May 5, 2017, thereby misleading Gerling as to the status of the litigation.

32. On October 4, 2017, after the Board had issued PFA2 on August 24, 2017 reiterating Gerling's right to receive information and to be given the opportunity to consent to settlements, Gerling made a further request for information. It stated that it needed to know "whether any portion of the claim might not be within the Policy period or Policy conditions (e.g., pollution exclusion)." Exhibit G14, pp.1-2. Mr. Ellison responded in a letter dated October 16, 2017, that he "wished to correct what appear to be some misunderstandings on Resolute's part as to the settled and open claims. New Jersey was settled earlier this year for $39,000,000, as Tosco previously explained to Resolute in correspondence from John Lyons dated January 26, 2017. Tosco and plaintiffs in Orange County Water District have a settlement in principle for $4,800,000, which Tosco previously explained to Resolute in correspondence from John Lyons dated May 9, 2017."  Gerling responded on October 30, 2017 that Tosco was in breach of its obligations. Tosco thereafter provided information concerning the settlements, but too late in Gerling's view to satisfy its duty to provide information needed to evaluate the settlements, or to seek and secure consent, as the Policy requires. All the information provided by Tosco, moreover, related to Tosco's potential liability for sales of its MTBE gasoline to third parties, on the premise that no

part of the settlement amount was attributable to spills from Tosco-owned or operated sites or at Tosco's Bayway refinery. This premise, Gerling contends, is mistaken, and Tosco is therefore clearly in breach of its duty to provide information as to such potential liability or to seek and secure consent for the settlement of such potential claims.

33. Gerling argues that clear and unambiguous language of the JCO establishes that Tosco remained potentially liable at the time of the settlement for spills at its own sites, as well as at the Bayway refinery. As noted, Gerling cites Paragraph K of the 2017 JCO (p.5) and argues: "For Paragraph K to be construed to have meaning . . . it necessarily follows that – at the time that the 2017 JCO was being negotiated – both COP and New Jersey acknowledged that COP faced exposure for MTBE discharges at sites that COP owned, leased, branded and/or operated." Post-Hearing Submission, p.2.

34. The language of Paragraph K, Gerling contends, undermines Tosco's claim that its potential liability for spills from its own sites had been settled and released in the 2005 NRDSA, subject to certain conditions that were deemed satisfied in the 2006 NRDR. In fact, Gerling argues, the NRDSA is properly read, not as a release, but as a settlement subject to certain conditions, and expressly contemplating a release in the form of the NRDR. In support of this position Gerling cites Paragraph 20 of the NRDSA which refers to two preconditions to the issuance of the contemplated "release": the payments and other actions contemplated in Paragraph 14, as well as the requirement that the comments made by the public during the comment period do not disclose facts that the NJDEP considers serious enough to undermine the settlement:

Ninety (90) calendar days after the end of the public comment period referenced in Paragraph 18 above, if the Department receives no comments or receives comments

that do not disclose facts of considerations that indicate to the Department in its sole discretion that the Settlement agreement is inappropriate, improper, or inadequate and the Settling Party has fully complied with Paragraph 14 above, the Department will issue a Release/Covenant Not to Sue to the Settling Party, consistent with this Settlement Agreement, that fully and forever releases, covenants not to sue, or to not otherwise take administrative action against the Settling Party and its predecessors, successors, assigns, parents, subsidiaries, officers, directors and employees for Natural Resource Damages, except in the instance where such person has independent liability for the discharge of hazardous substances at any Site.

35. This language establishes, Gerling contends, that the NRDSA is a settlement agreement, and nothing in Attachment B of the NRDSA undercuts this conclusion. That Attachment, Gerling argues, sets out that the "goal" of the NRDSA was to resolve "all potential liability of the Settling Party for groundwater natural resource damages," but Attachment B and the NRDSA do no more in seeking to reach that goal than to establish a "procedure to review, analyze and reach settlement regarding groundwater natural resources damages." That procedure involved identifying the "known" sites, listing them in Attachments A-1 and A-2, and having the Settling Parties provide land to the State "as compensatory ecological restoration for every acre of plume size at the remediation sites listed in Attachment A-1," as well as land in the same proportion as "100% compensation for the groundwater natural resource damages recoverable by the Department at those sites listed in Attachment A-2." COP purchased and gave the State 73 acres to substitute for the 73.6 acres of contamination at the 43 known sites in Attachments A-1 and A-2. The NRDSA also required a payment by COP of $39,800 for "assessment costs associated with settlement of Natural Resource Damages," a statutory fee, Gerling contends, and not a payment as compensation for any sites beyond those listed as "known." The "additional premium" referred to in Attachment B, Gerling notes, for sites which COP

had already divested itself, is nowhere described and is not mentioned in the press release issued by the State in December 2005. While Paragraph 2 of the NRDSA states that it covers both known and "unknown" sites, Gerling contends that this description does not make the NRDSA into a "release"; "if Paragraph 2 were intended to have the effect of a release, the discussion in Paragraph 20 concerning the future issuance of a release would make no sense, and there would have been no need to issue the 2006 release." Post-Hearing Submission, pp.6-8. Nor does any of the other provisions of the NRDSA, Gerling argues, actually release COP for groundwater damage, including the remediation obligation.

36. The "release" ultimately issued to COP, Gerling contends, is the 2006 NRDR. And that document is expressly limited to releasing liability for the 43 sites specified in Attachments A-1 and A-2. While Gerling notes that Paragraph 10 of the NRDR releases COP "for any and all of the New Jersey Department of Environmental Protection's and the Spill Fund's causes of action for Natural Resource Damages," it contends that Paragraph 2's language is what defines the scope of the release of COP liability, and that language is limited to the 43 listed sites:

> The contaminated sites that are the subject of this Natural Resources Damages Release are listed and described in Attachment A-1 and A-2 incorporated herein by reference (properties) . . . .

"Whatever might have been contemplated by the 2005 NRDSA," Gerling contends, "the release that was actually issued in 2006 made no reference to all "known or unknown" sites . . . but was instead limited to 43 specifically identified sites."

37. Gerling claims that its reading of the NRDSA and NRDR explains why Paragraph K is included in the JCO expressly releasing "certain liabilities, including those for

discharges of MTBE Products that occurred at sites while they were owned, leased, branded and/or operated by Settling Defendants." Paragraph K is the release that applies to all the "unknown" sites, Gerling argues, i.e., those not included in Attachments A-1 and A-2 and released in the NRDR. COP fails even to mention this provision in its post-hearing submission, Gerling notes, and the unambiguous meaning of the language includes all the sites not released in the NRDR, as well as the Bayway refinery which is expressly excluded in the NRDSA. The number of such sites, Gerling states, should be implied from the roughly 200 stations Tosco acquired from Exxon in 2000, some 182 of which were listed on the 2016 Revised Master Site List prepared by plaintiffs, "demonstrating unequivocally that COP was exposed to liability in New Jersey at these sites at the time that it entered into the 2017 JCO. Given the 2006 NRDR's prior release of COP's liability at 43 of its own sites, COP retained exposure to liability," Gerling contends, "with respect to at least 139 of the 182 COP sites included on the Revised Master Site List. These 139 sites, plus the Bayway Refinery, fully explain why Paragraph K was included in the 2017 JCO." Id. at 14.

38. Gerling deals with COP's reliance on Article VI of the JCO as a counter to Gerling's arguments by reading it as having two parts: the first releasing COP for MTBE discharges; and the second excluding liability based on "Upstream Activities," which Gerling views as irrelevant, "because a release for such discharges was granted in the first part of VI(a). Nothing in Article VI changes the meaning of Paragraph K . . . ." Id. at 15. Paragraph H of the JCO states, as Tosco notes, that "The 2005 NRDSA remains in force as written and nothing in this JCO shall be construed to limit or narrow any of the matters released in" that agreement. Gerling argues, however, that this language

does no more than confirm that the NRDSA "remains in force as written. Paragraph H does not turn the 2005 NRDSA into a release." Gerling notes in this regard that Mr. Lyons tried unsuccessfully to modify Paragraph H to make explicit the position Tosco is presently asserting, i.e., that the 2005 NRDSA released COP from all damages based on releases from its sites, known or unknown, and "Accordingly, because such claims were previously released by Plaintiffs or have been reserved with the exception of claims relating to Upstream Activities, this agreement does not provide a release from these released claims related to spills, releases of accidental discharges of gasoline containing . . . MTBE . . . at any known or unknown site owned, operated, or leased by ConocoPhillips in New Jersey." This effort by Mr. Lyons, however, to obtain New Jersey's recognition in the JCO that the claims for liability for spills from Tosco owned or operated sites were previously released, was "rejected" by New Jersey, Gerling states, thus supporting Gerling's view of the parties' understanding on this issue. That understanding is further supported, Gerling argues, by a statement made by the State's lead trial lawyer, Michael Axline, on the record during a 2008 hearing in the case – after the NRDSA and the NRDR, and before the JCO – that "we are also suing over releases from terminals, refineries, gas stations." Summation, p.80.

39. Gerling also rejects Tosco's effort to minimize the significance of spills at its Bayway refinery. Remediation at Bayway, Gerling argues, is not the issue; the release in the JCO relates to damages by spills at Bayway polluting the State's waters, and Tosco faced liability for substantial spills from Bayway that began with its ownership in 1993 of the huge area involved (1300 acres) and its many facilities; part of the settlement amount must have been to compensate for those spills and the massive

pollution on site, Gerling argues, or the payment of $39 million could not be justified. It notes that Tosco (COP) incorrectly claimed that Bayway was not on New Jersey's Master Site List whereas Bayway is in fact listed as Item No. 5945 on the List and was (contrary to Mr. Lyons' testimony) one of the sites at issue in the litigation. Bayway, Gerling contends, "was almost certainly COP's single largest exposure in the *New Jersey* litigation, noting its "sludge lagoons" and the settlement by its prior owner Exxon of its non-MTBE liability for $225 million. Id. at 81. Gerling rejects Mr. Lyons' claims that COP faces no potential liability based on spills at Bayway, because Exxon had assumed responsibility for "any remediation of contamination at Bayway," noting that the Purchase Agreement from Exxon establishes that Exxon assumed responsibility only for liability arising prior to the sale to Tosco in 1993. Id. at 87. In any event, the existence of third-party indemnification is not a defense to liability; the indemnity agreement only gives COP the ability to recover from Exxon some of what Gerling claims it must have paid New Jersey on Tosco's behalf. Id. at 90. Gerling also rejects the argument that the MTBE pollution at Bayway was insignificant because it polluted only non-potable water, arguing that New Jersey had nonetheless sought damages based on pollution of water. Id. at 88.

40. Based on its positions regarding the New Jersey settlement, Gerling contends that none of the $39 million COP paid for Tosco liabilities is recoverable. It is undisputed, Gerling notes, that Tosco provided Gerling with no information related to its potential liability for leaks from Tosco-owned, operated or affiliated sites, and that it neither sought nor obtained Gerling's consent for a settlement related to those sites. Specifically, Tosco remained responsible, Gerling argues, for MTBE leaks from some

183 sites, retail gas stations and other oil installations that it owned from 2000-2004 (when COP sold the stations to Getty). Gerling rejects as insufficient and inconclusive the testimony of Mr. Lyons and Ms. Renfroe that the technology and practices at stations by 2000 regarding leaks made it "extremely unlikely" that damaging spills of MTBE gasoline took place after 2000. In Gerling's view, considerable liability potentially remained and was reflected in the settlement amount. In 2004, it notes, COP disclosed in its sale of the stations to Getty that MTBE damage had been discovered at eight of its stations between 2000 and 2004; COP took responsibility for MTBE cleanup at three stations and paid $4 million for a release for damages at a station in Ringwood, indicating in Gerling's view that potential liability remained substantial. Id. at 91-92. This evidence is unnecessary in any event, Gerling argues, since Tosco bears the burden of proving the extent of its liability and the evidence it has offered is insufficient given its position that it bears no liability at all on this ground. Similarly, Tosco has failed in Gerling's view to provide information regarding Bayway, to seek Tosco's consent to a settlement that included such excludable spill liability, or to establish the extent of its liability related to spills from the Bayway site.

41. Gerling claims that Tosco failed to provide adequate information even regarding the liability that Tosco claims was settled by the JCO, i.e., product liability based on tracing MTBE gasoline from Tosco refineries to third parties responsible for damages. Gerling notes that at no point did Tosco expressly seek consent to the settlement even regarding such liability; in fact, Gerling was informed of the execution of the settlement agreement some five months after the fact. Tosco's submissions of information after the settlement was expressly revealed were both too late and

26

insufficient, Gerling contends. Specifically, Gerling notes that it sought information as to the identity and connection of Tosco to the 450-500 sites mentioned by Mr. Lyons, and that Tosco failed to provide such information even though, Gerling argues, Tosco cannot justify the $39 million figure as "reasonable" without having examined in some depth its potential liability from those sites. Gerling also argues that the settlement was unreasonable in that the amount paid must have included substantial sums for potential liability for spills that were excludable from the Policy's coverage under the Pollution Exclusion.

42. *OCWD.* Gerling does not contest that it was provided basic litigation documents related to *OCWD* early in this arbitration. It was informed of unsuccessful negotiations with OCWD. Then, in a letter dated June 26, 2017, Mr. Lyons advised that he was negotiating with Mr. Miller concerning COP's potential liability and that "Claimant's counsel has indicated that his client would be willing to enter into an agreement which would release Tosco and its successor entities from all claims related to product liability for MTBE gasoline sold and delivered to customers for $4.8 million." Mr. Lyons added that COP was in the process of reviewing draft documentation and working on specific terms and releases and expected to send "a version of an agreement which would be acceptable to claimant's counsel next week. Let us know if you have any questions."  On November 2, 2017 Mr. Lyons informed Mr. Knoerzer that Resolute and OCWD "have finalized a settlement agreement . . . in the amount of $4,800,000," and that Reed Smith would forward a copy of the agreement "for your records."

43. Gerling states that on November 30, 2016 it followed up on COP's disclosures with requests for information about the case, but that Tosco did not respond. Gerling claims that it "had received almost no meaningful information about the *OCWD* matter" before it was notified by letter dated November 2, 2017 that the case had been settled on October 10, 2017. This was, Gerling contends, an intentional breach "of Gerling's right to informed consent of the *OCWD* settlement [which] justifies an award denying COP's claims for coverage of the *OCWD* settlement." Gerling Response, p.60. Gerling notes that Tosco did not at any point expressly seek Gerling's consent. Moreover, Gerling notes, the information provided regarding *OCWD* included no concrete data regarding Tosco's potential liability for spills from stations it owned or operated; Gerling rejects COP's position that Tosco faced no material liability for direct spills from the stations it owned that were among the 100 sites identified as potential targets in the litigation. Claims for spills after those stations were acquired in 2000 may be regarded by Mr. Lyons as "defensible," Gerling argues, but no evidence establishes that Tosco could entirely avoid liability or expenses regarding such claims because of increased awareness by then of the MTBE problem and improved methods and equipment in the transmission of gasoline.

44. *Vermont*. Gerling claims that COP at no point explicitly sought Gerling's consent to the settlement in *Vermont*. The matter was settled, Gerling notes, prior to discovery and so without any evidence that would justify a 100% allocation of liability to Tosco. Gerling does not deny Tosco's having provided the information Tosco claims to have provided. Rather, it argues that, if the Board decides against denying Tosco relief on the ground of its failure to seek consent, the Board should treat the matter as having

been settled on a cost-of-defense basis with no evidence developed as to liability of any of the three COP entities, and should allocate the settlement amount equally among the three COP entities sued collectively in the case.

C. *Tribunal Decision Regarding Information and Consent.*

45. Gerling's contention that Tosco is not entitled to coverage under the consent condition of the Policy is based on the proposition that "COP entered into the settlement while simultaneously refusing Gerling a fair opportunity to obtain information related to the proposed settlement in order to give its informed consent . . . as is unequivocally required by the Gerling Policy." Gerling Phase III Submission, p.1. Gerling relies on Paragraph V(g) of the Conditions section of the Policy, entitled "Loss Payable," which provides:

> Liability under this Policy with respect to any occurrence shall not attach unless and until the Insured . . . shall have paid the amount of the underlying limits or the retention amount set forth in Item 2(a) of the Declarations and . . . unless and until the Insured's liability shall have been fixed and rendered certain either by final judgment against the Insured after actual trial or by settlement approved in writing by the Underwriters.

This provision remains enforceable under the Board's decision that the Policy's requirements remain in effect, though its meaning must be determined on the basis of the Parties' conduct and expectations. See PFA2, p.69. Gerling argues that the consent provision requires Tosco, as a condition precedent under New York law, to base the amount of its liability claim on final judgments and/or settlements that have been approved in writing by Gerling. The remedy for failing to satisfy this condition precedent, Gerling contends, is denial of coverage, citing several precedents including *Argo Corp. v. Greater New York Mut. Ins. Co.,* 4 N.Y. 3d 332, 339 (2005) (insurer need not show prejudice where notice of lawsuit was unreasonably late as a matter of law), and *Vigilant Insurance*

*Co. v. Stearns*, 10 N.Y. 3d 170, 178 (2008) (enforcing consent requirement of policy for settlements greater than $5 million). Gerling does not dispute the principle that its consent to settlements cannot be withheld unreasonably; it contends that Tosco failed to provide the information necessary for Gerling to determine the reasonability of the settlements, as required by Condition V(d) of the Policy, which as Gerling notes is designed to enable the insurer to perform its claim adjustment obligations, and to determine whether to consent to a settlement that provides coverage. Summation, p.48.

46. The requirements imposed by the Board on Tosco regarding information, given the history of conflicts and disputes between the Parties, are (1) to inform Gerling of all significant developments in the remaining MTBE cases on a quarterly basis; (2) to notify Gerling within four business days of the development of information potentially relevant to any of the issues still being litigated, which include spills; and (3) to advise Gerling of any plans for settlement negotiations before such negotiations begin. Phase 3, PO1, pp.9-10. The Board agrees that Tosco is required to seek consent for settlements from Gerling in writing, and only such evidence of consent (along with judgments) satisfies the Policy definition of a Loss Payable (though our understanding is that consent to a settlement may include a reservation on specific coverage issues). The Loss Payable provision of the Policy cannot be read, however, to enable Gerling effectively to deny recovery of coverage claims by simply refusing to give its consent in writing. A request for consent need not be explicit, moreover, but may reasonably be inferred from the information provided relating to negotiation of settlements. Gerling's failure to provide written consent in such circumstances cannot preclude Tosco from coverage if it has provided information adequate to enable Gerling to

determine whether the settlement is reasonable and includes claims covered by the Policy.

47. For the reasons that follow the Board concludes that Tosco satisfied its information obligations sufficiently to enable Gerling to exercise its right to consent to COP's settlements with New Jersey and Vermont, and that it has done so also with regard to its potential liability for third-party spills in *OCWD*. The Board regards Tosco as having failed to provide adequate information, however, as to its limited potential liability for direct spills in connection with the *OCWD* settlement. In reaching these conclusions the Board notes that the Policy at issue does not prohibit Tosco from consummating the settlements at issue without Gerling's consent, as did the policy language in the *Bear Stearns* case.[4] The New York Court of Appeals unanimously ruled in that decision that Bear Stearns ignored an unambiguous requirement of the policy at issue there that it obtain the insurer's consent or at least notify the insurer before entering into certain settlements for over $5 million. Gerling argues that its policy with Tosco is "substantially similar" to the policy at issue in *Bear Stearns* "in that both provisions plainly condition the insurer's obligation to indemnify the insured for any settled claims on the insurer's express approval of the relevant agreement." The policies differ, however, in key respects. Specifically, Tosco's obligation is to inform Gerling of each settlement adequately to enable Gerling to exercise an informed right to consent; it cannot be denied coverage for failing to obtain consent in advance. In

---

[4] "The Insured agrees not to settle any Claim, incur any Defense Costs or otherwise assume any contractual obligation or admit any liability with respect to any Claim in excess of a settlement authority threshold of $5,000,000 without the Insurer's consent, which shall not be unreasonably withheld . . . The insurer shall not be liable for any settlement, Defense Costs, assumed obligation or admission to which it has not consented." 10 N.Y.3d at 177.

*Bear Stearns*, on the other hand, the insured was required to secure consent before settling certain claims of over $5 million and could be denied coverage for having failed to do so without regard to the merits of its arguments that the settlement was reasonable and resolved an otherwise covered liability. In this case, moreover, unlike the situation in *Bear Stearns*, the insured gave notice to the insurer of the settlement under consideration whereas Bear Stearns settled a claim that required the insurer's prior consent without even having given the insurer notice. See 10 N.Y.3d at 177-178. The documents in evidence make clear that Gerling recognized that Tosco's letters informing it of COP's having reached agreements with New Jersey, OCWD, and Vermont were intended as requests for Gerling's consent. In responding to those letters, Gerling told Tosco it was in breach of its obligations, clearly signaling Gerling's resolve to refuse consent unless Tosco subsequently complied with Gerling's views as to Tosco's information and other obligations.

48. *New Jersey.* Mr. Ellison's letter to Mr. Knoerzer dated December 15, 2016 informed Gerling that COP had reached a "settlement in principle" with New Jersey for a full release in exchange for $39 million. Mr. Ellison noted in his letter (p.1) that "there are potentially thousands of other sites at issue in New Jersey which were never owned or operated by any P66 entity, for which Tosco could have substantial liability in connection with supply from the Bayway and Trainor refineries." Mr. Lyons' letter to Mr. Kevin Lewis of Resolute dated January 26, 2017 communicated more detailed reasons for COP's acceptance of that settlement, as well as an explanation of Tosco's position that the settlement's coverage excluded potential liability covered (or excluded from coverage) by the NRDSA. Mr. Lyons reiterated to Mr. Lewis in his

January 26 letter the fact that COP had negotiated "a potential settlement" with New Jersey in the form of a JCO, the draft of which he attached, in which COP would pay New Jersey $39 million "in return for a full release of all claims regarding injury to the waters and other property of the State caused by MTBE." The letter then states (p.1):

> There is an exception to this general release which provides that the normal service station remediation programs relating to properties owned and operated will continue. That said, however, in this JCO the State acknowledges that prior to this litigation ConocoPhillips entered into a valid and enforceable settlement and release of all damages relating to sites owned, operated or affiliated with ConocoPhillips. Hence, this JCO specifically settles only claims related to the sales of MTBE gasoline to third parties.

49. The letter goes on to provide the grounds upon which Mr. Lyons planned to recommend the potential settlement's approval by senior management of COP "as a prudent and reasonable resolution of these matters." He noted that: Tosco had sold MTBE gasoline to wholesalers and retailers in New Jersey beginning in 1993 when it purchased the Bayway refinery, "a major supply source of the State throughout the 1990s" during which the vast majority of injuries to water and other resources occurred; New Jersey banned MTBE in 2005 and sued the oil companies responsible in 2007, asserting "numerous claims which are essentially identical to prior cases brought by other States, water districts and cities," among which was  an "essential claim" of product liability (that MTBE gasoline is defective by reason of design and failure to warn); the product liability claim had proved extremely difficult to overcome, leading to very substantial damages against refiners, especially those who contested rather than settled; and the amount of the New Jersey settlement was "eminently reasonable" given the fact that the State had identified more than 5000 individual release sites for which it was seeking damages, at least 450-500 of which

"would be connected to Tosco's activities" based on COP's investigation and knowledge of its customer base.[5] Mr. Lyons noted in particular that Tosco's share of market sales to "the independent service station market would be between slightly more than 7 percent and 10 percent of the market," indicating based on the total liability anticipated for damages in New Jersey that "the verdict [against COP] attributed to the activities described would be more than $275 million and easily could be closer to $600 million," in addition to approximately $25 million in legal fees and costs. "Given all of these factors," Mr. Lyons stated, "clearly a settlement of $39 million represents a small percentage of the realistic liability in this matter, and a favorable resolution . . . ." Mr. Lyons also cited other settlements of refiners with New Jersey as evidence that COP's negotiated amount was favorable given the other refiners' much smaller footprint in the State. "For all of these reasons," he concluded, "I believe the proposed settlement to be prudent and reasonable and I will recommend that the management of ConocoPhillips approve it. If you have any questions, please contact me" directly or through counsel. (Id. at 2-3)

50. The Board views this January 26, 2017 letter as a legally sufficient request for Gerling's consent under the Policy to the settlement described in the letter, i.e., a settlement based on potential liability for selling MTBE gasoline to third parties responsible for polluting New Jersey natural resources. The fact that the deal had yet to be approved by the senior management of COP and by the NJDEP establishes that

---

[5] Ms. Renfroe's testimony supported Mr. Lyons' conclusions that "the defense of MTBE drinking water contamination cases [had become] extremely challenging for refiners who placed MTBE-gasoline into the stream of commerce", and that the three settlements at issue were "reasonable under the circumstances faced by Tosco," many of which she enumerated.  Third Expert Witness Statement, Gerling Initial Submission, Ex. 4, pp. 4-5.

the settlement was not yet final; but that does not undermine the nature or purpose of the communication. Absent some subsequent notification that the settlement had been disapproved, it was reasonable for Tosco to assume that Gerling had been informed that the settlement described would soon be finalized. While the letter does not explicitly ask for Gerling's consent, the document's design and intent was to provide the reasons why Mr. Lyons and his client believed the settlement was "reasonable" and therefore why they believed that Gerling should consent to it. The request for consent is implicit in the nature and content of the letter, read in the context of the applicable Policy. Mr. Lyons' letter, together with the information subsequently supplied pursuant to Gerling requests, gave Gerling sufficient information to exercise informed consent to the settlement he described (i.e., of the claim based on product liability for providing MTBE gasoline to third party polluters). In particular, Tosco subsequently supplied the NRDSA and NRDR, as well as several drafts of the JCO, for Gerling's review.

51. Gerling contends that the settlement amount was not adequately justified if it related only to Tosco's product liability based on tracing of its MTBE gasoline to third parties responsible for damaging spills. It argues in general terms that Tosco cannot justify $39 million as reasonable if the settlement excluded all spills from Tosco-owned, operated or affiliated sites, as well as all spills from the Bayway refinery. It notes that in its response to Mr. Lyons on February 10, 2017 Gerling sought a list of all "sites", including stations, "owned, operated, branded, leased, affiliated with or controlled by any past or present ConocoPhillips entity in the state of New Jersey between 1980 and today . . . ." It also sought identification of all such

sites sold by COP, and "all correspondence and/or communications with any such purchaser (or its counsel) regarding Paragraph K of the Draft JCO . . . ." Exhibit G12, pp.5-6. It contends that Tosco improperly refused to provide this information, which was necessary to evaluate the settlement coverage and amount, improperly forcing Gerling to seek discovery in this arbitration and "thus denying Gerling's right under the Policy to informed consent to settlements". Gerling Statement, p.3.

52. The Board notes, first, that the standard for determining compliance with the Policy's information requirement does not amount to a mandate that Tosco comply with any specific Gerling demand for information that is relevant to determining reasonability. Tosco's compliance with the Policy's information provision depends on whether, taking into account all the relevant issues, Tosco supplied information sufficient to enable Gerling to exercise its Policy rights and functions. New York law does not require a settling party, for example, to engage in additional investigation to develop evidence relevant to the reasonability of a settlement, if the information on which it relied – i.e., with which it was faced at the time of settlement – provides a sufficient basis for a good faith conclusion that the settlement was reasonable. The Board must determine, not whether particular Gerling requests sought "relevant" information, but whether the information Tosco possessed and provided was sufficient to enable Gerling to perform the function of consenting or refusing to consent to a given settlement. Tosco certainly failed to satisfy several Gerling requests for information "relevant" to Gerling's consideration of whether to consent

to the settlement.[6] But the reasonableness of a settlement must under New York law be determined based on the evidence which the insured had before it and considered, not evidence sought by the insurer that was not shown to have been developed and considered at the time of settlement.

53. The Board agrees with Tosco, in this regard, that some of Gerling's requests in response to Mr. Lyons' letter of January 26, 2017 were overbroad and sought "masses of irrelevant documents." Mr. Lyons in his letter of May 9, 2017 did supply considerable information in response to Gerling's requests,[7] but failed to provide documents that were conceptually relevant to whether Gerling should grant consent. It is clear, though, that important information sought by Gerling, while "plainly relevant" as Gerling argued (Phase III Summation, p.37), was not considered by Tosco at the time of settlement and could only have been developed after far more discovery than had taken place at that time. While Gerling's request for information about the 450-500 sites that Tosco stated would be connected to Tosco-refined MTBE gasoline

---

[6] In addition to its requests for detailed information as to the sites to which Tosco could be "connected," Gerling requested information as to whether "COP aware that it is a target defendant at any other site [besides the 19 'trial sites' at issue in Phase I of the New Jersey action] that will be addressed in a later phase of the trial, and if so, identify each site for which COP is alleged to have liability and the bases therefore, and provide all documents concerning COP's alleged liability." Tosco's failure to provide this potentially relevant information does not establish a breach of its duty to provide sufficient information to permit "informed consent," since no proof existed that Tosco had such information and relied on it in accepting the settlement.

[7] Gerling appears to have been genuinely misled as to the date upon which the *New Jersey* and *OCWD* settlements were finalized. However, as Mr. Ellison's letter of October 16, 2017 states, Mr. Lyons' letters of January 26, 2017 and May 9, 2017 can fairly be read to have conveyed that the settlements were about to be completed, and the fact that no further correspondence indicated any problem in completing the paperwork could reasonably have led Mr. Lyons and Mr. Ellison to have assumed that Gerling knew the settlements had been made final. Tosco gained no advantage, moreover, and Gerling was not disadvantaged, by the fact that definitive information as to the settlement dates was delayed.

was reasonable and related to its Policy functions, the existing record indicates that Tosco had no specific information about the 450-500 stations. Mr. Thurlow's letter of September 21, 2016 to the mediator objected, for example, that the plaintiffs in the case were attempting to extend the mediation to "thousands of remaining sites for which there has been no trial structure determined and for which there has been no formal discovery. . . . [T]he only available data for the vast majority of these thousands of remaining sites has not been updated by Plaintiffs in more than five years," so the status of remediation remained unclear. Tosco Initial Submission, Ex. 4, p.3. Mr. Lyons was clear about this issue in his May 9, 2019 letter:

> As I explained in my [January 26, 2017] letter, it is difficult to determine the sites to which Tosco would be alleged by the State to have supplied or to be found to have supplied because Tosco's sales were often to intermediaries, and the ultimate destination was unknown to Tosco. Tosco will agree to provide information provided in discovery, and Plaintiffs' Master Site List of the sites at issue.

54. Given the lack of discovery, it seems clear that Tosco examined its internal records as to its sales of gasoline during the relevant period and concluded, based on the wholesalers to whom sales were made and other evidence, including its 7-10% market share, that Tosco was likely to be connected to some 450-500 of the 5000 sites on New Jersey's list of targeted polluters. This was also confirmed by Mr. Ellison in his letter to Mr. Knoerzer dated May 8, 2018: "The approximation of liability in Mr. Lyons' letter of January 26, 2017 was based on his prediction of the success of the claimant the State of New Jersey **might** enjoy on arguments it **could** make only **after** discovery was completed." Tosco Reply Submission, Ex. L, p.2 (emphasis in original). It is also clear that Mr. Lyons supplied Gerling with the information it used in calculating COP's (i.e., Tosco's) potential market share, which was part of Tosco's calculation of

potential liability to New Jersey. Id. at 4. Gerling could have pursued these issues further at the hearing, but it chose not to question Mr. Lyons about it or about any other aspect of Mr. Lyons' explanation as to why he regarded the settlement as "eminently reasonable".

55. The record regarding information related to Tosco's potential liability for direct spills differs from that regarding third-party spills. It is clear that Tosco failed to supply information about its potential liability for direct spills, on the premise that it had no such potential liability at the time of the JCO. Gerling challenges the accuracy of that premise, and specifically Mr. Lyons' assertion that the JCO was strictly limited to the product liability Tosco faced for sales to third parties. It rejects the claim that New Jersey had already settled with and released Tosco for its liability based on leaks of MTBE gasoline from stations, known or unknown, that Tosco owned, operated, or with which it was affiliated in the 2005 NRDSA, which was implemented in part by the 2006 NRDR. Gerling contends that this position is refuted by Paragraph K of the JCO because that provision "makes plain that COP was settling liabilities at sites it owned, leased and/or operated – thus the pollution exclusion is in play." Summation, p.36. That paragraph, which appears in the final settlement, states that the "releases and covenants not to sue and reservations contained in this JCO apply to certain liabilities including those for discharges of MTBE products that occurred at sites while they were owned, leased, branded and/or operated by Settling Defendants."

56. The language of Paragraph K on its face supports the view that the New Jersey settlement released, not only liability for sales to third parties, but also liability for spills from Tosco-responsible sites, including even arguably Bayway. New Jersey was,

as Gerling argues, suing refineries and station owners for spills, not just for producing a dangerous product that others spilled. Gerling Initial Submission, p.30.  If, as Gerling contends, the JCO rather than the NRDSA released Tosco from any potential liability for its own spills, then Tosco clearly breached its obligation to provide Gerling with the information it needed to determine whether to consent to the settlement. If, on the other hand, Tosco is correct that any potential liability it had for spills from Tosco-owned or operated or affiliated sites was settled and released in the NRDSA and the NRDR, and that any liability concerning spills at Bayway had not been released, then Tosco had no duty to provide Gerling with additional information related to its liability for such spills.

57. The Board concludes that New Jersey's claim based on Tosco's direct spills, though part of the State's effort against several refiners and other polluters, was settled in the NRDSA.[8] Paragraph K read in context of the JCO's provisions, fails to establish Gerling's position. First, the JCO itself includes strong evidence that undermines Gerling's reading of Paragraph K. For example, as Mr. Lyons wrote in his January 26, 2016 letter: "in this JCO the State acknowledges that prior to this litigation ConocoPhillips entered into a valid and enforceable settlement and release of all damages relating to sites owned, operated or affiliated with ConocoPhillips. Hence, this JCO specifically settles only claims related to the sales of MTBE gasoline to third parties." The JCO provision referred to by Mr. Lyons appears as Paragraph H in the

---

[8] The State's complaint named several defendants, not just Tosco, and Gerling's reference to Mr. Axline's 2008 statement that it was suing for direct spills was addressed to the State's suit against the many defendants named in the complaint and was therefore consistent with Tosco's having been released.

section of the JCO entitled "Background", in which Paragraph K also appears, and states:

> ConocoPhillips, the Department and Administrator entered into a valid and binding "Natural Resource Damages Settlement Agreement," which was effective as of November 21, 2005 (the '2005 NRDSA' attached hereto as Exhibit 'A'). The 2005 NRDSA remains in force as written and *nothing in this JCO shall be construed to limit or narrow any of the matters released in the 2005 NRDSA which apply to all sites which 'have been owned, leased, affiliated with and/or operated by the Settling Party, including, but not limited to, any such sites that may have been transferred at any time to any person or entity not a party to [the 2005 NRDSA].* (Emphasis added.)

This provision of the JCO instructs the reader not to construe any of its other provisions in a manner that limits or narrows any of the matters "released" in the 2005 NRDSA, which it goes on expressly to describe as including "all" sites owned by COP, i.e., the sites for which Tosco was potentially responsible for direct spills of MTBE gasoline. The language of this Paragraph also undermines Gerling's argument that the 2005 NRDSA was only a settlement and not a "release"; Paragraph H explicitly describes the NRDSA as having "released" the potential liability it describes.[9]

58. The JCO's other, more substantive provisions, also support the conclusion that COP was released by the NRDSA from any potential liability for direct spills. In particular, the JCO provides in Article VI(a) – containing the "Plaintiffs' Covenants and Release" – that in consideration for the payment required, and "Notwithstanding any other provision of this JCO," Plaintiffs "fully and forever release" the Settling Defendants "for all causes of action and relief based upon Settling Defendants' liability to Plaintiffs under the common law or theories of products liability" with respect to MTBE

---

[9] Gerling notes that New Jersey was unwilling to accept language proposed by Mr. Lyons that would have made even clearer the JCO's exclusion of potential liability for spills from Tosco-owned, operated, or affiliated sites. But the State's refusal to accept the language proposed does not undermine the meaning and significance of the language that the State did accept, and that of other provisions consistent with the result sought by Mr. Lyons.

discharges that damage New Jersey resources "premised upon Settling Defendants' Upstream Activities." The phrase "Upstream Activities" is defined in Article IV(4), p.10 of the JCO, to mean "the manufacture, sale, supply, distribution, exchange, transfer, purchase, trading, marketing, and /or branding of MTBE Products prior to the Effective Date of this JCO," but to exclude "a discharge of an MTBE Product at or from a facility, as defined by N.J.A.C. 7:1E-1.6, in New Jersey that occurs at a time that the facility is owned or operated by a Settling Defendant while the Settling Defendant is engaged in the manufacture, sale, supply, distribution, exchange, transfer, purchase, trading, marketing, and/or branding of MTBE or gasoline with MTBE." These provisions, read together, make clear that the JCO's use of the language releasing Defendants from "all causes of action and relief" in Paragraph VI(a) excludes Tosco's potential liability for discharges from facilities "owned or operated" by a Settling Defendant, in this case unquestionably Tosco. It strongly implies, therefore, that the identical language used in Paragraph K was intended to be subject to the same exclusion.

59. This strong evidence of the validity of Tosco's argument that COP was not released in the JCO for spills from Tosco-owned, operated or affiliated sites is further supported by Article X of the JCO, titled "Effect of Settlement and Contribution Protection," which provides that "Settling Defendants expressly reserve all of ConocoPhillips' rights relating to the 2005 NRDSA. Nothing in this JCO shall be construed as reducing the scope of the releases, covenants not to sue, or protections contained in the 2005 NRDSA." And in Article XV – "Modification" – the parties agreed that the JCO "supersedes all prior negotiations, representations or agreements, either written or

oral, with the exception of the 2005 NRDSA, which remains valid and enforceable. ConocoPhillips shall retain the releases, covenants not to sue, and other protections provided by Plaintiffs under both." In both these provisions the NRDSA is, as in those discussed above, explicitly treated as having been, not only a settlement, but also a "release," and the parties forbid construing anything in the JCO (including Paragraph K of course) as modifying the NRDSA.

60. The Board also disagrees with the proposition that the NRDSA itself establishes that it is only a settlement and not a release, and that therefore the NRDR limits the scope of relief obtained by COP (on behalf of Tosco) in exchange for the actions and payments made by COP to the State as recited in the NRDSA. The NRDSA covers sites known and unknown located in New Jersey from which MTBE related damage may have been caused, except "a discharge of any hazardous substance at the Bayway refinery in Linden, N.J." or sites proposed to be listed on a CERCLA list or its equivalent. "A list of the known Sites is attached hereto and incorporated herein by reference as Attachments A-1 and A-2." Para. 2. The NRDSA explicitly describes the process by which the parties agreed to cover sites; as to some they agreed on remediation, and as to some they agreed information was lacking regarding potential injury, so a "certainty premium has been included in the compensation, which is set forth in paragraph 14 herein. See Attachment B." They agreed, moreover, that their information was "sufficient to form a rational basis for determining the nature and extent of the Settling Party's liability for Natural Resource Damages in the State of New Jersey arising from the Sites." And the Department acknowledged that "the compensation provided in Paragraph 14 as to the known sites listed in Attachments

A-1 and A-2 hereto amounts to a payment of 100% of the groundwater natural resource damages suffered at the said known sites listed in Attachment A-1 and A-2."

61. The "Attachment B" referred to in Paragraph 2 of the NRDSA is a commentary on the "Settlement Process." It notes the uncertainties faced by the parties regarding sites, since some were known and acknowledged as problems, others were known but regarding which liability was disclaimed, others had been transferred to other entities and could not be remedied by COP, and others were unknown (i.e., not identified). Attachment B notes that the NRDSA's "purpose" is "to resolve all potential liability of the Settling Party . . . except as specifically provided otherwise therein." To that end, the parties agreed to a procedure "to review, analyze and reach settlement regarding groundwater natural resource damages" whereby COP would provide land as compensatory restoration for damage to the known sites listed in Attachments A-1 and A-2, and would pay "an additional premium for a release from any potential liability for any of" two other categories of sites – those divested by the Settling Party for the liabilities of which it claims other entities are partially or completely responsible, and those for which it disclaims any liability – "in order to buy their peace in this matter and fully resolve any potential liability for any of those sites" and as to such "records" as indicate possible liability at sites for which liability was disclaimed. The notion that the NRDR was written for the purpose or with the effect of undercutting this express "purpose" is presumptively at odds with the arrangement expressly intended and would therefore have to be demonstrated by at least a preponderance of evidence of such an intent or effect.

62. Nothing in the NRDR, however, justifies Gerling's claim that it is the only release between New Jersey and COP, or that it was intended to have or had the effect of altering the NRDSA's purpose of settling all claims except those expressly excluded by releasing only the sites listed in Attachments A-1 and A-2. Gerling correctly argues that the NRDSA was not "final" by its own terms, in that the State retained the right to terminate based on adverse public comments, COP had to comply with the requirements of Paragraph 14, and several steps were required within specified numbers of days after the public comment period or after the NRDSA's "effective date," which was November 21, 2005. The March 14, 2006 letter from the NJDEP transmitting the NRDR to COP makes clear, however, that COP "has fully satisfied the terms of the NRDSA," and by the time the NRDR was signed on March 2, 2006 all the other pre-conditions to completion of the NRDSA had been satisfied.

63. Gerling also notes that the NRDR transmittal letter states that, because COP has satisfied all the terms of the NRDSA, the NRDR "fully and forever releases" COP "as specified" in the NRDR. The terms "specified" in the NRDR do not, however, conflict with the NRDSA. The NRDSA is referred to in Paragraph 3 of the NRDR as having been entered into in order to resolve COP's potential liability to the State "as described therein," i.e., in the NRDSA, and at no point does the NRDR expressly limit the NRDSA's scope or purpose. The NRDR does deal expressly with the "Property" referred to in the NRDSA, which is defined in the latter as including the sites in Attachments A-1 and A-2, and it releases "all claims" arising from discharges of MTBE (presumably "at the") "Property" that occurred prior to the effective date of the NRDSA. (Para. 8; see Para. 4 using the word Property with the preceding words "at

45

the".) But that release is expressly preceded by the fact that COP had satisfied the requirements of Paragraph 14 of the NRDSA, which related to the sites listed in Attachments A-1 and A-2.

64. Finally, however persuasive Gerling's arguments in this regard may be viewed in the abstract, the terms of the NRDSA preclude treating the NRDR as a modification of the NRDSA, since the NRDR is signed only by officials of the State, and not by any COP representative. The NRDR is not, in fact, an agreement of any kind, which would have been required to modify the NRDSA. It is a confirmation by the State that COP had satisfied the requirements of the NRDSA and that therefore a full release (as contemplated in the NRDSA) was justified as to the "Property," which the parties understood to be the known sites in the Attachments to both documents.

65. The Board concludes therefore that no part of the settlement amount paid by COP to New Jersey related to any potential Tosco liability for direct spills. Given our conclusion that the NRDSA was not altered by the NRDR, moreover, no part of the settlement was in exchange for a release from any potential liability for spills at the Bayway refinery. Unquestionably, Bayway was responsible for extensive damage to the land on which it operated, and to "water at the sites." Gerling Initial Submission, pp.58-59. Exxon paid some $225 million for the pollution at the refinery caused by spills during its operations there, excluding MTBE liability. But the evidence in the record at the hearing of this issue fails to support Gerling's view that Tosco faced substantial potential liability for MTBE spills at Bayway, and therefore needed the

release Gerling claims was provided in Paragraph K.[10] The Board concludes, therefore, that the full settlement amount related to potential Tosco liability as a refiner that produced and sold MTBE gasoline that caused damage to State resources through the actions of third parties. It follows that Tosco was justified in providing information that related only to such potential liability and in failing to provide information related to potential liability for spills from Tosco-owned, operated or affiliated sites, or to spills at Bayway. The Board finds no breach by Tosco on this ground of its obligation to seek Gerling's consent of the settlement on the basis of adequate information.

66. Gerling suggests that the payment made by COP on behalf of Tosco for what Gerling contends were the enormous liabilities Tosco faced for spills from Tosco-owned, operated, or affiliated sites, as well as on account of spills at the Bayway refinery, were inexplicably low. It notes that the only compensation established in the evidentiary record related to direct spills is the purchase by COP of 73 acres of land, matching the 73 acres of land polluted by the spills related to the properties listed in Appendices A-1 and A-2. Furthermore, while the NRDSA mentions additional value conveyed for the release of Tosco's liability for "unknown" sites, no evidence has been introduced as to the form or amount of such compensation.

67. The Board has no basis in the record, however, to question the sufficiency of the exchange made by New Jersey and COP; Gerling had the opportunity to pursue any

---

[10] The most probative evidence introduced at the hearing as to Tosco's potential liability for spills at Bayway was the testimony of Mr. Lyons and Ms. Renfroe, who explained why Tosco faced no significant liability there beyond remediation, and who confirmed that the water pollution caused by Bayway was of water at the site and not any drinking water sources. The evidence cited by Gerling is also consistent with the latter conclusion. See Gerling Initial Submission, p.35.

issues it may have had as to this matter, but chose not to question the witnesses presented, including Mr. Lyons who participated in the settlement process. Moreover, the limited compensation given for the release related to direct spills is consistent with Tosco's position that its responsibility for direct spills was limited by the fact that it owned the sites at issue starting in 2000, by which time the industry had learned about and implemented solutions for direct MTBE spills, establishing that damages after 2000 were very likely the result of spills that took place before 2000.[11] The record is consistent with that argument, including Ms. Renfroe's expert opinion that such liability was "extremely unlikely,"[12] which could explain why COP's payment on Tosco's behalf was relatively modest, and why New Jersey agreed to that payment.[13] As for the liability for spills at Bayway, the fact that Tosco concedes that it has not obtained a release for such spills supports its evidence that its potential liability (beyond remediation) at Bayway is relatively insignificant. The evidence provided the Board fails to support the proposition that the Bayway spills led to any compensable damage to drinking water. Tosco Reply Submission, p.26, and documents at Ex. Z.

68. The Board disagrees, moreover, with Gerling's claim that the settlement amount of $39 million is reasonable only if it included direct spills and a release for Bayway. The information supplied by Tosco concerning its potential liability was sufficient to enable Gerling to make an informed decision as to consent and does establish under

---

[11] The arguments in this regard are based on "six factors" spelled out in Tosco's brief as well as in Mr. Lyons' affidavits. See, e.g., Tosco Initial Submission, pp.12-13.

[12] Third Expert Witness Statement, Tosco Original Submission, Ex. 4, p.11.

[13] Gerling's argument that direct spill liability was potentially high was based in part on its reference to the payment made by COP for pollution at the HP Delta Service Station; Tosco responded that the station was not owned or operated by Tosco. Initial Submission, p.5.

New York law that the settlement was reasonable based on the information considered by Tosco at the time of settlement. Mr. Lyons' letter of January 26, 2017 and his affidavits described in testimony that was unrebutted the difficulties refining companies were having in proving to juries that they should not be held responsible for third party spills, and stated that Tosco might have been forced to pay some $225 million to $600 million if it had gone to trial and lost, instead of the settlement amount. In the absence of contradictory evidence, the Board regards Tosco's position as stated in that letter, and as supported by additional information supplied to Gerling, including the testimony by affidavit of both Mr. Lyons and Ms. Renfroe, as satisfying the New York standard of proof regarding the reasonableness of the settlement amount. See *Luria Bros. & Co. v. Alliance Assurance Co.,* 780 F.2d 1082, 1092 (2d Cir. 1986) (reasonableness to be judged on basis for facts known to and conclusions reached by insured at time of settlement).

69. *OCWD.* The record establishes that Tosco provided substantial information to Gerling regarding the *OCWD* litigation and the settlement reached in that case. Here, as with regard to *New Jersey*, Tosco did not formally state that it was seeking Gerling's consent to the settlement. But that request was implicit in the purpose of the information, including the material provided after the settlement was signed, all of which was to explain why the settlement was a reasonable outcome.

70. In the Board's view, moreover, the information provided was sufficient to enable Gerling to make an informed judgment as to the reasonableness of the settlement of Tosco's potential liability for third party spills. Specifically, Mr. Lyons provided information, not only as to the Focus Plume Sites, but also as to the "Non-Focus Plume

Sites". He stated that "Tosco had potential liability related to the supply of MTBE gasoline from Tosco's Los Angeles refinery . . . ." While he noted that OCWD had not yet developed evidence linking Tosco to releases involving Tosco supplied gasoline or causation or damages evidence he explained that Tosco had concluded that "the settlement was the most reasonable course of action given recent unfavorable trial court rulings, the uncertainty surrounding Tosco's potential liability arising from the sale of MTBE gasoline to third parties, the potential for damages surrounding claims for the failure to warn these customers, the potential for Tosco to be implicated in a portion of the 100 sites alleged to be at issue, the significant defense costs that would be incurred at trial for the Focus Plume Sites, and the risk of an adverse verdict if P66 proceeded to trial."

71. COP provided additional information about the OCWD settlement in response to Gerling requests over the following two months. Letters dated January 19 and 30, 2018 from Ellison and Engstrom to Knoerzer, Tosco Reply Submission, Ex. D & O. This information, together with the information earlier provided regarding *OCWD*, gave Gerling an adequate basis to consider whether to consent to a settlement that Tosco insists was entirely for product liability based on sales of its MTBE gasoline to third parties that thereafter caused damages.

72. Tosco provided virtually no information to Gerling, however, as to its potential liability for spills from Tosco owned, operated or affiliated stations. Tosco could not, in *OCWD*, contend that it had obtained a release for potential liability due to spills from Tosco-owned, operated or affiliated sites, and that therefore its settlement payment was exclusively for product liability based on its manufacture of MTBE

gasoline traced to third parties responsible for damaging spills. It had no such release. Tosco informed Gerling that two of the sixteen sites which the trial court determined would be Focus Plume Sites were Tosco-owned stations, specifically the stations labelled Unocal #5226 and Unocal #5792, which sold exclusively Tosco-refined MTBE gasoline from April 1, 1997 to December 13 or 17, 2000. These sites were specified as Tosco-owned and operated in the Case Management Order specifying the stations listed for trial (the "Focus Plume Sites"). In his letter of November 2, 2017 describing the reasons for supporting the *OCWD* settlement Mr. Lyons mentioned "the potential for Tosco to be implicated in a portion of the 100 sites alleged to be at issue . . . ," and the settlement agreement includes a release for all forms of liability, including for direct spills. Tosco therefore had an obligation to provide enough information to enable Gerling to weigh the reasonableness of Tosco's position that the *OCWD* settlement's inclusion of Tosco's potential liability for direct spills cost Tosco nothing, and that therefore Gerling could not claim that at least part of the settlement amount was for liability subject to the Pollution Exclusion.

73. Instead, Tosco took the position that the two stations it owned that were potentially involved in the OCWD litigation posed no material risk of liability, since they had been acquired from Unocal after 2000, and involved spills for which Unocal would be responsible. Initial Submission, p.14. Tosco's "strong defenses" included its position that it "had no liability at" the two sites of the sixteen slated for trial "where Tosco supplied MTBE gasoline," because "these two Unocal sites . . . involved releases prior to Tosco's acquisition of Unocal assets." Mr. Lyons testified by affidavit, as in the past, that the harmful characteristics of MTBE gasoline were well known by 2000, and that

upgrades to relevant systems and equipment had been widely implemented that made spills far less likely. He claims that neither a failure-to-warn suit nor proof of damage from post-2000 spills was likely, so spill cases based on post-2000 ownership were "defensible" and highly unlikely to result in liability. He noted also that no COP station had ever been linked by evidence to having caused MTBE damage to water supplies. April 2019 Witness Statement, Paras. 29-43. Ms. Renfroe took the same positions, noting that the amount agreed was favorable relative to other refiner settlements, that the cost was "far less" than the expense of continuing to litigate through a 2019 trial, and that liability for post-2000 spills would be extremely unlikely. Tosco Submission, Tab 4. That New Jersey regarded pre-2000 spills as primarily responsible for the damages to its natural resources is supported by the fact that the release Tosco obtained explicitly excluded liability attributable to "Unocal entities arising from sales of gasoline products prior to the acquisition of Unocal by Tosco or its related companies." Tosco Initial Submission, Ex. 9, p.3.

74. As Gerling contends, however: "That a case is 'defensible' or that certain facts alleged at the time of settlement were 'unproven' is not the same thing as 'no exposure to pollution liability.'" Reply, p.47. In the *OCWD* case no evidence was supplied to Gerling that related to improvements and other measures implemented at the specific sites at issue that could establish that Tosco faced no potential liability for spills from those sites after Tosco obtained control over gasoline supplies or became owner. No evidence was introduced related to those sites that established the speed of movement of MTBE gasoline underground into OCWD water resources. Tosco did supply Gerling with information as to the two sites specified as Tosco-owned and

operated, but Gerling could justify claiming that absent the sort of definitive release obtained in *New Jersey,* some potential liability remained, given that Tosco's own experts acknowledged the difficulty of obtaining favorable verdicts in such cases. Tosco itself acknowledged potential liability for those sites in the Phillips 66 motion for an order determining good faith settlement in the case, noting that the potential liability would be as low as $79,050 per site, or a combined $160,000 for the two sites. Gerling Submission, Exhibit 42, pp.12&15. Tosco's refusal to acknowledge this information as to potential liability at those sites constituted a limited but tangible failure to satisfy its obligation to provide all appropriate information to Gerling on the issue.

75. The significance of Tosco's failure in this regard is limited in that Tosco did provide adequate information about the most significant aspect of its potential liability in *OCWD*, i.e., for product liability in refining MTBE gasoline that could be traced from Tosco to third parties responsible for spills. The proper remedy for this failure, therefore, given substantial compliance by Tosco, is to determine what value to place on that part of the settlement amount that should reasonably be attributed to the possibility of liability for Tosco-responsible spills from the two stations at issue, while resolving doubts as to the extent of such liability against Tosco, as it bears the burden of proof on the issue. Attributing some potential liability to such sites is supported by the outcome in the *New Jersey* settlement, where COP, on Tosco's behalf, purchased and transferred to the State some 73 acres of property as compensation for the damage done to a similar amount of property in addition to a release for all such potential liability based on properties Tosco had owned but which were no longer

"known" and listed on Appendices A-1 and A-2. In *OCWD,* the information found in the settlement proposal submitted by COP to the court for approval in a motion dated October 31, 2017 and referred to by Gerling seems a reasonable estimate. In that motion P66 stated that its liability regarding the Focus Plume Sites would derive exclusively from the two sites to which Tosco was linked in the Case Management Order 116, which was "likely to be approximately $160,000." This amount, it added, constituted "a tiny portion of COP's proposed settlement amount"; the bulk of its potential liability derived from the "approximately two dozen stations to which Tosco directly supplied MTBE gasoline during the period from approximately 1997 to 1999, and an additional set of approximately 80 stations Tosco's MTBE gasoline theoretically could have been distributed by third parties" which were not among the Focus Plume Sites. See Gerling Initial Statement, pp. 62-66. The fact that Tosco owned those stations and was charged with and released for direct spills from those sites justifies attributing that amount of the settlement to the release for those two stations. Tosco therefore is deemed to have failed to provide adequate information as to its liability for those stations, the value of which the Board concludes is $160,000 based on the available evidence on the issue.

III.   *Vermont.* The Board concludes that Tosco satisfied its obligation to provide information and seek Gerling's consent in connection with settlement of the Vermont litigation. Here, too, consent was not expressly sought; but the correspondence informing Gerling of how and why the settlement had developed, and why Tosco viewed it as reasonable, was intended to evoke Gerling's position on the settlement and its response as to whether it would consent or oppose.

Tosco also made clear that the reason very little information existed as to the mediation and possible liability was that Exxon had taken the lead in negotiating the settlement on behalf of all the oil company defendants, and no discovery had taken place. Letter of Mr. Ellison to Mr. Knoerzer, October 8, 2018, Tosco Reply Submission, Ex. U. It also made clear its position, consistent with the Board's conclusion in PFA2, that only Tosco among the three COP entities faced any possible liability in Vermont (or New England in general), as issue dealt with below.

**IV.**     **Application of the Pollution Exclusion**

A. *Gerling Position on the Pollution Exclusion*

76. Gerling contends that the settlements of *New Jersey* and *OCWD* include payments for spill liability based on direct spills from Tosco-owned, operated or affiliated sites as well as on product liability for spills of third parties. Any such payments, it argues, should be excluded from coverage under the Policy by Endorsement 5, the Blended Pollution Endorsement. The Pollution Exclusion applies "to any liability for . . . Property Damage . . . arising out of the discharge of pollutants . . . into the environment." It applies "whether or not such discharge . . . results from the Insured's activities or the activities of any other person or entity . . . ." An exception applies to this Exclusion for "Product Liability", which "has essentially three requirements":

> (1) the liability must take the form of injuries and damage "arising out of the end use" of COP's goods or products; (2) such use must occur "after possession of such goods or products has been relinquished to others by the insured" or other trading "in its name"; and (3) such use must occur "away from premises owned, rented or controlled by the Insured".

The Board has previously concluded that these requirements are "intended to keep the liabilities from product pollution on the polluter to the extent the polluter is able to control the amount of pollution it causes." Order No.1, pp.30-31. The burden of proof on establishing the Exclusion is on the insurer; the burden of proof on establishing the "Product Liability" exception to the Exclusion is on the insured. *Ment Bros. Iron Works Co. v. Interstate Fire & Cas. Co.,* 702 F.3d 118, 121 (2d Cir. 2012).

77. Gerling claims that the Pollution Exclusion applies to any part of the settlement amounts in *New Jersey* attributable to Tosco's liability for spills from Tosco-owned, operated or affiliated sites, some 200 stations and the Bayway refinery. It argues that amount should be determined to include "all or substantially all" of the $39 million settlement. As in the initial stage of this arbitration, Tosco does not contest Gerling's legal argument that direct or indirect spills are potentially subject to the Pollution Exclusion. It contends that the argument has no application to the *New Jersey* settlement, because COP received a release from liability for spills from Tosco-owned, operated or affiliated sites, and because – with regard to Bayway – it has not secured a release for pollution from spills at that property. The Board has agreed with Tosco's position on both these issues, so the Pollution Exclusion is inapplicable to Tosco's liability based on direct spills.

78. The Board has accepted Gerling's argument, however, that Tosco did have potential liability attributable to Tosco-owned, operated or affiliated sites in the *OCWD* litigation. That potential liability is not covered by the Policy due to the Pollution Exclusion, since the potential liability for pollution alleged by OCWD was based on the possibility of spills from Tosco-owned and controlled sites. The Board has decided, in

this regard, based on the available evidence, that $160,000 of the settlement amount should be deemed attributable to potential liability for direct spills in *OCWD*. This amount is properly excludable under the Pollution Exclusion, and no basis exists for applying the Commercial Product Exception to this amount.

79. Gerling also argues that the Pollution Exclusion applies to Tosco's liability for pollution caused by MTBE from gasoline that was traced from its refineries to third parties responsible for spills. That position would result in the exclusion from coverage of the entire *New Jersey* settlement, since Tosco has established that the settlement was entirely based on tracing of Tosco MTBE gasoline to such third parties. It would also result in the exclusion of all of the *OCWD* settlement not excluded as potential liability for spills for which Tosco was directly responsible. Gerling argues, moreover, that the Commercial Product Exception relied on by Tosco is inapplicable with regard to both settlements, as it is based on a "mischaracterization of the Panel's June 11, 2013 decision on COP's partial motion for summary judgment . . . and a selective reading of PFA 1 . . . ." Summation p.105. Gerling claims it is entitled to relief on this issue based on its reading of the three criteria the Board specified must be established to avoid the exclusion: (1) liability must arise out of the "end-use" of its product; (2) the end-use must occur after the insured "relinquished control" of its product; and (3) that use must occur "away from premises it owned, rented, or controlled."

80. Gerling contends that, to read these criteria as providing an exception to liability for acts of third parties that sell gasoline would ignore the Exclusion's provision that it applies whether or not the pollution "results from the Insured's activities or the

57

activities of any other person . . . ." Summation, pp.106-08. The "end-use" of gasoline, according to Gerling, must be "without any subsequent uses," i.e., "when MTBE is combusted in motor engines." Gerling Submission, p.51. Regarding the relinquishing-possession requirement, Gerling contends that Tosco has "failed to present *any* evidence as to when COP formally 'relinquished' possession or control of its MtBE gasoline in relation to when any given leak or spill was alleged to have occurred." Id. at 54 (emphasis in original). As to the third requirement – that the liability arose out of the use of MTBE "away from premises owned, rented or controlled" by COP – Gerling points out that the complaint against COP in *New Jersey* alleged that COP (as well as the other defendants) owned sites from which spills occurred "and/or exercised control over such gasoline stations through a variety of means, including written agreements, inspection rights, prescribing certain procedures and operating practices, prescribing specifications for products, conditions on sale of branded goods, agreements obligating such stations to acquire, store and sell gasoline containing MTBE, and training." Fourth Amended Complaint, Para. 107.

B.   *Tosco Position on the Pollution Exclusion*

81. Tosco once again does not challenge Gerling's argument that Paragraph 1 of the Pollution Exclusion applies regardless of whether the pollution results from the Insured's activities or the activities of any other person or entity, and that therefore coverage may be excluded based on product tracing to a refiner. (See Order No. 1: "Tosco makes no effort to claim its MTBE liabilities fall outside the pollution exclusion.") It insists however that, even if correct, that reading of the Pollution Exclusion is "irrelevant." This is so, Tosco contends, because Paragraph 2 of the

Exclusion provides that it does not apply to "product pollution liability." Reply Submission, p.29. That position, Tosco argues, is mandated by the Board's decision of a summary judgment motion made at the initial stage of this arbitration.

C.  *Board Decision on the Pollution Exclusion*

82. The Board agrees with Tosco that it has already determined the meaning of the exception for product pollution liability in its Order No.1. Based on that ruling the Board agrees that the exception's requirements are met in *New Jersey* as well as in *OCWD*. The Board reaffirms its view that the combination of "arising out of" and "end use" includes the full range of end uses of the completed product, including the sale and transfer by a refiner of MTBE gasoline to a wholesaler. Specific proof of each transfer that is traced to pollution is unnecessary and impractical to require. The sales and transfers were alleged by New Jersey and accepted by Tosco as having involved the relinquishment of the MTBE gasoline to the wholesalers and other buyers, and the pollution certainly occurred away from premises owned or rented by Tosco. As we ruled in Order No. 1 (pp.30-31): "The policy considerations underlying the pollution exclusion support relying on the definition of 'Product Liability' in determining the meaning of 'Product Pollution Liability'. The pollution exclusion is consistent with New York's policy of encouraging polluters to exercise care in commercial activities having a potential to cause pollution," and the definition's terms "implicitly exclude from coverage those forms of product liability that are within the control of the manufacturer to control." All three of the exclusion's requirements are "intended to keep the liabilities from product pollution on the polluter to the extent the polluter is able to control the amount of pollution it causes." Gerling argues that the "end use"

requirement cannot be read to eliminate all liability covered by the Pollution Exclusion," which extends to all pollution caused by anyone. The Exclusion's application to polluters, however, is part of the Pollution Exclusion and not part of the Exception, which exempts some forms of pollution potentially covered by the Exclusion. And the "end use" requirement is only one of three elements found in the 'Product Liability' definition . . . ." The Exclusion is not rendered meaningless merely because the "end use" requirement is read to apply to the full range of end uses of the completed product, as the Board previously ruled. Id. at 32. It is wholly impractical, moreover, to require a refiner to prove an end use that occurs out of its control and off its property.

83. Gerling also relies on the allegation in New Jersey's complaint against COP and others that the defendants "controlled" the premises from which the pollution occurred through contract requirements and other means. Such an allegation in a complaint, however, made in general terms regarding a number of defendants without differentiation, and unsupported by any evidence (such as an actual contract or other requirement), cannot itself be treated as evidence to rebut Tosco's proof that it sold and transferred control over its gasoline to third parties and that New Jersey intended to prove its gasoline was connected to third parties responsible for spills. No evidence has been introduced to support the proposition that Tosco exercised control over any of the third-party site owners Tosco estimated that New Jersey might have been able to connect to Tosco MTBE gasoline and were responsible for pollution. It would be inconsistent with the purpose of the exception to impose liability for pollution from

such sites on Tosco on a record that includes no evidence of any authority or exercise of control by Tosco over any possibly connected third-party polluter.

84. The Board, for the same reasons, cannot accept Gerling's contention that the Pollution Exclusion applies to Tosco-made MTBE gasoline traced to third parties responsible for environmental damages, which in the *OCWD* case amounted to the damages caused by some 80 stations to which Tosco-made MTBE gasoline could potentially have been traced. Id. at 112 (citing Lyons Affidavit, Para. 14). While, for the reasons stated above in connection with *New Jersey,* we assume pollution by third parties may be attributed to a refiner based on tracing, the Product Liability exception applies to the pollution liability in *OCWD* as it does in *New Jersey,* and so the settlement of such liability is entitled to coverage.

**IV**. **Exclusion of OCWD Coverage Based on Statutes of Limitation**.

85. Gerling contends that the settlement in *OCWD* is not covered by the Policy because of two decisions issued by Judge Scheindlin related to statutes of limitation. The Policy's "Period of Insurance," Gerling notes, extended from August 1, 1998 to August 1, 1999. Any possible liability Tosco faced in *OCWD* "must necessarily arise too late to fall under the terms of the Gerling Policy," Gerling contends, based on the reasoning in those decisions. One decision to which Gerling refers was issued on December 14, 2006; it dismissed claims arising from contamination which occurred prior to May 6, 2000 where OCWD "acted in response to an MTBE contamination." The second decision to which Gerling refers was issued on November 16, 2009; it dismissed claims related to contamination occurring prior to May 6, 2000 "where MTBE was detected in monitoring wells at levels at or above five [parts per billion]." Summation,

p.114. Gerling contends that, as a result of these decisions, the complaint in *OCWD* was amended to seek statutory damages only for contamination that occurred after May 6, 2000, and to seek declaratory relief only "with respect to future expenses" that OCWD might incur. This took Tosco's claims for relief out of the period of insurance coverage, Gerling argues. See Gerling Submission, pp.67-68.

86. Tosco's response is, first, that Judge Scheindlin dismissed claims against refiners, not insurance claims by refiners, especially in a case where injuries for which compensation is sought are part of an integrated occurrence expressly covered by the Policy. (Gerling stated in its letter of December 14, 2016 (p.4), for example, that all the claims before the Board "relate to the same integrated occurrence for which COP seeks coverage.") Second, Tosco states that its liability in the cases at issue in *OCWD* was for damage done by releases of gasoline in the 1990s that were detected years later. Tosco provided evidence that the wells at issue in this case were reviewed on a well-by-well basis, and wells in which contamination was *detected* before May 6, 2000 were removed from the settlement and "Tosco paid nothing for them." Opening Statement, p.15. The Board regards Tosco's positions on this issue, which are unrebutted by evidence, as persuasive. The Board therefore confirms that the *OCWD* claim is not barred by the statutes of limitation relied on by Judge Sheindlin in the cases referred to by Gerling.

## V. Gerling Claim Re Allocation of *Vermont* Settlement

87. In addition to its argument that the *Vermont* settlement of $316,666 should be excluded from coverage because Tosco failed to seek or secure Gerling's consent, Gerling argues that the settlement was based on an amount that COP's attorneys

considered significantly less than the cost of defending the action. It notes that the witness statement of Stephen Dillard, COP's attorney in negotiating the settlement, affirms that the settlement preceded what would have been an "expensive discovery process," and as a result no evidence had been developed as to "retail stations or any historic operations in the state of Vermont as to Tosco, Conoco, Phillips or ConocoPhillips." Witness Statement, Para. 13. Gerling argues that, since no evidence had been developed to justify any liability of Tosco at the time of settlement, and since the complaint was filed against COP and the settlement included all three COP entities, each of which would have faced at least one-third of the cost of the legal process, the settlement amount should be allocated equally to all three entities. If accepted this position would result in only one-third of the settlement amount being eligible for coverage as Tosco-based liability.

88. Tosco responds that it was the only one of the three companies facing liability in *Vermont*, in the form of a product liability claim based on Tosco's "history of distribution" of MTBE gasoline in New England. See Witness Statement of Stephen C. Dillard, Para. 13. The complaint in *Vermont* names COP as a defendant, including Tosco, but the only evidence submitted concerning possible liability is a letter from Mr. Ellison (referred to above) and Mr. Dillard's affidavit filed in connection with the hearing in Phase 3, both of which state that none of the three COP entities had gas stations or any historic operations in Vermont, and that the only possible basis for liability in the litigation was Tosco's "product exposure" due to its sale of MTBE gasoline in the New England area.

89. Based on the state of the record, and the Board's decision in PFA2, pp. 65-66, dealing with the *Bichmaf* and *Kirkman* cases, the Board concludes that the entire settlement amount should be attributed to Tosco. Tosco has carried its burden of proving that it faced some possible liability in Vermont, whereas no proof exists that either Conoco or Phillips faced any possible liability in that State. Tosco has also demonstrated that the settlement amount is reasonable, as it was far below the cost of litigation and preceded even the discovery process.

## VI. Costs

90. Tosco claims that it is entitled to recover all the costs of its defense in the three settlements at issue. It argues that its defense strategy was reasonable in all three cases, and that the amounts incurred were proportionate to the risks faced. It claims total costs in the three cases of $15,961,713.00, of which $1,896,657.00 are "pending". Tosco Initial Submission, Ex. 4(E). Ms. Renfroe testified that "averaging these defense costs across the 16 years of Tosco's Phase 3 Underlying Claims litigation equal approximately $875,000 per year – a very reasonable cost of defense for a national multi-case docket." She found "Tosco's costs of defense in the *New Jersey, OCWD,* and *Vermont* cases to be reasonable and necessary based on my experience in product liability cases of this nature and my review of the fees and costs involved." Third Expert Witness Statement, Gerling Initial Submission, Ex. 4, Para. 8 & pp. 13-14. Whereas in earlier cases portions of the costs incurred were attributable to the defense of Conoco or Phillips, the costs of defending the three cases at issue here were in "overwhelming measure" incurred in Tosco's defense and should therefore be recovered under the Policy, a conclusion consistent with the Board's ruling in PFA2,

pp. 29-30. Lyons April 2019 Witness Statement, Para. 49. The Board finds the unchallenged conclusions of both Tosco's experts to be sound, and based on extensive experience and expertise.

91. Gerling's position on costs appears to have been advanced in its Summation (Slides 62-63) rather than in any of its filings. It does not challenge Tosco's right to recover costs, but objects on the ground that, as to its Phase 3 claims, "COP did not submit its attorneys' legal fee invoices or any other admissible support for its expenses." It recalls "fighting this issue before: COP was previously required, and did, produce its legal fee invoices for inspection by Gerling." Consequently, it contends, COP has not met its burden, even under the procedure agreed "in prior phases," where "Gerling did not challenge the reasonableness." In addition, Gerling claims that "COP cannot summarize how it segregated out uncovered amounts without providing an explanation and detail," especially given at least one significant Tosco "math error." "Gerling has no reason to trust that COP otherwise performed its math right or made fair determinations of what is covered and what is not covered."

92. The Board would normally have disregarded Gerling's arguments advanced as they were only in its oral summation and set of slides. Gerling is correct, however, that even assuming the propriety of Tosco relying on the Parties' prior understandings related to costs – and in particular Gerling's willingness to assume that the fees proved actually to have been paid by Tosco were "reasonable" and "necessary" – Tosco should have supplied its invoices and other detail for Gerling's review. The Board does not accept Gerling's statement that Ms. Renfroe "does not testify that she has even seen the invoices." Ms. Renfroe affirmed that she reviewed the fees and costs

involved. However, Gerling has the right to perform such a review for itself, for the limited purposes agreed to by Gerling in prior phases. The Board will therefore retain jurisdiction to award the reasonable and necessary costs incurred by Tosco to enable Tosco to provide and for Gerling to review the evidence and raise such issues as it sees fit to raise. The Board notes in this regard that the allocation issue that was highly relevant at the first stage, and that was seriously argued at the second stage, is of far lesser significance at this stage. Gerling has introduced no evidence to justify allocating any part of the liability in any of the three settlements at issue to any COP entity other than Tosco.

## VII. Partial Final Award

93. Based on its Findings and Conclusions, as recited above in this Third Partial Final Award (PFA3), and the evidence to which it refers and the prior PFAs and orders it incorporates herein, the Board issues the following Partial Final Award:

   a.  All of the potential liability settled by COP in the *New Jersey*, *OCWD,* and *Vermont* settlements is exclusively attributable to Tosco, and none of the liability settled in those cases is attributable to other COP entities.

   b.  Tosco satisfied its obligations to provide Gerling with information and to seek Gerling's consent with regard to the settlements reached by COP on Tosco-based liability with New Jersey, OCWD, and Vermont, except for its claim for coverage of that part of the potential liability it settled with OCWD that related to spills from Tosco-owned, operated or affiliated sites, that the available proof indicates amounted to $160,000 of the settlement sum.

c.  The Policy's Pollution Exclusion is applicable to the entire settlement amounts in *New Jersey* and *OCWD*, as claimed by Gerling. The Policy's Product Exception applies, however, to the entire settlement amount in *New Jersey*, because that settlement released only claims based on Tosco's product liability for manufacturing MTBE gasoline traced to third parties responsible for the pollution alleged. The Policy's Product Exception applies to the entire amount of the settlement in *OCWD,* except the amount determined by the Board to be related to Tosco's potential liability for pollution from Tosco-owned, operated or affiliated sites, specifically $160,000.

d.  The statutes of limitation relied upon by Gerling as to the claims settled in *OCWD* are inapplicable, as the settled claims excluded wells polluted after the statutory period had expired.

e.  The following claims are therefore entitled to coverage under the Policy: for *New Jersey,* $39 million; for *OCWD*, $4,640,000; and for *Vermont*, $316,666, or in total the sum of $43, 956,666.

f.  In addition, Tosco is entitled to recover the reasonable and necessary costs incurred in securing coverage for the three settlements at issue, in an amount to be agreed by the Parties or determined by the Board, after Tosco has provided Gerling with its invoices and other evidence, and Gerling has had an opportunity to review the evidence for the limited purposes of determining that the amounts sought are accurately calculated, have actually been paid by COP, and are limited to Tosco-related liabilities. The Parties should advise the Board within sixty days of this Third Partial Final Award as to whether they have agreed on the amount of

costs Tosco is entitled to recover, failing which the Board retains jurisdiction to determine that amount after hearing from the Parties on the relevant issues.

g.  The Board also retains jurisdiction to resolve any remaining controversies related to the matters covered by the Parties' agreement to arbitrate.

So Ordered.

New York, New York, October 27, 2019

_____

Caleb Fowler, Arbitrator (dissenting in part)

_____

Jerold Oshinsky, Arbitrator

_____

Abraham D. Sofaer, Umpire