# EXHIBIT 2



## COMPANY POLICY

**IN CONSIDERATION** of the Insured named in the Schedule hereto having paid the premium set forth in the said Schedule to the Insurers who have subscribed their Names (hereinafter referred to as "the Insurers")

**THE INSURERS HEREBY AGREE** for the proportion set forth herein to indemnify the Insured or the Insured's Executors, Administrators and Assigns against Loss as more fully set forth in the attached wording and any amendments which are endorsed hereon during the period of Insurance stated in the said Schedule or during any subsequent period of Insurance stated in the said Schedule or during any subsequent period as may be mutually agreed upon between the Insured and the Insurers.

**PROVIDED** that the liability of the Insurers shall not exceed the Sum Insured expressed in the said Schedule.

If the Insured shall make any claim knowing the same to be false or fraudulent, as regards amount or otherwise, this Policy shall become void and all claim hereunder shall be forfeited.

**IN WITNESS WHEREOF I,** being a representative of the Insurers and authorised by the said Insurers to sign this Policy on their behalf, have hereunto subscribed my name this     4th   day of    April        Two Thousand

S.R.1 (WDG)

| The Insurers | Proportion | Reference Numbers |
|---|---|---|
| Gerling-Konzern General Insurance Company UK Branch | 50% | 62 500283 01 62 920096 01 |

## <u>SEVERAL LIABILITY NOTICE</u>

The subscribing insurers' obligations under contracts of insurance to which they subscribe are several and not joint and are limited solely to the extent of their individual subscriptions. The subscribing insurers are not responsible for the subscription of any co-subscribing insurer who for any reason does not satisfy all or part of its obligations.

**LSW1001 (Insurance) 08/94**

Date: 1st March, 2000

Policy No. 509/DL253098

## THE SCHEDULE

| | |
|---|---|
| **The Insured** | **TOSCO CORPORATION** |

**Premium**  US$485,000 (100%)

**Sum Insured**  )
)
)
)
**Interest Insured**  )  All as more fully set forth in the attached wording
)  which is deemed to form an integral
)  part of this Policy.
)
**Insured Perils**  )

**Hereon**  50% of the Premium and Sums Insured above.

### Period of Insurance

From 1st August, 1998          To      1st August, 1999
Both days at 12.01 a.m. Local Standard Time at the address of the Insured
and for such further period or periods as may be mutually agreed upon.

Policy No.: 509/DL253098

## GERLING-KONZERN GENERAL INSURANCE COMPANY UK BRANCH

**Producer:**              Marsh Ltd,
                          Global Broking Division,
                          No 1, The Marsh Centre,
                          London,
                          E1 8DX.
                          U.K.

**In favor of:**           Tosco Corporation,
                          72 Cummings Point Road,
                          Stamford, Connecticut 06902, U.S.A.

**Type of Coverage:**      Excess Liability arising from all of the Insured's operations.

                          In the amount as stated in Item 2 of the Declarations.

**Term:** Beginning at 12:01 A.M. on the 1st day of August, 1998 ("Inception Date") with retroactive coverage from 12:01 A.M. on the 1st April 1989 other than in respect of Employment Practices Liability which 1st August, 1998("Retroactive Coverage Date"), Expiring at 12:01 A.M. on the 1st day of August, 1999 ("Expiration Date") in each case, Local Standard Time at the address of the Named Insured and in accordance with terms and conditions of the form (s) attached.

**Net Premium:**           $485,000 flat, in full per annum 100%

Policy No. DL253098     COVERAGE APPLIES, SUBJECT TO THE TERMS, CONDITIONS AND EXCLUSIONS OF THE POLICY, ONLY IF NOTICE OF OCCURRENCE OR CLAIM IS GIVEN DURING THE POLICY PERIOD (AS IT MAY BE EXTENDED) OR, IF PURCHASED, THE OPEN-END DISCOVERY PERIOD

## EXCESS LIABILITY INSURANCE DECLARATIONS

**Item 1**   (a)   Named Insured:     Tosco Corporation

       (b)   Address of Named Insured:   72 Cummings Point Road
Stamford, Connecticut 06902. U.S.A.

**Item 2**   Limit of Liability:

| | Layer | Limit in Respect of each Occurrence | | Per Occurrence Retention Amount |
|---|---|---|---|---|
| (a) | | US $100,000,000 | excess of: | See Endorsement No. 1 |

       (b)   Annual period limit in the aggregate for all covered occurrences and claims:

            US $100,000,000

**Item 3**   Inception Date: 1st August 1998 at 12:01 a.m. Local Standard Time

**Item 4**   Retroactive Coverage Date: 1st April, 1989 other than in respect of Employment Practices Liability which 1st August, 1998

**Item 5**   Representative of Named Insured:     Marsh Ltd
Global Broking Division,
No 1, The Marsh Centre,
London,
E1 8DX.
U.K.

**Item 6**   Notice:     Marsh Ltd, Global Broking Division
(Address: As per Item 5 Above)

**Item 7**   Currency:     United States Dollars

**Item 8**   Premium:     $485,000 flat, in full per annum

Said insurance is subject to the provisions, stipulations, exclusions and conditions contained in this form and the representations and warranties of the Named Insured contained in the Named Insured's initial and extension applications for this policy of insurance, which are hereby made a part of said insurance, together with other provisions, stipulations, exclusions and conditions as may be endorsed on said policy or added thereto as therein provided (collectively hereinafter referred to as the "Policy").

Tosco98.sam

**EXCESS LIABILITY POLICY**

Named Insured:    As stated in item 1 of the Declarations forming a part hereof (hereinafter called the "Named Insured").

**INSURING AGREEMENTS**

I. **COVERAGE**

The Insurers subscribing to this policy (hereinafter called the "Underwriters") hereby agree subject to the limitations, terms, exclusions and conditions hereinafter mentioned, to indemnify the Insured for all sums which the Insured shall be obligated to pay by reason of liability imposed upon the Insured by law or assumed under contract or agreement by the Insured for damages on account of -

(1)    personal injury,
(2)    property damage or
(3)    advertising liability

anywhere in the universe, resulting from:

Coverage (A):    an occurrence (as defined herein), notice of which shall have been given by the Named Insured to the Underwriters prior to the expiration of this Coverage A in accordance with Section (d) of Article V (Conditions) hereof ("Coverage A"), or

Coverage (B):    an occurrence (as defined herein), notice of which shall have been given by the Named Insured to the Underwriters during the Discovery Period in accordance with Section (d) of Article V (Conditions) hereof ("Coverage B"), but only if the Named Insured shall have elected to obtain Coverage B pursuant to Section (u) of Article V (Conditions) hereof (or if a former subsidiary, affiliate or associated company of the Named Insured shall have Coverage B by virtue of Section (w) of Article V (Conditions) hereof):

provided, however, that the aggregate limit, the per occurrence limit, the per occurrence retention, and the terms, conditions and exclusions of coverage shall be determined under the Policy as in effect at the time notice of the occurrence for which coverage is asserted is first given pursuant to Section (d) of Article V (Conditions) hereof.

II. **LIMIT OF LIABILITY**

(a)    Subject to all the provisions hereof, for each layer of coverage as set forth in Item 2(a) of the Declarations the Underwriters shall be liable only for that amount of ultimate net loss for each occurrence covered pursuant to Article I hereof in excess of the greater of either:

(1)    the limits (to the extent not exhausted by actual payment of claims) of the underlying insurances listed on the present and/or any prior Schedule B hereto

(hereinafter called the "underlying limits"), as to which the Underwriters and the Named Insured expressly agree that the insurance provided by this Policy shall (A) be in excess in respect of such occurrences covered by said underlying insurances (it being understood that this Policy shall in no way be subject to, or affected by, the terms, conditions, or limitations of said underlying insurances), and (B) apply only as if such underlying insurances were fully available and collectable for all occurrences covered thereunder,

or

(2)   the per occurrence retention amount set forth in Item 2(a) of the Declarations,

and then only up to a further sum as stated in Item 2 (a) of the Declarations in respect of each layer for each occurrence - subject to the limit as stated in Item 2 (b) of the Declarations in the aggregate for each annual period for all occurrences covered hereunder of which notice is first given during such annual period (or during the Discovery Period with respect to the immediately preceding annual period or portion thereof) - irrespective of the period over which the losses, injuries, damages or liabilities occur or the number of such losses, injuries, damages or liabilities.

(b)   The inclusion or addition hereunder of more than one Insured shall not operate to increase the Underwriters's limits of liability beyond those set forth herein.

## III.   DEFINITIONS

This Policy is subject to the following definitions:

(a)   **Insured**

(1)   The unqualified word "Insured" includes:

(A)   the Named Insured, and, if the Named Insured is designated in item 1 of the Declarations as a partnership or joint venture, the partnership or joint venture so designated and each partner or member thereof but only with respect to his liability as such;

(B)   (i) any subsidiary or affiliate of the Named Insured for any annual period whose accounts as of the date of the financial statements of the Named Insured submitted to the Underwriters most recently prior to the rating of the premium for such annual period (x) are consolidated in the financial statements of the Named Insured in accordance with generally accepted accounting principals in the United States of America (or, in the case of any foreign Named Insured, any subsidiary or affiliate whose accounts would be consolidated in the financial statements of such Named Insured if such accounts would have been consolidated in accordance with generally accepted accounting principles in the United States of America), or (y) were eligible for such consolidation and

whose financial statements were submitted to the Underwriters with such financial statements of the Named Insured as of such date; and/or (ii) any subsidiary, affiliate or associated company of the Named Insured listed on Schedule A hereto;

(C)   any present or former officer, director, stockholder or employee of any person or entity named in paragraph (A) or (B) above or (F) below, but only with respect to liability for acting within the scope of his duties as such an officer, director, stockholder or employee, and any organization or proprietor with respect to any liability for providing real estate management for any such person or entity named in paragraph (A) or (B) above or (F) below;

(D)   any person, organization, trustee or estate to whom any person or entity named in paragraph (A) or (B) above or (F) below is obligated by virtue of a written contract or agreement to provide insurance such as is afforded by this Policy, but only to the extent of such obligation and only in respect of operations (other than commercial insurance operations) by or on behalf of such person or entity named in paragraph (A) or (B) above or (F) below or of facilities owned or used by such person or entity named in paragraph (A) or (B) above or (F) below;

(E)   with respect to any automobile owned by any person or entity named in paragraph (A), (B) or (C) above or (F) below or hired for use on behalf of any such person or entity, any person or organization legally responsible for the use thereof, provided the actual use of the automobile is with the permission of such person or entity;

(F)   any joint venture, co-venture, joint lease, joint operating agreement or partnership (hereinafter called "Joint Venture") in which the Insured has an interest, but only if:

   (i)    the Insured has sole responsibility for the Joint Venture, or

   (ii)   the Insured is obligated to provide insurance for the Joint Venture in its entirety such as is afforded by this Policy.

(2)   (A)   It is hereby understood and agreed by each Insured and the Underwriters that, as regards any liability of an Insured which arises in any manner whatsoever out of the operations or existence of any Joint Venture in which such Insured has an interest, the liability of the Underwriters under this Policy in each layer shall be limited to the product of (a) the percentage interest of the Insured in such liability of such Joint Venture (whether direct or by virtue of the insolvency of others interested in such Joint Venture) and (b) the total limit of liability insurance afforded such Insured for such layer by this Policy.

(B)   It is further understood and agreed that in circumstances where paragraph (A) applies to limit the liability of the Underwriters under

this Policy, the Underwriters shall be liable for each layer in respect of the liability of the Insured in excess of the greater of (i) the product of the per occurrence retention amount specified in Item 2(a) of the Declarations and the percentage interest of the Insured in such liability of such Joint Venture as determined pursuant to paragraph (A), or (ii)

the underlying limits (as such may be reduced if the underlying insurances have been reduced by a clause having the same effect as paragraph (A)).

(C)   It is further understood and agreed that paragraphs (A) and (B) of this subsection (2) shall not apply if:

(i)   the insured has sole responsibility for the Joint Venture, or

(ii)   the Insured is obligated to provide insurance for the Joint Venture in its entirety such as is afforded by this Policy.

(3)   It is agreed to automatically include as an Insured without adjustment of premium under this Policy for any annual period any entity acquired or formed by or merged with an Insured (a "Potential Additional Insured") during such annual period provided that (a) the fair value of the sum of all cash, securities, assumed indebtedness and other consideration expended by all Insureds for any such acquisition, formation or merger or any series of interrelated acquisitions, formations or mergers does not exceed 5% of the total assets of the Named Insured and its consolidated subsidiaries and affiliates as most recently reported to the Underwriters for rating purposes prior to such annual period, (b) the incremental annual gross revenues attributable to such acquisition, formation or merger or any series of interrelated acquisitions, formations or mergers do not exceed 5% of the total annual gross revenues of the Named Insured and its consolidated subsidiaries and affiliates as most recently reported to the Underwriters for rating purposes prior to such annual period: and (c) neither the operations of the Potential Additional Insured prior to such acquisition, formation or merger or any series of interrelated acquisitions, formations or mergers nor the resultant combined or consolidated operations of such Insured and the Potential Additional Insured subsequent to such acquisition, formation or merger or any series of interrelated acquisitions, formations or mergers are materially different from those of such Insured prior to such acquisition, formation or merger or any series of interrelated acquisitions, formations or mergers. Unless notice to the Underwriters shall have been given and additional premium, if any, shall have been paid in respect of the acquisition or formation of or merger with any Potential Additional Insured not meeting the criteria set forth herein, such Potential Additional Insured shall not be an Insured hereunder. With respect to any occurrence giving rise to liability of any Potential Additional Insured that qualifies to be an Insured hereunder, the Inception Date (for the first and all subsequent annual periods) shall be the date of merger with or acquisition or formation of the Potential Additional Insured by an Insured or such other date as may be agreed between the Named Insured and the Underwriters.

(b)   **Personal Injury**

The term "personal injury" means, but is not limited to, bodily injury (including death at any time resulting therefrom), mental injury, mental anguish, shock, sickness, disease, disability, false arrest, false imprisonment, wrongful eviction, detention, malicious prosecution, discrimination, humiliation, and all libel, slander or defamation of character or invasion of rights of privacy.

(c)   **Property Damage**

The term "property damage" means (1) physical injury to or destruction of tangible property including the loss of use thereof at any time resulting therefrom, (2) loss of use of tangible property which has not been physically injured or destroyed, or (3) evacuation losses arising from actual or threatened physical injury to or destruction of tangible property or bodily injury.

(d)   **Advertising Liability**

The term "advertising liability" means liability for damages on account of:

(1)   libel, slander or defamation;

(2)   any infringement of copyright or of title or of slogan;

(3)   piracy or misappropriation of ideas under an implied contract;

(4)   any invasion of right of privacy;

committed or alleged to have been committed in any advertisement, publicity article, broadcast or telecast and arising out of the Insured's advertising activities.

(e)   **Occurrence**

The term "occurrence" means

(i)   an event or a continuous, intermittent or repeated exposure to conditions which causes, allegedly causes or is deemed to cause personal injury or property damage or gives rise to advertising liability, which event or conditions commence at or subsequent to the Inception Date (or, if applicable, the Retroactive Coverage Date) and prior to the expiration of Coverage A, or

(ii)   use of the Insured's products which causes, allegedly causes or is deemed to cause personal injury or property damage taking place both prior to the expiration of Coverage A and at or subsequent to the Inception Date (or, if applicable, the Retroactive Coverage Date),

and which injury, damage or liability is neither expected nor intended by the Insured. Where certain actual or alleged injury, damage or liability is expected or intended by

the Insured or the Insured has historically experienced a level or rate of actual or alleged injury, damage or liability associated with given products or operations and actual or alleged injury, damage or liability fundamentally different in nature or vastly greater in order of magnitude occurs, such actual or alleged injury, damage or liability shall not by virtue of such expectation, intent or historical experience be deemed expected or intended to the extent and only to the extent it is different or incrementally greater.

(f)   **Occurrence Integration**

Where a series of and/or several actual or alleged losses, injuries, damages or liabilities occur which are attributable directly, indirectly or allegedly to the same actual or alleged event, condition, cause, defect or hazard or failure to warn of such, all such actual or alleged losses, injuries, damages or liabilities shall be added together and treated as one occurrence irrespective of the period or area over which the actual or alleged losses, injuries, damages or liabilities occur or the number of such actual or alleged losses, injuries, damages or liabilities.  So far as losses, injuries, damages or liabilities resulting or alleged to result from the design, formulation, manufacture, distribution, use, operation, maintenance or repair of an Insured's product or the failure to warn as to the use, operation or maintenance of an Insured's product, the term "the same actual or alleged event, condition, cause, defect or hazard or failure to warn of such" means any such design, formulation, manufacture, distribution, use, operation, maintenance, repair or failure to warn, as the case may be, as to which such losses, injuries or damages are directly, indirectly or allegedly attributable.

(g)   **Damages**

The term "damages" means all forms of compensatory damages, monetary damages, statutory damages and punitive or exemplary damages and costs of compliance with equitable relief (other than governmental or criminal fines or penalties), and legal expenses or other costs which the Insured shall be obligated to pay by reason of judgement (or, where applicable, settlement) for liabilities on account of personal injury, property damage and advertising liability including, but not limited to, hospital, medical and funeral charges and all sums paid as salaries, wages, compensation, fee charges and law costs, premiums on attachment or appeal bonds, interest, expenses for doctors, lawyers, nurses and investigators and other persons, and for litigation (including, but not limited to, attorneys' fees and disbursements), settlement, adjustment, and investigation of claims and suits which are paid as a consequence of an occurrence covered hereunder, excluding only the salaries, wages and benefits of the Insured's employees.

(h)   **Ultimate Net Loss**

The term "ultimate net loss" means the total sum which the Insured (or an underlying insurer) shall become obligated to pay in respect of any one occurrence for damages on account of personal injury, property damage or advertising liability, either through adjudication or (subject to Section (g) of Article V (Conditions) hereof) compromise.

(i)     **Automobile**

The term "automobile" means a land motor vehicle, trailer or semi-trailer.

(j)     **Watercraft**

The term "watercraft" means any ship or vessel of whatever type, including, but not limited to, cargo vessels, passenger vessels, other vessels used for transport, towboats and barges, vessels used in the construction of pipelines, platforms or other facilities, storage vessels, tanker vessels, drill ships, drilling rigs and barges (including, without limitation, submersible drill rigs and barges, semi-submersible drill rigs and barges and self-elevating drill rigs and barges) and all other vessels of whatever nature and description, all whether or not self-propelled but shall not include an offshore oil or gas platform secured in place for drilling and/or producing operations.

The term "incidental watercraft use" means use by the Insured of any owned, leased or chartered watercraft less than 75 feet in length but shall not include:

(i)     use of watercraft for the commercial carriage of paying passengers or cargo for parties other than the Insured in exchange for a fee;

(ii)    use of watercraft in connection with the commercial provision of marine services to others for a fee;

(iii)   use of any watercraft held in inventory or otherwise for lease or charter to another person by an Insured in the business of lease or charter of watercraft; or

(iv)    use of watercraft owned by a party other than the Insured which is being serviced, maintained, fueled, or tested or otherwise is in the temporary care, custody or control of the Insured in connection with any business operations of the Insured relating to watercraft servicing, maintenance, fueling, testing, storage or associated or similar matters.

(k)     **Aircraft**

The term "aircraft" means any heavier than air or lighter than air aircraft, missile or spacecraft.

(l)     **Annual Period**

The term "annual period" means the annual period commencing at (i) the Inception Date or each anniversary date and time of the Inception Date for the Named Insured, or (ii) with respect to Coverage B, at the expiration of Coverage A or each anniversary date and time of such expiration; provided, however, that if the Retroactive Coverage Endorsement is purchased, the first "annual period" shall be the period from the Retroactive Coverage Date until the first anniversary date and time of the Inception Date.

(m)  **Discovery Period**

The term "Discovery Period" means the period, if applicable, commencing upon the expiration of Coverage A of this Policy and ending on the date provided in Section (u) or (w) of Article V (Conditions) hereof.

(n)  **Product Liability**

The term "product liability" means liability for personal injury or property damage arising out of the end-use of goods or products manufactured, sold, tested, handled or distributed by the Insured or others trading under its name if such use occurs after possession of such goods or products has been relinquished to others by the Insured or by others trading under its name and if such use occurs away from premises owned, rented or controlled by the Insured; provided such goods or products shall be deemed to include any container thereof other than a vehicle, watercraft or aircraft.

(o)  **Industrial Aid Aircraft Use**

The term "industrial aid aircraft use" means use by the Insured of any owned, non-owned, leased or chartered aircraft principally for the transportation of officers and employees of the Insured and invited guests having a seating capacity (exclusive of cockpit crew but inclusive of cabin crew) of no more than 20 persons (whether or not all such seats are occupied) but shall not include (i) use of any aircraft for commercial airline operations, (ii) use of any aircraft held in inventory or otherwise for sale, lease, charter or delivery to another person by an Insured in the business of manufacture, sale, lease or charter of aircraft; (iii) use of aircraft for product testing or demonstration purposes; (iv) use of aircraft owned by a party other than the Insured which is being serviced, maintained, fueled or tested or otherwise is in the temporary care, custody or control of the Insured in connection with any business operations of the Insured relating to aircraft servicing, maintenance, fueling, testing, storage or associated or similar matters; or (v) use of any aircraft giving rise to product liability of the Insured.

(p)  **Insured's Products**

The term "Insured's products" means goods or products manufactured, sold, tested, handled or distributed by the Insured or others trading under its name or materials that were the subject of completed or abandoned operations of the Insured.

IV.  **EXCLUSIONS**

This Policy shall not apply to, and the Underwriters shall have no liability hereunder to the Insured in respect of, the following:

(a)  any liability or alleged liability for personal injury or property damage taking place prior to the Inception Date (or, if applicable, the Retroactive Coverage Date), not withstanding any other provision of this policy.

(b)    any obligation for which the Insured or any underwriters as its insurer may be held liable under any worker's compensation, unemployment compensation or disability benefits law; provided, however, that this exclusion does not apply to liability of others assumed by the Insured under contract or agreement or to liability arising under the Federal Employers' Liability Acts, the Jones Act or, in the case of any Insured which is an authorized self-insurer, the Longshoremen's and Harbor Workers' Compensation Act.

(c)    liability or alleged liability for property damage arising or alleged to arise out of any act, error or omission in the rendering of professional services, other than architectural and engineering services (which are nonetheless subject to the other exclusions herein, including, without limitation, exclusion (e) below), including, but not limited to, the rendering of legal, accounting, data processing, consulting, or investment advisory services.

(d)    property damage to:

    (1)    property owned or occupied by or rented to the Insured;
    (2)    property loaned to the Insured;
    (3)    personal property in the care, custody or control of the Insured; or
    (4)    that particular part of real property or fixtures on which the Insured or any contractors or subcontractors working directly or indirectly on behalf of the Insured are performing operations, if such property damage arises out of such operations;

provided, however, that subsections (2), (3) and (4) of this exclusion (d) do not apply to liability assumed under a sidetrack agreement.

(e)    liabilities or alleged liabilities of the Insured:

    (1)    resulting from or alleged to result from the failure of the Insured's products or work completed by or on behalf of the Insured to meet any warranty or representation by the Insured as to the level of performance, quality, fitness or durability or perform the function or serve the purpose intended by the Insured to the extent that such liability or alleged liability from such failure relates to the diminished value or economic utility of the Insured's products or work completed by or on behalf of the Insured;

    (2)    with respect to personal property, on account of property damage to any part of the Insured's products or of work performed by or on behalf of the Insured, if such property damage arises out or is alleged to arise out of that particular part of such products or work, or out of materials, parts or equipment furnished in connection therewith;

    (3)    for the withdrawal, inspection, repair, replacement, or, in connection with any of the foregoing, loss of use of the Insured's products or work completed by or for the Insured or of any property of which such products or work form a part; or

    (4)    in respect of loss of use of tangible property which has not been physically injured or destroyed attributable to any failure to perform or inadequate performance of any contractual or legal obligation by the Insured, except where such loss of use results from unexpected and unintended physical injury to or destruction of tangible property.

(f)    with respect to advertising activities, liabilities or alleged liabilities of the Insured for:

    (1)    breach of contract, but this shall not relate to claims for unauthorized appropriation of ideas based upon alleged breach of an implied contract;

    (2)    infringement of a registered trademark, service mark or trade name by use thereof as the registered trademark, service mark, or trade name of goods or services sold, offered for sale or advertised, but this shall not relate to titles or slogans;

    (3)    mistake in advertised price; or

    (4)    the failure of goods, products or services to conform to advertised quality or performance.

(g)    except in respect of personal injury or property damage taking place in and caused by events or conditions occurring in the land area of the United States of America, its territories or possessions or Canada, any personal injury, property damage or advertising liability of the Insured directly or indirectly occasioned by, happening through or in consequence of war, invasion, hostile action of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation or nationalization or requisition or destruction of or damage to property by or under the order of any government or public or local authority.

(h)    personal injury, property damage or advertising liability arising out of, or alleged to arise out of, the manufacture and/or distribution and/or sale and/or installation and/or removal and/or utilization and/or ingestion or inhalation of, or exposure to, as the case may be, products manufactured, distributed, sold or installed by the Insured containing or consisting of:

    (1)    asbestos fibers,

    (2)    tobacco or tobacco products,

    (3)    2, 4, 5 trichlorophenoxyacetic acid ("2,4,5-T"),

    (4)    asbestiform talc,

    (5)    diethylstilbesterol ("DES") or

    (6)    any intra-uterine device ("IUD");

provided, however, that this exclusion shall not apply to personal injury or property damage caused by an occurrence where such personal injury or property damage is not

related to the asbestos, tobacco, or other consumed portion of a tobacco product, 2,4,5-T, asbestiform talc, DES or IUD content or nature of the product or completed operations.  The listing of products herein shall not give rise to an inference that personal injury, property damage or advertising liability attributable to other products was neither expected nor intended by the Insured.

(i)     any liability or alleged liability for damages arising out of, or alleged to arise out of, the design, manufacture, construction, maintenance, service, use or operation of any aircraft, or any component part or equipment thereof, or any other airplane navigational or aviation related equipment or any other actual or alleged liability, personal injury, property damage or advertising liability directly or indirectly arising out of a crash, hijacking or other circumstance in connection with the operation of an aircraft; provided, however, that this exclusion shall not apply:

     (1)     in respect of aircraft fueling and related operations with respect to personal injury or property damage occurring at the time of such operations, i.e.. while the aircraft involved in any occurrence is on the ground and motionless;

     (2)     to liability or alleged liability in respect of any item of goods intended to be a component part of an aircraft or aircraft equipment where such part or equipment has not yet been incorporated into any aircraft (other than an incomplete aircraft which is in the process of initial manufacture at an indoor premises and which has never been used for self-propelled movement either on the ground or in the air) and such liability or alleged liability and the personal injury, property damage or advertising liability giving rise thereto do not arise directly or indirectly out of a crash, hijacking or other circumstance in connection with the operation of any aircraft;

     (3)     to liability or alleged liability in connection with manufacturing and associated operations in respect of aircraft or any component part thereof or any aircraft equipment where all personal injury and property damage giving rise to such liability or alleged liability take place at a manufacturing, storage or associated premises on the ground (or in connection with on the ground transportation by other than an aircraft) and such liability or alleged liability and the personal injury, property damage or advertising liability giving rise thereto do not arise directly or indirectly out of a crash, hijacking or other circumstance in connection with the operation of any aircraft;

     (4)     in respect of the Insured's products which consist of or are incorporated into cabin furnishings, food service equipment or other materials or equipment used in the interior of an aircraft which are not necessary to or integrally related with flight. take-off, landing or navigation of the aircraft;

     (5)     in respect of the Insured's products which are of a type and grade sold principally for purposes other than use in aircraft or aviation which are incorporated into aircraft hulls or components or aviation related equipment (e.g., microchips used principally in personal computers which also are used in flight computers or a grade of aluminum ingot suitable for a broad range of commercial uses which is used in an aircraft wing); or

(6)     to liability or alleged liability for physical property damage to third parties or personal injury arising out of or allegedly arising out of industrial aid aircraft use, but in respect of any occurrence arising out of industrial aid aircraft use the per occurrence retention amount shall be the greater of the amount set forth in Item 2(a) of the Declarations or $50,000,000. "Physical property damage to third parties" shall include only physical damage to other aircraft or to tangible property on the ground occurring upon the physical impact of the aircraft owned, leased or chartered by the Insured or the debris thereof with such other aircraft or property on the ground (as well as associated debris removal) and shall not include, without limitation, property damage to the hull or any other portion of the aircraft, owned, used, leased or chartered by the Insured or to its cargo or other contents.

(j)   any liability or alleged liability for personal injury, property damage or advertising liability in any manner arising out of or alleged to arise out of the design, construction, maintenance, sale, manning, ownership or operation of any watercraft, including, by way of illustration but not by limitation, liability arising out of or alleged to arise out of any collision, explosion, fire, sinking or debris involving watercraft, liabilities arising out of or alleged to arise out of the discharge, dispersal, release or escape of cargo, ballast, fuel, pollutants or any other matter from any watercraft, or any liability of the Insured arising under or alleged to arise under the terms of the International Convention on Civil Liability for Oil Pollution Damage, including any amendments or supplemental agreements thereto or extensions thereof, and any future conventions (as amended, supplemented or extended) of a similar nature or purpose which are applicable to watercraft; provided, however, that this exclusion does not apply to:

(1)     watercraft or risks listed on Schedule C hereto and any additional watercraft acquired in the ordinary course of business during the annual period of a similar type and use as vessels listed on Schedule C, subject to the limitation that the aggregate gross registered tonnage of all such additional watercraft of any given type and use shall not exceed 20% of the gross registered tonnage of vessels of such type and use listed on Schedule C;

(2)     loading or unloading of any watercraft at premises owned, leased or controlled by the Insured;

(3)     liability or alleged liability for any personal injury or property damage to third parties arising out of or allegedly arising out of incidental watercraft use (provided that damage to the hull or any portion, component or equipment of the watercraft owned, leased or chartered by the Insured or to its cargo or other contents shall not constitute property damage to third parties);

(4)     liability or alleged liability for personal injury, property damage or advertising liability arising out of or alleged to arise out of the design, construction, maintenance or sale by the Insured of any watercraft less than 75 feet in length; or

(5)     liability or alleged liability for personal injury, property damage or advertising liability arising out of or alleged to arise out of design, manufacture, maintenance or sale by the Insured of any component part or equipment of any watercraft.

(k)    (1)    (A)    except as provided in subsection (2) below, any liability or alleged liability of the Insured for personal injury, property damage or advertising liability arising out of or alleged to arise out of the discharge, dispersal, release, or escape of pollutants into or upon land or other real estate, atmosphere, any watercourse or body of water whether above or below ground or otherwise into the environment; or

       (B)    to any liability or alleged liability, loss, cost or expense of the Insured arising out of any direction or request, whether governmental or other, that the Insured test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants.

       (C)    It is understood and agreed that this exclusion shall apply whether or not the discharge, dispersal, release or escape:

              (i)     results from the Insured's activities or the activities of any other person or entity;

              (ii)    is sudden, gradual, accidental, foreseeable, expected or fortuitous (except as provided in subsection (2) below).

       (D)    This exclusion shall not apply as respects any intentional discharge or dispersal of any substance for the purpose of mitigating or avoiding personal injury or property damage which, subject to satisfaction of the per occurrence retention amount and/or exhaustion of underlying limits, would be covered under this Policy.

    (2)    (A)    The exclusion set forth in subsection (1) above does not apply to any liability of the Insured (i) for product liability; or (ii) for personal injury or property damage caused by an occurrence constituting from the standpoint of the Insured an unexpected and unintended discharge, dispersal, release or escape of pollutants but only if the Insured becomes aware of the commencement of the discharge, dispersal, release or escape within seven (7) days of such commencement and complies with the special notice provisions of paragraph (B) of this subsection (2).

       (B)    Notwithstanding anything in this Policy to the contrary, the Underwriters shall not be liable to the Insured by virtue of paragraph (2) (A) (ii) of this Section (k) unless the Named Insured provides the Underwriters with notice in writing of the commencement of such discharge, dispersal, release or escape within forty (40) days of such commencement.  The Insured shall otherwise comply with all the conditions set forth in this Policy.

The term "pollutant" shall mean any solid, liquid, gaseous or thermal irritant, contaminant or toxic or hazardous substance or any substance which may, does, or is alleged to affect adversely the environment, property, persons or animals, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  "Waste" includes, without limitation, materials to be recycled, reconditioned or reclaimed.

(l)     liability or alleged liability for:

(1)     personal injury, property damage or advertising liability in the United States, its territories or possessions, Puerto Rico or the Canal Zone (A) with respect to which an Insured under the Policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limited liability or (B) resulting from the hazardous properties of nuclear material and with respect to which (i) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (ii) the Insured is or, had this Policy not been issued, would be entitled to indemnity from the United States of America or any agency thereof under any agreement entered into by the United States of America or any agency thereof with any person or organization;

(2)     medical or surgical relief or expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization in the United States, its territories or possessions, Puerto Rico or the Canal Zone;

(3)     injury, sickness, disease, death or destruction resulting from hazardous properties of nuclear material, if (A) the nuclear material (i) is at any nuclear facility owned by or operated by or on behalf of an Insured in the United States, its territories or possessions, Puerto Rico or the Canal Zone or (ii) has been discharged or dispersed therefrom, (B) such nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed by or on behalf of an Insured in the United States, its territories or possessions, Puerto Rico or the Canal Zone or (C) the injury arises out of the furnishing by an Insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of a nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this clause (3) (C) applies only to injury to or destruction of property at such nuclear facility.

(4)     As used in this Section (l):

(A)     "hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear

material or by-product material; "source material," "special nuclear material" and "by-product material" have the meanings given them by the Atomic Energy Act of 1954 or in law amendatory thereof; "spent fuel" means any fuel element or fuel component, solid or liquid which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material (i) containing by-product materials and (ii) resulting from the operation by a person or organization of a nuclear facility included within the definition of nuclear facility under clauses (B) (i) or (B) (ii) (below):

(B)   "nuclear facility" means

(i)   any nuclear reactor;

(ii)   any equipment or device designed or used for (x) separating the isotopes of uranium or plutonium, (y) processing or utilizing spent fuel, or (z) handling, processing or packaging waste;

(iii)   any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the Insured at such premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or combination thereof or more than 250 grams of uranium 235;

(iv)   any structure, basin, excavation, premises or place prepared for storage or disposal of waste.

(C)   "Nuclear facility" includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

(D)   "Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain critical mass of fissionable material.

(E)   With respect to injury or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property or loss of the use thereof.

(m)   liability or alleged liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from ionizing radiations or contamination by radioactivity outside the United States, its territories or possessions, Puerto Rico or the Canal Zone from any nuclear fuel or from any nuclear waste from the combustion, fission or fusion of nuclear fuel.

(n)   (1)   any liability or alleged liability arising out of or alleged to arise out of any negligent act, error or omission of the Insured, or any other person for whose acts the Insured is legally liable, in the administration of the Insured's

Employee Benefits Programs, as defined in subsection (2) below, including, without limitation, liability or alleged liability under the Employee Retirement Income Security Act of 1974, as amended, and/or any similar Federal, State or local statutory or common law.

(2)     As used in this Section (n), the term "Employee Benefits Programs" means group life insurance, group accident or health insurance, profit sharing plans, pension plans, employee stock subscription plans, workers' compensation, unemployment insurance, social benefits, disability benefits, and any other similar employee benefits.

(3)     As used in this Section (n), the unqualified word "administration" means:

(A)     giving counsel to employees with respect to the Employee Benefits Programs;

(B)     interpreting the Employee Benefits Programs;

(C)     handling of records in connection with the Employee Benefits Programs; and/or

(D)     effective enrollment, termination or cancellation of employees under the Employee Benefits Programs; provided all such acts are authorized by the Insured.

(o)     any personal injury, property damage or advertising liability asserted in any claim, action, investigation or proceeding, including, without limitation, any private lawsuit (legal, equitable or otherwise) or proceeding, any derivative or class action commenced by shareholders of an Insured or any action, investigation or proceeding brought by any governmental department, agency or other body, on account of any liability arising or alleged to arise under any law, rule or regulation, whether established pursuant to legislative, administrative, judicial, executive or other authority, of any nation or federal, state, local or other governmental or political body or subdivision thereof relating to:

(1)     the purchase, sale or distribution of securities or offers to purchase or sell securities, or investment counseling or management, including, without limitation, liability under the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Public Utility Holding Company Act of 1935, the Investment Company Act of 1940, the Investment Advisers Act of 1940, and the so-called "blue-sky" laws of the various state or other jurisdictions;

(2)     antitrust or the prohibition of monopolies. activities in restraint of trade, unfair methods of competition or deceptive acts and practices in trade and commerce including, without limitation, the Sherman Act, the Clayton Act, the Robinson-Patman Act, the Federal Trade Commission Act and the Hart-Scott Rodino Antitrust Improvements Act;

(3)     fraud or breach of fiduciary duty;

(4)     criminal penalties;

(5)     the failure to pay when due any governmental tax (including, without limitation, income, excise, property, value added and sales tax) or tariff, license fee or other governmental fee which is incidental to the conduct of business or any assessment, fine, or penalty related thereto;

(6)     copyright, patent or trademark infringement (other than advertising liability with respect to titles or slogans);

(7)     any defect in or impairment to title to real property, including fixtures, whether or not owned by an Insured;

(8)     disclosure or other regulation of sales of, and offers to sell, real property; or

(9)     any liability or alleged liability arising out of employee, officer or director dishonesty or any liability of an employee, officer or director of an Insured to such Insured.

No inference shall be made from the express exclusion of liabilities in this Section (o) that this Policy would otherwise cover such liabilities or covers similar liabilities.

## V.     CONDITIONS

This Policy is subject to the following conditions:

(a)     **Premium**

Unless otherwise provided, the premium for each annual period under this Policy is a flat premium and is not subject to adjustment except as otherwise provided herein. The premium shall be paid to the Underwriters.

(b)     **Inspection**

The Underwriters shall be permitted but not obligated to inspect the Insured's property and operations at any time.  Neither the Underwriters's right to make inspections nor the making thereof nor a report thereon shall constitute an undertaking on behalf of or for the benefit of the Insured or others to determine or warrant that such property or operations are safe or are in compliance with any law, rule or regulation.

(c)     **Cross Liability**

In the event of claims being made by reason of personal injury suffered by an employee of one Insured hereunder for which another Insured hereunder is or may be liable, this Policy shall cover such Insured against whom a claim is made or may be made in the same manner as if separate policies had been issued to each Insured hereunder.

In the event of claims being made by reason of damage to property belonging to any Insured hereunder for which another Insured hereunder is or may be liable, this Policy shall cover such Insured against whom a claim is made or may be made in the same manner as if separate policies had been issued to each Insured hereunder.

Nothing contained herein shall operate to increase the Underwriters's limit of liability as set forth in Item 2 of the Declarations.

(d)   **Notice of Occurrence and Claim**

If a manager or equivalent level employee of the risk management, insurance or law department or any executive officer of the Named Insured shall become aware of an occurrence likely to involve this Policy, the Named Insured shall as soon as practicable, as a condition precedent to the rights of any Insured under this Policy, give written notice containing particulars sufficient to identify the Insured and the occurrence and also such reasonably detailed information as the Underwriters may request regarding the occurrence to the Underwriters.  Failure to provide such written notice as required herein shall result in a forfeiture of any rights to coverage hereunder.

If any claim is made against any Insured likely to involve this Policy, the Named Insured shall, as a condition precedent to the rights of any Insured under the Policy, give written notice thereof to the Underwriters as soon as practicable and shall promptly forward to the Underwriters copies of any written claim, demand, notice, summons, complaint or other process received by the Insured or its representatives or agents.  Failure to provide such written notice as required herein shall result in a forfeiture of any rights to coverage hereunder.

Where applicable, notice of occurrence or claim shall identify an occurrence in respect of actual or alleged personal injury and/or property damage arising from two or more units of a product as a "batch occurrence."  A batch occurrence exists where actual or alleged personal injury and/or property damage arising out of two or more units of a product is attributable directly, indirectly or allegedly to the same event, condition, cause, defect or hazard or failure to warn of such but only if such occurrence is identified in a notice hereunder as a "batch occurrence."  With respect to any batch occurrence, (1) all actual or alleged personal injury and/or property damage attributable to the same actual or alleged event, condition, cause, defect or hazard or failure to warn of such shall be added together and treated as one occurrence irrespective of the period or area over which the actual or alleged injuries or damages occur or the number of such actual or alleged injuries or damages, and (2) the aggregate limit, the per occurrence limit and the terms, conditions and exclusions of coverage shall be determined under the annual period of the Policy as in effect at the time such notice of such batch occurrence is first given ("batch policy period") notwithstanding that prior notice may have been given with respect to such occurrence other than as a batch occurrence; provided, however, that if such prior notice was given, then the ultimate net loss with respect thereto shall be included with the ultimate net loss in respect of such batch occurrence for all purposes, and appropriate adjustments shall be made in the prior annual period of such notice and in the batch

policy period to transfer any loss payments and erosion of limits from the former to the latter. Notwithstanding Sections (e) and (f) of Article III, if an occurrence arising out of a unit of a product is not identified in the notice thereof as a "batch occurrence", then, subject to the preceding sentence, actual or alleged personal injury and/or property damage in connection therewith shall be deemed to arise from a separate occurrence from which actual or alleged personal injury and/or property damage arises from any other unit of such product.

(e)     **Assistance and Cooperation**

The Underwriters shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceeding instituted against an Insured, but the Underwriters shall have the right and shall be given the opportunity to associate at its own expense with the Insured or the Insured's underlying insurers or both in the defense and control of any claim, suit or proceeding relative to any occurrence where the claim or suit involves, or appears reasonably likely to involve, the Underwriters in which event the Insured and the Underwriters shall cooperate in all things in the defense of such claim, suit or proceeding.

(f)     **Appeals**

In the event the Insured or the Insured's underlying insurers elect not to appeal a judgment in excess of the underlying limits, the Underwriters may elect to make such appeal at its own cost and expense and shall be liable for the taxable costs and disbursements or interest on judgments incidental thereto, but in no event shall liability of the Underwriters for ultimate net loss exceed the amount set forth in Item 2 of the Declarations for any one occurrence and in addition the cost and expense of such appeal.

(g)     **Loss Payable**

Liability under this Policy with respect to any occurrence shall not attach unless and until the Insured and/or the Insured's underlying insurer(s) shall have paid the amount of the underlying limits or the retention amount set forth in Item 2(a) of the Declarations as provided in this Policy and, with respect to the Insured's liability on account of personal injury, property damage or advertising liability, unless and until the Insured's liability shall have been fixed and rendered certain either by final judgment against the Insured after actual trial or by settlement approved in writing by the Underwriters. The Insured shall make a definite demand for payment for any amount of the ultimate net loss for which the Underwriters may be liable under this Policy within twelve (12) months after the Insured shall have paid such amount. If any subsequent payments shall be made by the Insured on account of the same occurrence or claim. additional demands for payment should be made similarly from time to time. Such losses shall be due and payable by the Underwriters within thirty (30) days after they are respectively demanded and proven in conformity with this Policy. If judgment is rendered, settlement is denominated or another element of damages is stated in a currency other than the applicable currency under Section (n) below. payment under this Policy shall be made in such applicable currency at the rate

of exchange prevailing on the date the final judgment is rendered, the amount of the settlement is agreed upon or the other element of damages is due, respectively.

(h)   **Representation**

The Named Insured or such other person as it shall designate in Item 5 of the Declarations shall represent the Named Insured and any and all Insureds hereunder in all matters under this Policy, including, without limitation, payment of premium, negotiation of the terms of renewal and/or reinstatement and the adjustment, settlement and payment of claims.

(i)   **Other Insurance**

Subject to Article IV, Section (a) above, if other valid and collectable insurance with any other insurer (whether issued prior hereto, simultaneously herewith or subsequent hereto) is available to the Insured covering a loss covered by this Policy other than insurance which is expressly and specifically excess of the limits of, or quota share on the same layer as, this Policy, the insurance afforded by this Policy shall be in excess of and shall not contribute with such other insurance.  Nothing herein shall be construed to make this Policy subject to the terms, conditions and limitations of other insurance.  If this Policy shall be deemed to contribute to a loss with other insurance and such contribution arises in whole or part from the failure of the Named Insured to list such other insurance (whether issued prior hereto, simultaneously herewith or subsequent hereto) on Schedule B hereto in accordance with the instructions on such Schedule B, then the Named Insured shall indemnify the Underwriters for the amount of any such contribution and this Policy shall provide coverage as if such other insurance had been so listed.

(j)   **Subrogation**

Inasmuch as this Policy is excess coverage, the Insured's right of recovery against any person or other entity cannot be exclusively subrogated to the Underwriters.  It is, therefore, understood and agreed that in case of any payment hereunder, the Underwriters will act in concert with all other interests (including the Insured) concerned in the exercise of such rights of recovery.  The apportioning of amounts which may be so recovered (net of associated expenses) shall follow the principle that any interests (including the Insured's) that shall have paid an amount over and above any payment hereunder, shall first be reimbursed up to the amount paid by them; the Underwriters are then to be reimbursed out of any balance then remaining up to the amount paid hereunder; lastly, the interests (including the Insured's) of which this coverage is in excess are entitled to claim the residue, if any.

(k)   **Changes**

Notice to or knowledge possessed by any person shall not effect waiver or change in any part of this Policy or estop the Underwriters from asserting any right under the terms of this Policy; nor shall the terms of this Policy be waived or changed, except by endorsement issued to form a part hereof, signed by the Underwriters or its authorized representative.

(l) **Assignment**

Assignment of interest under this Policy shall not bind the Underwriters unless and until consent is endorsed hereon.

(m) **Cancellation**

This Policy may be cancelled on a pro rata basis:

(1) at any anniversary date of this Policy by the Named Insured delivering prior written notice to the Underwriters or by the Underwriters delivering prior written notice to the Named Insured, or

(2) at any time by the Named Insured by delivering written notice to the Underwriters stating when, but in no event prior to the date the notice is delivered, cancellation shall be effective, or

(3) except as provided in Section (u) below, at any time by the Underwriters by delivering written notice to the Named Insured stating when, not less than ninety (90) days from the date the notice is delivered, cancellation shall be effective, or

(4) at any time by the Underwriters, effective fifteen (15) days after delivering written notice to the Named Insured, if any payment of premium is not made when due and payable.

(n) **Currency**

The premiums and losses under this Policy are payable in the currency set forth in Item 7 of the Declarations.  Unless otherwise specified in such Item 7, the currency shall be United States dollars.

(o) **Arbitration**

Any dispute arising under this Policy shall be finally and fully determined in London, England under the provisions of the English Arbitration Act of 1950, as amended and supplemented, by a Board composed of three arbitrators to be selected for each controversy as follows:

Any party to the dispute may, once a claim or demand on his part has been denied or remains unsatisfied for a period of twenty (20) calendar days by any other, notify the others of its desire to arbitrate the matter in dispute, and at the time of such notification the party desiring arbitration shall notify any other party or parties of the name of the arbitrator selected by it.  Any party or parties who have been so notified shall within ten (10) calendar days thereafter select an arbitrator and notify the party desiring arbitration of the name of such second arbitrator.  If the party or parties notified of a desire for arbitration shall fail or refuse to nominate the second arbitrator within ten (10) calendar days following the receipt of such notification, the party who first served notice of a desire to arbitrate will, within an additional period of ten (10)

calendar days, apply to a judge of the High Court of England for the appointment of a second arbitrator and in such a case the arbitrator appointed by such a judge shall be deemed to have been nominated by the party or parties who failed to select the second arbitrator. The two arbitrators, chosen as above provided, shall within ten (10) calendar days after the appointment of the second arbitrator choose a third arbitrator. In the event of the failure of the first two arbitrators to agree on a third arbitrator within said ten (10) calendar day period, any of the parties may within a period of ten (10) calendar days thereafter, after notice to the other party or parties, apply to a judge of the High Court of England for the appointment of a third arbitrator, and in such case the person so appointed shall be deemed and shall act as the third arbitrator. Upon acceptance of the appointment by said third arbitrator, the Board of Arbitration for the controversy in question shall be deemed fixed. All claims, demands, denials of claims and notices pursuant to this Section (o) of the Policy shall be deemed made if in writing and mailed to the last known address of the other party or parties.

The Board of Arbitration shall fix, by a notice in writing to the parties involved, a reasonable time and place for the hearing and may in said written notice or at the time of the commencement of said hearing, at the option of said Board, prescribe reasonable rules and regulation governing the course and conduct of said hearing.

The Board shall, within ninety (90) calendar days following the conclusion of the hearing, render its decision on the matter or matters in controversy in writing and shall cause a copy thereof to be served on all the parties thereto. In case the Board fails to reach a unanimous decision, the decision of the majority of the members of the Board shall be deemed to be the decision of the Board and the same shall be final and binding on the parties thereto, and such decision shall be a complete defense to any attempted appeal or litigation of such decision in the absence of fraud or collusion.

All costs of arbitration shall be borne equally by the parties to such arbitration.

The Underwriters and the Insured agree that in the event that claims for indemnity or contribution are asserted in any action or proceeding against the Underwriters by any of the Insured's other insurers in any jurisdiction or forum other than that set forth in this section (o), the Insured will in good faith take all reasonable steps requested by the Underwriters to assist the Underwriters in obtaining a dismissal of these claims (other than on the merits) and will, without limitation, undertake to the court or other tribunal to reduce any judgement or award against such other insurers to the extent that the court or tribunal determines that the Underwriters would have been liable to such insurers for indemnity or contribution pursuant to this Policy. The Insured shall be entitled to assert claims against the Underwriters for coverage under this Policy, including, without limitation, for amounts by which the Insured reduced its judgement against such other insurers in respect of such claims for indemnity or contribution, in an arbitration between the Underwriters and the Insured pursuant to this Section (o): provided, however, that the Underwriters in such arbitration in respect of such reduction of any judgement shall be entitled to raise any defenses under this Policy and any other defenses (other than jurisdictional defenses) as it would have been entitled to raise in the action or proceeding with such insurers.

(p)   **Conflicting Statutes**

In the event that any provision of this Policy is unenforceable by the Insured under the laws of any State or other jurisdiction wherein it is claimed that the Insured is liable for any injury covered hereby, because of non-compliance with any statute therein, then this Policy shall be enforceable by the Insured with the same effect as if it complied with such statute.

(q)   **Governing Law and Interpretation**

This Policy shall be governed by and construed in accordance with the internal laws of the State of New York, except insofar as such laws may prohibit payment in respect of punitive damages hereunder and except insofar as such laws pertain to regulation by the Insurance Department of the State of New York of insurers doing insurance business or issuance or delivery of policies of insurance within the State of New York; provided, however, that the provisions, stipulations, exclusions and conditions of this Policy are to be construed in an evenhanded fashion as between the Insured and the Underwriters; without limitation, where the language of this Policy is deemed to be ambiguous or otherwise unclear, the issue shall be resolved in the manner most consistent with the relevant provisions, stipulations, exclusions and conditions (without regard to authorship of the language, without any presumption or arbitrary interpretation or construction in favor of either the Insured or the Underwriters and without reference to parol evidence).

(r)   **Liability of the Underwriters**

The Named Insured and the Insured agree that the liability and obligations of the Underwriters hereunder shall be satisfied from the funds of the Underwriters alone and that the individual shareholders of the Underwriters shall have no liability hereunder to the Named Insured or the Insured.

(s)   **Policy Extension**

Coverage A of this Policy may be extended at the expiration of each annual period for another annual period, subject only to agreement between the Underwriters and the Named Insured as to the applicable premium and such other terms and conditions as the Underwriters and the Named Insured may mutually deem appropriate.

(t)   **Reinstatement**

At the time of each annual policy extension, the aggregate limit of liability set forth in Item 2(b) of the Declarations shall, unless otherwise agreed by the Named Insured and the Underwriters. automatically be reinstated with respect to covered occurrences of which notice is first given during the following annual period (but there shall be no reinstatement in respect of the Discovery Period which. if applicable. is subject to the remaining limit for the preceding annual period). There shall be no separate premium charged for this automatic reinstatement in addition to that provided for in Section (s) above.

If during any annual period the aggregate limit of liability set forth in Item 2(b) ("Original Aggregate Limit") of the Declarations is or may be impaired by virtue of occurrence(s) of which notice has been given previously during such annual period, then the Named Insured shall be entitled to one reinstatement of all or any portion of such aggregate limit, based on the following terms and conditions:

(1)   Such reinstatement must be elected in writing by the Named Insured, which election shall specify the amount being reinstated (not to exceed the amount of the Original Aggregate Limit) ("Reinstatement Amount") and must be accompanied by payment of the reinstatement premium as provided in paragraph 3 below.  Such reinstatement shall be effective as of the date of the receipt by the Underwriters of such written election and premium ("Reinstatement Date").

(2)   The aggregate limit of liability for all occurrences and claims of which notice is first given to the Underwriters during the portion of the annual period prior to the Reinstatement Date shall be the Original Aggregate Limit.  The aggregate limit of liability for all occurrences and claims of which notice is first given to the Underwriters during the portion of the annual period on and subsequent to the Reinstatement Date (and during any Discovery Period in the event Coverage A terminates at the end of such annual period) shall be the lesser of the Original Aggregate Limit or the sum of the Reinstatement Amount and any unused portion of the Original Aggregate Limit pertaining to the portion of the annual period prior to the Reinstatement Date.  In no event shall the aggregate limit of liability of the Underwriters in respect of all occurrences and claims of which notice is first given to the Underwriters during the entire annual period exceed the sum of the Original Aggregate Limit and the Reinstatement Amount.

(3)   The reinstatement premium shall be an amount determined by the Underwriters but in no event shall this amount exceed one hundred and twenty-five percent (125%) of the total premium (including any Reserve Premium offset) for the annual period in which the reinstatement takes place.

(u)   **Optional Extension of Reporting Period**

In the event of expiration of Coverage A, other than by reason of cancellation for non-payment of premium, the Named Insured may elect, prior to expiration of any of the coverages hereunder, to secure (or in the case of extension, continue) Coverage B for such annual periods (which total period shall be the Discovery Period) and for such Insureds as the Named Insureds shall designate by giving the Underwriters written notice of such election and paying to the Underwriters the annual premium(s) as set forth in the attached Schedule D no later than the date(s) of commencement of the annual period(s) to which such coverage will apply.  Where first notice of an occurrence is given during the Discovery Period, it shall be deemed to have been given in the immediately preceding annual period or portion thereof.

(v)   **Expiration Date**

Except as otherwise provided in Section (w) of this Article V, Coverage A shall expire upon cancellation thereof or at the end of an annual period if not extended.  Coverage B shall expire upon termination of the Discovery Period.

(w)   **Former Subsidiaries, Affiliates and Associated Companies**

If any subsidiary, affiliate or associated company of the Named Insured which is an Insured hereunder by virtue of Paragraph (I) (B) or subsection (3) of Section (a) of Article III hereof shall cease to be such a subsidiary, affiliate or associated company of the Named Insured, then at such time Coverage A shall automatically expire as to such former subsidiary, affiliate or associated company (although Coverage A shall continue with respect to the Named Insured and any other entity which remains an Insured as respects its own liability, if any, arising out of its prior ownership of or affiliation or association with the former subsidiary, affiliate or associated company) and Coverage B shall (unless the Named Insured otherwise specifies) automatically incept as to such former subsidiary, affiliate or associated company and continue in force until termination of the annual period (which portion of such annual period shall be the Discovery Period) in which such cessation takes place, without additional payment or refund of any premium.  Prior to the end of such annual period, such former subsidiary, affiliate or associated company may, with the written consent received by the Underwriters from the Named Insured, elect to extend Coverage B (and the Discovery Period) beyond the end of such annual period on such terms and conditions, for such period, subject to such limits and for such additional premium(s) as may be agreed with the Underwriters.

(x)   **Headings**

The descriptions in the headings and sub-headings of this Policy are inserted solely for convenience and do not constitute any part of the terms or conditions hereof.

(y)   **Notice**

All notices under any provision of this Policy shall be in writing and given by prepaid express courier, airmail, telex or telecopier properly addressed to the appropriate party.  Notice to any Insured may be given to the Named Insured at the address shown in Item 1 of the Declarations or to such other person as it shall designate in Item 5 of the Declarations.  Notice to the Underwriters shall be given to the party indicated in Item 6 of the Declarations.  Notice given as above shall be deemed to be received not later than one day following the date such notice is given.

## SCHEDULE A

Section 1.    any subsidiary, affiliate or associated company whose financial statements are NOT consolidated in the financial statements of the Insured and which companies ate to be fully insured under this Policy.

None

Section 2.    any joint venture where the applicant has sole management responsibility or is obligated to provide insurance.

None

**SCHEDULE D**

If the Named Insured shall elect to obtain Coverage B pursuant to Article V (Conditions), Section (u) of this Policy, the annual premium charge for Coverage B shall be computed by multiplying the premium for the last annual period Coverage A was in force by the applicable factor set forth in the following table:

**Coverage B**
**Annual Premium Charge**

| | |
|---|---|
| 1st Year ..................................... | 30% |
| 2nd Year .................................... | 20% |
| 3rd Year  ................................... | 10% |
| 4th Year  ................................... | 10% |
| 5th and each Additional Year ............... | 9% |

INSURED:             **TOSCO CORPORATION**
POLICY NO:          **DL253098**
ENDORSEMENT NO:    **1**
EFFECTIVE DATE:      **AUGUST 1, 1998**

## PER OCCURRENCE RETENTION AMOUNTS

A.    Third Party Liability:           US$ 100,000,000     per Occurrence

B.    Marine Liability:              US$ 100,000,000     per Occurrence

C.    Employment Practice Liability    US$100,000,000     per Occurrence

D.    Aircraft Liability
(industrial aid only):           US$300,000,000     per Occurrence

E.    Aircraft Fuel:              US$300,000,000     per Occurrence except in respect
of Grounding Liability which US$225,000,000 per Occurrence

F.    Charterers Liability
including Cargo Owner's
Pollution Liability:             US$400,000,000     per Occurrence

G.    Owned Vessel Pollution:       US$800,000,000     perOccurrence, pollution only.

All other Terms, Clauses and Conditions of the Policy remain unchanged.

INSURED:           **TOSCO CORPORATION**
POLICY NO:         **DL253098**
ENDORSEMENT NO:  **2**
EFFECTIVE DATE:     **AUGUST 1, 1998**

## INCORPORATION OF SCHEDULES BY REFERENCE ENDORSEMENT

The following schedules submitted with the Excess Liability Policy Application are hereby incorporated by reference as if physically attached to the Policy:

X      Schedule B dated <u>May 7, 1998</u>

X      Schedule C dated <u>May 7, 1998</u>

INSURED:          **TOSCO CORPORATION**
POLICY NO:        **DL253098**
ENDORSEMENT NO:   **3**
EFFECTIVE DATE:    **AUGUST 1, 1998**

## KNOWN OCCURRENCE EXCLUSION ENDORSEMENT

(1)    In consideration that retroactive coverage is being afforded under the Policy to the date set forth in Item 4 of the Declarations, it is a condition precedent to the rights of any Insured under this Policy with respect to any Occurrence which otherwise would be subject to coverage because the Retroactive Coverage Date precedes the date listed below that any Insured was not aware of such Occurrence at the date listed below.

(2)    The Insured shall be deemed to have been aware of an Occurrence if any officer of it or if the manager or equivalent level employee of its risk management, insurance or law department was aware, in the case of an Occurrence under subparagraph (1) (a) of Definition V, of any event, exposure to conditions, Personal Injury, Property Damage or Advertising Liability referred to therein or, in the case of subparagraph (1) (b) of such Definition, of any of the Personal Injury or Property Damage referred to therein, in each case irrespective of whether or not such person was aware that such Occurrence was likely to involve this Policy.

Date:  1st August, 1998

All other Terms, Clauses and Conditions of the Policy remain unchanged.

INSURED:                    **TOSCO CORPORATION**
POLICY NO:                  **DL253098**
ENDORSEMENT NO:             **4**
EFFECTIVE DATE:             **AUGUST 1, 1998**

## BROAD FORM EMPLOYMENT PRACTICES LIABILITY INSURANCE ENDORSEMENT
### Form X.L. EPLI005 (7/98)

**THIS IS A CLAIMS REPORTED ENDORSEMENT. THIS ENDORSEMENT COVERS ONLY CLAIMS FIRST REPORTED TO THE INSURER DURING THE POLICY PERIOD. DEFENSE COSTS SHALL REDUCE THE AVAILABLE TOTAL POLICY PERIOD LIMIT OF LIABILITY.**

**PLEASE READ THE ENTIRE ENDORSEMENT CAREFULLY.**
Terms appearing in boldface type are defined within this Endorsement.

I.   **INSURING AGREEMENTS**

A.   Subject to the General Insuring Conditions of this Policy and the terms and conditions of this Endorsement, this Policy is extended to indemnify any **Insured** for **Loss Amounts** that such **Insured** is legally obligated to pay because of a **Claim.** The amount the **Underwriters** will pay is limited as described in Item 4. of the Declarations.

B.   This Endorsement applies only if the **Insured** first gives notice to the **Underwriters** during the **Policy Period** of a **Claim** or circumstances which may give rise to a **Claim**, and if such notice is given, then this Endorsement, subject to its limits, terms, conditions and exclusions, shall apply to such **Claim** or any **Claim** which arises out of such circumstances.

II.  **DEFENSE AND SETTLEMENT PROVISIONS**

A.   The **Insured** retains the responsibility to defend any **Claim.** The **Underwriters** have no duty to provide a defense to any **Claim.**

B.   The **Insured** has the right to select defense counsel; however, **Underwriters** have the right to consent to any defense counsel selected by the **Insured** as respects any **Claim** for which **Defense Costs** exceed USD 100,000, which consent shall not be unreasonably withheld. The **Insured** must advise **Underwriters**, in writing, of their selection of counsel within sixty (60) days of the time **Defense Costs** reach such amount. Once the **Underwriters** have provided their consent to a particular counsel, the **Insured** may select this counsel to defend a future **Claim** without the requirement of notification to the **Underwriters**. The **Underwriters** have the right to rescind their consent at any time with reasonable advance notification to the **Named Insured.** Any attorney designated as defense counsel to represent any **Insured** pursuant to this Endorsement shall cooperate with **Underwriters** and their monitoring counsel in defense of the **Claim.**

C.  The Underwriters shall have the right to associate with any **Insured** in the defense and settlement of any **Claim**. An **Insured** shall not settle any **Claim** without the consent of the Insurer where **Loss Amounts** exceed, or giving effect to the settlement would cause the **Loss Amounts** to exceed, the applicable underlying excess amount. An **Insured** shall not partially settle any **Claim** without the consent of the Underwriters for which **Loss Amounts** exceed, or giving effect to the settlement would cause the **Loss Amounts** to exceed, sixty percent (60%) of the applicable underlying excess amount. The Underwriters' consent shall not be unreasonably withheld.

D.  Once the applicable underlying excess amount has been exceeded, the Underwriters shall provide indemnity payments for **Loss Amounts** on a periodic basis prior to the final disposition of a **Claim**. Interim payments shall be made when the total of unreimbursed **Loss Amounts** reaches USD 250,000 and proper documentation of these **Loss Amounts** has been provided to the Underwriters. Such payments shall be repaid to the Underwriters by the **Insureds**, severally according to their respective interests, in the event and to the extent that the **Insureds** are not ultimately entitled under the terms and conditions of this Endorsement to payment of such amounts.

E.  In the event a plaintiff offers a settlement, and we recommend that such settlement offer be accepted but any **Insured** withholds consent to so settle, and the **Claim** later results in a judgment or settlement in excess of the amount of the recommended settlement offer with respect to such plaintiff, then the **Insured** shall be subject to a twenty-five percent (25%) coinsurance obligation with respect to all **Loss Amounts** in excess of the greater of 1) the underlying excess amount or 2) the amount of such settlement offer and **Defense Costs** incurred to that time.

F.  **Defense Costs** are not in addition to, but rather are included within, the **Policy Period Limit of Liability.**

III.  **DEFINITIONS**

A.  **"Additional Insured Organization"** means:

(1)  any subsidiary or limited liability corporation in which the **Named Insured,** at the beginning of the **Policy Period,** either directly or indirectly, through one or more majority owned entities, owns more than fifty percent (50%) of the authorized voting stock; and

(2)  any entity which is acquired or merged with an **Insured** and becomes an **Insured** pursuant to Section VI 1 of this Endorsement; and

(3)  any subsidiary or limited liability corporation in which the **Named Insured,** during the policy period of any prior policy of which this **Endorsement** is the latest of a series of continuous renewals but not as of the beginning of the **Policy Period,** either directly or indirectly, through one or more majority owned entities, owned more than fifty percent (50%) of the authorized voting stock, but only as respects **Claims** involving such **Additional Insured Organization** that arise from facts and circumstances occurring during the

time such **Additional Insured Organization** was owned by the **Named Insured** as set forth above in this subsection (3).

B.  **"Claim"** means the filing of a lawsuit, receipt of a demand for arbitration or an alternative dispute resolution proceeding, or notice of an administrative proceeding, a written demand for payment of money or other redress, a written threat of legal action or request to toll or waive any statute of limitations or other potential defense based on timeliness against an **Insured** which alleges **Employment Practice Liability** to an **Employee.**

For the purpose of determining both the applicable **Limits of Liability** and underlying excess amounts, all **Claims** attributable to the same event condition, practice, policy, cause or series of interrelated circumstances shall be considered to be one **Claim**, regardless of the number of **Claims** made, claimants, or **Insureds** against whom such **Claims** are made and regardless of the length of the period over which such **Claims** are made or the circumstances giving rise thereto took place, and only the Endorsement in effect upon the first notice of **Claim** or circumstances which may give rise thereto to the Underwriters shall apply to all such **Claims.**

C.  **"Common Law Violations"** mean allegation(s) of employment related: defamation, infliction of emotional distress, invasion of privacy, misrepresentation, wrongful reference, negligent hiring, libel, slander, humiliation, wrongful failure to employ or promote, wrongful deprivation of a career opportunity, negligent evaluation, negligent hiring or retention, wrongful discipline, wrongful failure to provide or enforce corporate policies or procedure related to employment, violation of an **Employee's** civil rights, or violations of any statute which restates any of the preceding employment related torts in the applicable jurisdiction; arising out of acts or omissions by an **Insured** or a person for whom the **Insured** is legally responsible.

D.  **"Defense Costs"** mean all reasonable fees and expenses of retaining outside attorneys, consultants, or other firms or persons by the **Insured** to investigate, defend or appeal a **Claim**, whether such **Claim** is ultimately settled or adjudicated. Defense Costs includes attorney fees and expenses. the cost of legal, administrative or alternative dispute resolution proceedings, the cost of appeal bonds, the cost of bonds to release property being used to secure a legal obligation, reasonable expenses that any **Insured** incurs at Insurers' request while helping Underwriters investigate or defend a **Claim** and legal costs taxed against any **Insured** in a suit or proceeding.

The salary or other compensation of any **Insured** or an **Insured's Employees** are not **Defense Costs** covered by this Endorsement.

E.  **"Employee"** means a person who is employed by, or whose service is engaged and directed by, or who is paid through the payroll of the **Named Insured** or an **Additional Insured Organization** (or any entity which, at the time of the **Employment Practice Liability** was or would have been an **Additional Insured Organization** had this Endorsement been in effect), including past, present, part time, seasonal and temporary **Employees**, as well as applicants for employment with the **Named Insured** or an **Additional Insured Organization.** Independent contractor organizations are not **Employees.** Employees of independent contractors are also not

Employees, except for temporary or leased personnel retained by an **Insured**, or persons claiming to be **Employees**, or persons determined to be joint **Employees** retained by an **Insured**.

F.   **"Employment Practice Liability"** means, as respects an **Employee**, any actual or alleged:

(1)   failure to provide equal opportunity of employment;
(2)   discrimination;
(3)   harassment (sexual or otherwise, and whether in quid pro quo or hostile work environment situations);
(4)   **Wrongful Termination or Treatment;**
(5)   retaliation (including retaliation against whistleblowers);
(6)   invasion of privacy;
(7)   inducement to become or remain as an **Employee** based upon an erroneous job description; or
(8)   **Common Law Violations.**

G.   **"Insured"** or **"Insureds"** means: (1) the Named Insured and any **Additional Insured Organizations**; and (2) any individuals (including their estates, heirs and legal representatives if deceased or incapacitated) who are or were owners, partners, employees, directors, officers, shareholders or trustees, but only in their respective capacity(ies) as such, of the **Named Insured** or any **Additional Insured Organizations** and (3) the lawful spouses of the foregoing individuals (whether such status is derived by reason of statutory law, common law or otherwise under applicable law) in respect of a **Claim** asserted against such spouse solely out of his or her other capacity as the spouse of such person, including, without limitation, **Claims** that seek damages recoverable from marital community property, property jointly held by the two spouses or property transferred from one spouse to the other; provided, however, that this extension shall not afford coverage for any **Claim** for any actual or alleged act, error or omission of the spouse, and the coverage afforded by this extension as respects a person's spouse shall not be broader than the coverage would be as respects the person.

H.   **Joint Venture Organization"** means any joint venture, co-venture, joint lease, joint operating agreement or partnership, which in each case is neither incorporated nor otherwise affords limited liability to an **Insured** having an interest therein.

I.   **"Limits of Liability"** means one or more Limit of Liability shown in Item 4. of the Declarations.

J.   (1)   **"Loss Amounts"** mean compensatory damages, monetary damages, statutory damages, **Defense Costs**, pre- and post- judgment interest, attorneys fees awarded to opposing counsel, liquidated damages, monetary equitable relief, multiplied damages, and punitive or exemplary damages (other than governmental or criminal fines or penalties), and legal expense or other costs which the Insured shall be obligated to pay to another by reason of judgment

(or, where applicable, settlement) or arbitration award for liabilities on account of a **Claim.**

(2)    **Loss Amounts** shall include (i) a retroactive increase in prior compensation of an **Employee** and (ii) a payment to a terminated **Employee** of compensation in lieu of reinstatement (but in no event including any future compensation or increase in compensation when an Employee is reinstated or continues as an **Employee**) which the **Insured** shall be obligated to pay by reason of judgment (or, where applicable, settlement) or arbitration award for liabilities on account of a **Claim,** provided, however, in no event shall **Loss Amounts** include any portion of such compensation which would have been paid an **Employee** absent such judgment, settlement or award.

(3)    **Loss Amounts** shall not include (i) the costs of providing any injunctive or non-pecuniary relief, (ii) costs incurred by any **Insured** to acquire, modify, or construct any building or property, or (iii) damages, expenses, compensation or any other costs (with the exception of **Defense Costs**) which arises from or are attributable to any written contract of employment with any **Employee,** or any severance obligation, golden parachute, poison pill or other compensation payable upon termination of employment of an **Employee** or the change in control of an **Insured.**

K.    **"Named Insured"** means the entity identified in Item 1. of the Declarations.

L.    **"Policy Period"** means the period of time commencing with the inception date shown in Item 3. of the Declarations and the earlier of the termination date or the date on which the Endorsement is terminated in accordance with Section VI E.

M.    **"Wrongful Termination or Treatment"** means the actual or constructive termination of an employment, partnership or shareholder relationship (in the case of a professional corporation only), the denial of a promotion, a demotion, failure or refusal to grant partnership or shareholder status (in the case of a professional corporation only), or any adverse change in the terms or conditions of an **Employee's** employment or status, which is alleged to be unlawful or is alleged to be in breach of an agreement relating to the **Employee's** employment or status.

## IV.    EXCLUSIONS

Coverage does not apply under this Endorsement to any **Claim:**

A.    for benefits under any workers compensation law, unemployment insurance or compensation law, disability benefits law, law regulating the provision of employee benefits or wages, including, but not limited to, the Fair Labor Standards Act (FLSA) (29 U.S.C. 201 et seq), the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1001, et seq.) ("ERISA"), or any amendments thereto, or any law, statute or regulation of any jurisdiction similar to the foregoing; provided however, as respects **Claims** based upon Section 510 of ERISA (29 U.S.C. 1140), subject to all the terms and conditions of this Endorsement, this Exclusion A shall not apply in respect of **Loss Amounts** the Insured is obligated to pay because of such **Claims,** but excepting

any **Loss Amount** consisting of any benefit (including, without limitation, compensation) to which the Employee is found to be entitled under the employee benefit plan.

B.  for **Loss Amounts** which the **Insured** is obligated to pay by reason of the written contractual assumption of the liability of any entity or person who is not an **Insured** under this Endorsement unless such liability would have existed even in the absence of such written contract;

C.  where, prior to the earlier of the inception date of this Endorsement or the inception date of the first Endorsement issued by us of which this Endorsement is a continuous renewal:

   (1)   notice of such **Claim** or circumstance giving rise to such **Claim** had been given under any other policy of insurance, or application therefor;

   (2)   the persons responsible for receiving notice of employment practice **Claims** in the **Insured's** Law Department, Human Resources Department or Risk Management Department had actual knowledge of such **Claims** or the circumstances giving rise thereto;

D.  for liability of any **Insured** for failure to fund or perform any fiduciary obligation as respects any pension benefit plan, welfare benefit plan, health or other welfare or benefit plan in accordance with plan documents or applicable legal requirements;

E.  for disease or illness arising out of long-term exposure to conditions at the **Employee's** place(s) of employment or other occupational disease or illness, or arising out of the alleged failure of any **Insured** to provide for the physical safety of its **Employees**, including, but without limitation, any requirement of the Occupational Safety and Health Act (29 U.S.C. 651 et seq.), or any law (statutory, common or traditional) or regulation similar to the foregoing of any jurisdiction;

F.  which arises under the National Labor Relations Act (29 U.S.C. 151 et seq.), or related statutes, or any law, statute or regulation of any jurisdiction similar to the foregoing, or as a result of any dispute with any labor union or labor organization, including without limitation a lockout, strike, picket line, the hiring of replacement workers, outsourcing or other similar actions, or arising out of a collective bargaining agreement or similar agreement;

G.  which arises out of any requirement relating to notification or payment of wages, benefits or other compensation to **Employees** arising from closing of a factory, plant, facility, or office or the cessation of business or operations, including without limitation. the Workers' Adjustment and Retraining Notification Act (W.A.R.N.) (29 U.S.C. 2101. et seq. or any amendment thereto), or any law, statute or regulation of any jurisdiction similar to the foregoing:

H.  as respects coverage for the personal liability of any natural person **Insured** who. at the time any act was committed. undertook any act giving rise to a **Claim** with the deliberate intention of causing harm to any person; however, Insurers will afford the

defense to which such natural person **Insured** would otherwise be entitled until such time as the natural person **Insured** is judicially determined to have deliberately and intentionally caused the alleged resulting harm; and

I.    for **Loss Amounts** attributable to or arising out of a criminal investigation or criminal proceeding brought against any **Insured** in any jurisdiction.

Exclusions H and I are several as respects each **Insured**. With respect to the application of these Exclusions, no act committed by any **Insured** shall be imputed to any other **Insured**.

**V.    LIMITS OF LIABILITY AND UNDERLYING AMOUNTS**

**A.    EACH CLAIM LIMIT OF LIABILITY**

The combined single limit amount shown in Item 2(a) of the Declarations is the most Underwriters will pay for any **Claim**, subject always to the Aggregate Limit of Liability for the **Policy Period** shown therein.

**B.    POLICY PERIOD AGGREGATE LIMIT OF LIABILITY**

The amount shown in Item 4. of the Declarations as the combined Aggregate Limit of Liability for the **Policy Period** is the maximum Underwriters will pay under this Policy for all **Claims** and circumstances which may give rise to **Claims** of which notice has been first given to the Underwriters during the **Policy Period**, exclusive of applicable underlying amounts.

**C.    UNDERLYING AMOUNTS**

Our obligation to pay under this Endorsement applies only to **Loss Amounts** in excess of the applicable underlying amounts stated at Item 5. of the Declarations.

**D.    JOINT VENTURE ORGANIZATIONS**

1.    As regards any liability of an **Insured** which arises in any manner whatsoever out of operations or the existence of any **Joint Venture Organization** in which such **Insured** has an interest, the liability of the Underwriters under this Endorsement shall be limited to the product of (1) the percentage interest of the **Insured** in such liability of such **Joint Venture Organization** (whether direct or by virtue of the insolvency of others interested in such **Joint Venture Organization**) and (ii) the total limit of liability insurance afforded such **Insured** by this Endorsement.

2.    It is further understood and agreed that in circumstances where paragraph (1), above, applies to limit the liability of the Underwriters under this Endorsement, the Underwriters shall be liable in respect of the liability of the **Insured** in excess of the product of the per **Claim** underlying amounts stated at Item 5. of the Declarations, and the percentage interest of the **Insured** in such liability of such **Joint Venture Organization** as determined pursuant to paragraph (1), above.

3. It is further understood and agreed that paragraphs (1) and (2) of this Clause V D. shall not apply if the **Insured** is obligated to provide insurance for the **Joint Venture Organization** in its entirety such as is afforded by this Endorsement.

## VI. CONDITIONS

It shall be a condition precedent to our obligations under this Endorsement that the **Insured** shall make all reasonable efforts to comply with the following Conditions A and B of this Endorsement.

### A. DUTIES IN THE EVENT OF A CLAIM OR KNOWLEDGE OF CIRCUMSTANCES

1. All notices of **Claims** or notification of circumstances shall be made in writing to the Underwriters via the entity set forth in Item 6. of the Declarations.

2. No later than thirty (30) days before the end of the **Policy Period**, any extension of the **Policy Period** or the Extended Reporting Period, if applicable, the **Named Insured** shall supply a bordereau of any **Claims** of which its law department, human resources department, or risk management department is aware or has received notification. This bordereau shall include to the extent practicable:

   a. the date of the **Claim**;
   b. the date(s) of the acts alleged to have given rise to the **Claim**;
   c. the name of the parties and the forum of the **Claim**;
   d. the name of the counsel selected to defend the **Claim**;
   e. the amount of **Defense Costs** incurred in the defense of the **Claim**;
   f. a brief description of the allegations contained in the **Claim**;
   g. the current status of the **Claim**; and
   h. details of any offers of settlement made in the **Claim**.

   Any **Claim** listed on this bordereau of which notice thereof or the circumstances giving rise thereto was not previously given to the Insurer shall be deemed to be first notice thereof at the time the bordereau is submitted.

   In the event the **Named Insured's** law department, human resources department, or risk management department becomes aware of or has received notification of a **Claim** which was first made during the **Policy Period** and which was not provided to Underwriters in the bordereau, it may provide notice of the **Claim** to Underwriters subject to the conditions in Section VI G 1, below.

3. Notwithstanding Section VI A 2., above. if the anticipated **Defense Costs** plus the anticipated costs of resolving any **Claim**, or the circumstances which may give rise to a **Claim** (which include the anticipated costs of settlement or judgment). reach or exceed sixty percent (60%) of the applicable underlying excess amount, in the judgment of the **Insured's** Law Department, or upon

notification of the filing or consolidation of a lawsuit or an administrative action with five (5) or more plaintiffs or a purported class, the Named Insured shall provide notification to the Underwriters of this event as soon as practicable.

4.    The Named Insured may give Underwriters written notice of any circumstances which may reasonably be expected to give rise to a Claim covered by this Endorsement. To the extent reasonably possible, such notice shall include:

a.    the identity of the person(s) alleging the circumstance(s); if the circumstances involves a group or class of individuals, the identity of the lead individual claimant(s) shall satisfy this condition.

b.    the identity of the Insured(s) who allegedly committed acts giving rise to the Claim and any witnesses.

c.    the date or general time frame in which the circumstances allegedly took place along with a general description thereof.

If notice of circumstances to the Underwriters conforming to the requirements of this Endorsement is first reported during the Policy Period, then any resulting Claim which is subsequently made against any Insured by the individual(s) identified pursuant to the above, or by their estates, heirs or legal representatives or any actual or alleged beneficiary, shall be considered to be a Claim first notified within the Policy Period.

5.    Upon request of the Underwriters, the Insured shall provide copies of all pleadings filed, summaries of all discovery undertaken, and shall give the Insurer such other information and cooperation as the Underwriters may reasonably require.

## B.    ENDORSEMENT COVERAGE DETERMINATION

Underwriters have the right to review all documentation necessary in order to reach an opinion as to the applicability of coverage under this Endorsement. Underwriters shall provide the Insureds with an initial coverage position as soon as practicable after receiving the Claim and any information Underwriters have requested. To the extent possible, based on the information and documents provided to Underwriters, Underwriters shall provide the Insureds with a definitive coverage position when Defense Costs reach fifty percent (50%) of the underlying excess amount or USD 2,500,000, whichever is less.

## C.    OTHER INSURANCE

The coverage provided by this Endorsement is intended to be primary insurance that applies excess of the underlying excess amount specified in the Declarations.

D.   **CANCELLATION AND NON-RENEWAL**

I.   This Endorsement may not be cancelled except on a pro rata basis:

   i.   by the Named Insured at any time by delivering written notice to the Underwriters via the entity listed in Item 6. of the Declarations stating when, but in no event prior to the date such notice is received, cancellation shall be effective;

   ii.   by the Underwriters by delivering written notice to the Named Insured stating when, not less than ninety (90) days from the date the notice is received, cancellation shall be effective;

II.   This Endorsement will be cancelled automatically retroactive to the inception of this Endorsement if the premium or proof of payment thereof is not received by Underwriters within five (5) business days of the commencement of this Endorsement.

III.   If this Endorsement is non-renewed by the Underwriters with less than sixty (60) days advance notice, then the Named Insured shall be entitled to purchase a sixty (60) day extension, with no increase in, or reinstatement of, the aggregate **Limit of Liability** remaining at the expiration of the **Policy Period**, for an additional premium equal to the pro rata amount of the premium at the inception date of the Endorsement. If Underwriters increase the premium by more than twenty-five percent (25%) or materially change the terms and conditions of coverage and the **Named Insured** declines to purchase such coverage, this will be deemed a refusal by Underwriters to renew. In the event of non-renewal, either by the Underwriters pursuant to this Section G or by the **Named Insured** for any reason, the **Named Insured** shall also have the right to purchase the Extended Reporting Period pursuant to Condition VI F, subsection 2., below.

E.   **TERMINATION AND RUN-OFF COVERAGE**

1.   If, during the **Policy Period**:

   a.   the **Named Insured** merges into or consolidates with another organization, such that the **Named Insured's** Board of Directors are not in control of the combined organization, or

   b.   another organization, or person or group of organizations and/or persons acting in concert acquires securities or voting rights which result in ownership or voting control by the other organization(s) or person(s) of more than fifty percent (50%) of the outstanding securities representing the present right to vote for the election of directors of the **Named Insured**, then coverage shall continue until the expiration of the **Policy Period** or termination of this Endorsement, whichever is earlier, but only with respect to **Claims** involving the **Named Insured** that arise

from facts and circumstances occurring prior to the time of the event described in sections a. or b., above.

2.    If during the **Endorsement Period** an organization described in Definition III A., subsection (1) or (2) ceases to be an **Additional Insured Organization**, coverage with respect to such **Additional Insured Organization** shall continue until the expiration of the **Policy Period** or termination of this Endorsement, whichever is earlier, but only with respect to **Claims** involving such **Additional Insured Organization** that arise from facts and circumstances occurring prior to the date the organization ceased to be an **Additional Insured Organization.**

F.    **EXTENDED REPORTING PERIOD**

1.    If the Endorsement is renewed with the Underwriters for the same limits and retentions, then the **Insured** automatically shall be entitled to an additional thirty (30) days after the end of the **Policy Period** to give notice to the Underwriter of any **Claims** first made against the **Insured** during the **Policy Period.** Any **Claim** so notified to the Underwriter during such thirty (30) day period shall be deemed to have been notified on the last day of the **Policy Period** and shall be subject to all the limits of liability, underlying amounts and other terms, conditions and exclusions applicable to the **Policy Period.** Without limiting the generality of the preceding sentence, this subsection 1. shall in no way reinstate or increase **Limits of Liability** of the **Policy Period.** If any expired Endorsement of which this Endorsement is a renewal has a provision similar to the foregoing, then any **Claim** which is subject to such provision shall be deemed not to be a **Claim** of which notice is first given during the **Policy Period.**

2.    If the Endorsement is not renewed, either because the Named Insured does not elect to renew or because Underwriters refuse to renew this Endorsement pursuant to Condition VI D., above, then the period for reporting **Claims** may be extended, subject to all other terms and conditions of the Endorsement, to apply to **Claims** first reported in writing to us during the Extended Reporting Period, as provided below:

a.    The Extended Reporting Period applies only to Claims otherwise covered under this Endorsement, and only if the facts or circumstances from which the **Claim** arise, occurred entirely before the cancellation or non-renewal date.

b.    The Extended Reporting Period will commence on the expiration date of this Endorsement, or at the end of the sixty (60) day period if provided pursuant to Condition D. above, and will be in effect for a period of one year thereafter.

c.    The Extended Reporting Period can only be purchased by the **Named Insured** and only if Underwriters' cancellation or non-renewal of the

Endorsement is for a reason other than non-payment of a premium or noncompliance with the terms and conditions of this Endorsement.

d.  If this Endorsement is immediately succeeded by another Endorsement which provides similar coverage, with no retroactive date limitations, then the succeeding Endorsement shall be deemed to be a renewal of this Endorsement and the Named Insured shall have no rights to purchase the Extended Reporting Period.

e.  The Extended Reporting Period shall be effective only upon the payment of an additional premium of one hundred percent (100%) of the full annual premium to be paid for the purchase of this additional coverage.

f.  The Named Insured shall have no right to purchase the Extended Reporting Period unless the Named Insured has satisfied conditions of the Endorsement in all material respects and all premiums outstanding have been paid.

g.  The Named Insured's right to purchase the Extended Reporting Period must be exercised by written notice postmarked not later than thirty (30) days after the cancellation or expiration date in the event of non-renewal of this Endorsement AND MUST INCLUDE PAYMENT OF THE PREMIUM FOR THE EXTENDED REPORTING PERIOD. Failure to pay the premium at the time of exercise of this option will render the option void and unenforceable. At the commencement of the Extended Reporting Period, the entire premium shall be deemed fully earned and non-refundable.

h.  The fact that this Endorsement is extended by virtue of the Extended Reporting Period shall not in any way reinstate or increase the **Limits of Liability**. The **Limit of Liability** applicable to the Extended Reporting Period shall be the **Limit of Liability** remaining under the expiring or non-renewed Endorsement when the Extended Reporting Period begins.

G.  **REPRESENTATIONS**



By accepting this Endorsement, the **Insureds** agree that the particulars and statements contained in the application (including any application for a prior Endorsement of which this is a continuous renewal) are true, accurate and complete, and agree that this Endorsement is issued in reliance on the truth of those representations, and that such particulars and statements, which are deemed to be incorporated into and constitute a part of this Endorsement, are the basis of issuance of this Endorsement and are material to acceptance of this risk. This Endorsement shall not be avoided as to any particular Insured on account of the falsity of any particular or statement contained in the application unless:

1.  such **Insured** (including any executive officer having direct or indirect responsibility for employment matters. or any of the persons responsible for receiving notice of employment practice claims in the **Insured's** Law

Department, Human Resources Department and/or Risk Management Department (or in any other department having responsibility for receiving such notice)) knew or should have known of the falsity of such particular or statement, in which event such knowledge shall be imputed only to such **Insured**; or

2.      the person(s) signing the application knew or should have known of the falsity of such particular or statement, in which event such knowledge shall be imputed to all **Insureds**.

### H.   MERGERS AND ACQUISITIONS

1.      Each entity acquired by, merged or affiliated with an **Insured** during the **Policy Period** which has less than 1000 employees, or less than five percent (5%) of the number of employees of the **Insured**, whichever is the greater, which otherwise would be an Insured under Definition III.F. above automatically shall become an **Insured** at the time of such acquisition, merger or affiliation. Within thirty (30) days prior to each anniversary date of the inception date during the **Policy Period**, the **Insured** shall give notice to the Underwriter as to all such entities acquired, merged or affiliated with the **Insured** since the inception date of the Endorsement or the last anniversary notice, whichever the case may be.

2.      If the **Insureds** acquire, merge or affiliate with any entity or entities during the **Policy Period** which have more employees than the amount provided in Clause 1. above, then coverage for such entity will be granted for ninety (90) days subject to the **Insured** providing the Underwriter with full underwriting particulars, paying any additional premium and accepting any additional terms and conditions.

3.      Coverage of any acquired, merged or newly affiliated entity will not include any **Loss Amount** that results from any act with respect to any such entity, assets, subsidiary, or changed business activities, prior to the effective date of acquisition, merger, creation, or change.

4.      For purposes of this Condition an entity shall mean any corporation, business trust, partnership, or other form of organization, including an **Insured**.

### I.   ENTIRE AGREEMENT

This Endorsement contains all the agreements between the Insured and Underwriters concerning the insurance afforded. The **Named Insured** is authorized by all other Insureds to negotiate changes in the terms of this Endorsement with Underwriters and to receive and give all notices under this Endorsement. This Endorsement's terms can be amended or waived only by endorsement issued by us and made part of the Endorsement.

## DECLARATIONS

## BROAD FORM EMPLOYMENT PRACTICES LIABILITY INSURANCE

| | | | |
|---|---|---|---|
| Item 1. | NAMED INSURED: | | **Tosco Corporation** |
| Item 2. | ADDRESS: | | **72 Cummings Point Road,**<br>**Stamford, Connecticut 06902,**<br>**U.S.A.** |
| Item 3. | POLICY PERIOD: | | **1st August 1998 12.01 AM to 1st August 1999**<br>**12.01 AM at the address shown above** |
| Item 4. | LIMIT OF LIABILITY: | A) | **$50,000,000 (50%) PART OF:**<br>**$100,000,000** |
| | | B) | **$100,000,000 ANNUAL AGGREGATE FOR**<br>**ALL CLAIMS OR CIRCUMSTANCES**<br>**REPORTED DURING AN ANNUAL**<br>**PERIOD** |
| Item 5. | RETENTION: | | **$100,000,000 per occurrence** |
| Item 6. | NOTICE: | | **Marsh Ltd,**<br>**Global Broking Division,**<br>**No 1, The Marsh Centre,**<br>**London,**<br>**E1 8DX.**<br>**U.K.** |

All other Terms, Clauses and Conditions of the Policy remain unchanged.

INSURED:            **TOSCO CORPORATION**
POLICY NO:          **DL253098**
ENDORSEMENT NO:     **5**
EFFECTIVE DATE:     **AUGUST 1, 1998**

## BLENDED POLLUTION ENDORSEMENT

This Policy is amended in that Exclusion (k) is deleted and replaced as follows:

(1)  (a)  to any liability for Personal Injury, Property Damage or Advertising Liability arising out of the discharge of pollutants into or upon land or real estate, the atmosphere, or any watercourse or body of water whether above or below ground or otherwise into the environment, or

(b)  to liability, loss, cost or expense of any Insured or others arising out of any direction or request, whether governmental or otherwise, that any Insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants.

This Exclusion (k) applies whether or not such discharge of pollutants:

(i)  results from the Insured's activities or the activities of any other person or entity;

(ii)  is sudden, gradual, accidental, unexpected or unintended; or

(iii)  arises out of or relates to industrial operations or the waste or by-products thereof.

(2)  Paragraph (1) of this Exclusion (k) does not apply to:

(a)  product pollution liability; or

(b)  liability of the Insured for Personal Injury or Property Damage caused by an intentional discharge of pollutants solely for the purpose of mitigating or avoiding Personal Injury or Property Damage which would be covered by this Policy; or

(c)  liability of the Insured for Personal Injury or Property Damage caused by a discharge of pollutants which is not expected or intended and which results solely from a Covered Pollution Peril provided that such discharge commences upon a date (i.e., a specific day) which can be determined and which is subsequent to the policy Inception Date.

(3)  In the event that any pollution loss or circumstance does not fit into the criteria for coverage pursuant to (2) (a), (2) (b) or (2) (c) above, then coverage for a pollution loss or circumstance shall apply as follows:

(a)  Paragraph (1) of this Exclusion (k) does not apply to liability of the Insured for Personal Injury or Property Damage caused by a discharge of pollutants which is not expected or intended, but only if the Insured becomes aware of the commencement of such discharge within fifty (50) days of such commencement and provided that the

Insured gives Underwriters written notice of such commencement of the discharge within one hundred (100) days of such commencement.

"Covered Pollution Peril" means fire, explosion, lightning, windstorm, earthquake, flood, the collision of an aircraft, the collision of a watercraft or vessel, or the upset, overturn or collision of an automobile or rail vehicle."

"Discharge" shall mean discharge, emission, dispersal, migration, release or escape (or any series of such of a similar nature at the same site) but does not include any discharge, emission, dispersal, migration, release or escape to the extent that the Pollutants involved remain confined within the building or other man-made structure in which they initially were located".

All other Terms. Clauses and Conditions of the Policy remain unchanged.

INSURED:              **TOSCO CORPORATION**
POLICY NO:            **DL253098**
ENDORSEMENT NO:       **6**
EFFECTIVE DATE:       **AUGUST 1, 1998**

## EXEMPTIONS TO C.C.C. EXCLUSION

It is understood and agreed that Article (IV), Exclusion (d) (3) shall not apply to those risks and/or operations listed on Schedule C.

All other Terms, Clauses and Conditions of the Policy remain unchanged.

INSURED:              **TOSCO CORPORATION**
POLICY NO:            **DL253098**
ENDORSEMENT NO:       **7**
EFFECTIVE DATE:       **AUGUST 1, 1998**

## WAIVER OF SUBROGATION

Underwriters expressly waive any rights of subrogation against any of the Insureds hereunder. Further, Underwriters shall have no right of recovery against any person or organization to the extent that the Insured has agreed with such person or organization under contract in writing to waive its rights of recovery or Underwriter's rights of subrogation against such person or organization prior to such loss occurring.

All other Terms, Clauses and Conditions of the Policy remain unchanged.

INSURED:                TOSCO CORPORATION
POLICY NO:              DL253098
ENDORSEMENT NO:         8
EFFECTIVE DATE:         AUGUST 1, 1998

## AIRCRAFT FUELING ENDORSEMENT

It is hereby agreed that Article IV(i) shall not apply in respect of aircraft fueling and related products and operations irrespective of whether or not personal injury or property damage occurs at the time of such operations or whether or not the aircraft involved in any occurrence is on the ground or in motion.

All other Terms, Clauses and Conditions of the Policy remain unchanged.

INSURED:           **TOSCO CORPORATION**
POLICY NO:         **DL253098**
ENDORSEMENT NO:    **9**
EFFECTIVE DATE:    **AUGUST 1, 1998**

---

### JOINT VENTURE ENDORSEMENT

Section (a)(2) of Article III of the Policy is hereby deleted and replaced by the following provisions:

It is hereby understood and agreed by each Insured and the Underwriters that:

(A)     as regards any liability of an Insured which arises in any manner whatsoever out of operations or the existence of any joint venture, co-venture, joint lease, joint operating agreement or partnership (hereinafter called "Joint Venture") in which such Insured has an interest, the liability of the Underwriters under this Policy shall be limited to the Insured's liability arising out of such Joint Venture, and the total limit of liability insurance afforded such Insured by this Policy shall be available with respect thereto.

All other Terms, Clauses and Conditions of the Policy remain unchanged.

INSURED:                TOSCO CORPORATION
POLICY NO:              DL253098
ENDORSEMENT NO:         10
EFFECTIVE DATE:         AUGUST 1, 1998

## RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE-LIABILITY-DIRECT

In relation to liability arising outside the U.S.A., its Territories or Possessions, Puerto Rico or the Canal Zone, this Policy does not cover any liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel.

13/2/64
N.M.A. 1477

All other Terms, Clauses and Conditions of the Policy remain unchanged.

INSURED:            **TOSCO CORPORATION**
POLICY NO:          **DL253098**
ENDORSEMENT NO:     **11**
EFFECTIVE DATE:     **AUGUST 1, 1998**

## NUCLEAR INCIDENT EXCLUSION CLAUSE-LIABILITY-DIRECT (BROAD)

This policy does not apply:-

I.   Under any Liability Coverage, to injury, sickness, disease, death or destruction

(a)   with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(b)   resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II.  Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

III. Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if

(a)   the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

(b)   the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

(c)   the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

IV.  As used in this endorsement:

"**hazardous properties**" include radioactive, toxic or explosive properties: "**nuclear material** " means source material, special nuclear material or byproduct material; "source

material", "special nuclear material" and "byproduct material" have the meaning given them in the Atomic Energy Act of 1954 or in any law amendatory thereof: "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor:; "waste" means any waste material (1) containing byproduct material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof; "nuclear facility" means

(a)     any nuclear reactor,

(b)     any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c)     any equipment or device used for processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235.

(d)     any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.  With respect to injury or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the Policy to which it is attached.

17/3/60
N.M.A. 1256

Policy No. 509/DL253098

# COMPANY

# POLICY

---

**Name: TOSCO CORPORATION**

**Expiry Date:** 1st August, 1999

# EXHIBIT 2

## CONFIDENTIAL AGREEMENT FOR ALTERNATIVE DISPUTE RESOLUTION
## OF MTBE CLAIMS

This Agreement as of November 8, 2011 is entered into between Resolute Management Ltd. ("Resolute") acting as the agent for HDI-Gerling Industrie Versicherung AG, formerly known as Gerling Konzern Allgemeine Versicherungs – AG and Gerling-Konzern General Insurance Company ("Gerling") and ConocoPhillips Company ("COP") as the successor to Tosco Corporation ("Tosco"). Resolute, Gerling and COP shall be referred to collectively in this Agreement as "the Parties."

### RECITALS

1.  Tosco purchased excess Insurance for the policy year August 1, 1998 to July 31, 1999 under a policy of insurance issued by Gerling, Policy No. 509/D1.253098 (hereinafter the "Policy").

2.  In accordance with its terms and conditions, the Policy provides excess coverage over certain attachment points described in Item 2a of the Declarations of the Policy.

3.  The Parties agree that Exhibit A is a true and correct copy of the Policy and all endorsements to the Policy.

4.  Tosco provided Gerling with timely notice of certain lawsuits alleging product liability claims arising from the manufacture and sale of gasoline with the additive methyl tertiary butyl ether ("MTBE") (hereinafter the "MTBE Lawsuits"). Tosco elected that the MTBE Lawsuits "be treated as one occurrence per the terms and conditions of the above-referenced policy, specifically Definition (f): Occurrence Integration, and Condition (d): Notice of Occurrence." Gerling acknowledged notice of an integrated occurrence but reserved its rights with respect to whether any and all of the individual claims qualify as a single integrated occurrence.

5.  A dispute has arisen between the parties concerning coverage under the Policy for claims asserted against COP in relation to Tosco in the MTBE Lawsuits (hereinafter "the Controversy").

6.  The Policy provides in section V(o) that disputes arising under the Policy shall be finally and fully determined in London, England under the provision of the English Arbitration Act of 1950, as amended and supplemented, by a Board composed of three arbitrators.

7.  The Parties desire to resolve the Controversy in an efficient and expeditious manner in a more convenient forum with the goal of resolving the dispute within one (1) year from the date of the Procedural Hearing held by the Panel with the Parties. The parties further agree to define the issues in the Controversy pursuant to the terms of this Agreement and the process by which the Controversy will be resolved. As such, Resolute and COP agree to alter and amend section V(o) of the Policy and to agree on an alternate dispute resolution framework to resolve the issues as defined in this Agreement. This Agreement

is intended to, and does, supersede the dispute resolution clause of the Policy, and to the extent there are any inconsistencies between the Agreement and the Policy, the terms of this Agreement shall control. It remains, however, the Parties' intent that the Controversy shall be finally and fully resolved by means of the procedure outlined in this Agreement, and that the decision shall be final and binding on the Parties.

8.    This Agreement shall apply solely to the present Controversy, and does not alter the Policy or any of its terms for purposes of any other dispute between the Parties under the Policy that may develop in the future.

9.    For purposes of this Agreement, it is acknowledged that the rights and obligations of Tosco under the Policy are solely owned and exercisable by COP, and that the rights and obligations of Gerling under the Policy are exercisable by Resolute. Any award by the arbitrators shall reflect the succession to the rights and obligations as set forth herein as part of the decision.

## AGREEMENT AS TO DISPUTE RESOLUTION

10.    <u>Procedural Rules and Selection of Arbitrators</u>. Except as otherwise provided herein, the arbitration shall be conducted ad hoc in accordance with the UNCITRAL Arbitration Rules (as revised in 2010) without the supervision or oversight of an appointing authority. Notwithstanding the application of the UNCITRAL rules, Resolute and COP agree that the Controversy shall be determined by a panel composed of three neutral arbitrators (the "Panel"), to be selected as follows:

a.    Resolute and COP will simultaneously nominate one neutral arbitrator each on November 15, 2011.

b.    The third member of the Panel, who shall serve as the Chairman, shall be selected by agreement between Resolute and COP on or before December 1, 2011.

c.    If the Parties are unable to reach agreement on a Chairman on or before December 1, 2011, they will each submit a list of five (5) candidates to one another on or before December 14, 2011. Each party will exercise three (3) peremptory strikes as to the other Party's list, leaving a pool of four (4) candidates comprised of two (2) candidates from the list of each Party. If either side is not willing to accept one (1) of the other side's candidates at that point, the party-appointed neutrals will select the Chairman from the remaining four (4) candidates. If the neutrals cannot agree on the selection of the Chairman, the neutrals shall rank each candidate and the candidate with the highest ranking shall be the Chairman.

The Parties expressly agree that the arbitrator compensation provisions of the UNCITRAL Rules do not apply here, and the Parties will independently agree to compensation arrangements with the Panel as it is constituted.

11.   Terms of Reference and Schedule.  Notwithstanding the application of the UNCITRAL Rules, the Parties agree to the following.  The Parties shall jointly prepare Terms of Reference outlining the issues for the Panel along with a proposed schedule for the proceedings.  In addition to outlining the issues for the Panel in the Terms of Reference, the Parties shall prepare a schedule with the following sequence of key events: exchange of pleadings; Procedural Hearing; exchange of disclosure requests; responses to same; COP's submission of witness statements and documentary evidence; Resolute's submission of witness statements and documentary evidence; COP's Reply with rebuttal evidence and witness statements, if any; and Resolute's Rejoinder with rebuttal evidence and witness statements, if any; exchange of expert reports, and Final Hearing.

12.   Discovery.  The Panel shall permit and facilitate specific requests for documents, exhibits or other evidence, as requested by the Parties.  However, there will be no pre-hearing depositions unless a Party demonstrates a necessary witness is not available to testify at the final hearing.  In any event neither side shall be entitled to take more than two (2) depositions even if such a need is shown.

13.   Timing and Schedules.  The proceedings shall be conducted in an expeditious manner, to the extent possible, with a view to having the Final Hearing within nine (9) months of the date of the Procedural Hearing and issuing a final decision and award within one (1) year from the date of the Procedural Hearing held by the Panel with the Parties.  The Panel shall be authorized to impose time limits it considers reasonable on each phase of the proceedings, including, without limitation, the time allotted to each party for presentation of its case and for rebuttal.  The Parties shall also be afforded the opportunity to present full Opening and Closing oral submissions at the Final Hearing in equally allotted times.

14.   Venue.  The seat and location for the arbitration shall be New York.

15.   Specific Issues to be Determined.  The substantive issues to be decided by the Panel are agreed to be the following:

   (a)   Whether (and if so to what extent) the Ultimate Net Loss submitted by COP under the Policy (the "UNL"):

      (i)   meets the definition of "Damages" in the Policy;

      (ii)   arises out of property damage or personal injury that falls within the "Occurrence" definition in the Policy;

      (iii)   relates to one occurrence per the terms and conditions of the Policy, specifically Definition (f) and Condition (d), as notified by Tosco;

      (iv)   exceeds the per occurrence retention amounts stated in Endorsement 1 of the Policy; and

      (v)   meets the requirements of "Loss Payable" under Condition V(g) under the

Policy.

(b)     Whether (and if so to what extent) insurance afforded by the Policy is to be excess of "other insurance" as defined by the Policy;

(c)     Whether Resolute/Gerling is entitled to rescind the Policy by reason of alleged material misrepresentations or omissions of material fact made by Tosco at the time of application for the Policy; and

(d)     Whether (and if so to what extent) the UNL is excluded by (i) the Known Occurrence Exclusion Endorsement or (ii) the Blended Pollution Endorsement.

There are no other alleged impediments to coverage for these claims under the Policy. No other such issues will be submitted or decided by the Panel without the express written permission of the Parties. The issues stated herein shall be decided in accordance with the Governing Law and Interpretation clause of the Policy (section V(q)).

16.     Final Hearing. Each party may only present witnesses who previously submitted witness statements, and cross examination of each party's witnesses is at the election of the other party unless such witness statement is withdrawn. Upon good cause shown by either Party, the Panel may allow for the submission of additional evidence at the Final Hearing such as reply testimony or testimony as to some new development as it decides in its discretion is appropriate.

17.     Decision and Award. The decision of any two arbitrators as to a single issue shall be sufficient for a determination. The Panel shall issue a reasoned decision with findings of fact and conclusions of law within a reasonable time after the final hearing but no later than ninety (90) days from the date of the final hearing, except in extraordinary circumstances or with consent of the Parties. The Parties expressly agree that the decision and award shall be non-appealable, final and binding as to coverage for alleged MTBE liabilities of Tosco for all current claims which have been asserted absent fraud or manifest error. The Parties further agree that the rulings of the Panel shall be binding with respect to future MTBE claims however nothing in this paragraph shall relieve Tosco of its burden of showing that each MTBE claim fits within the integrated occurrence noticed by Tosco. If a dispute arises after any award issued by the Panel about any future MTBE claim, the Parties expressly agree that the Panel as a whole, or a member of the Panel with the express consent of both Parties, shall hear the dispute to determine how the Policy and Award apply to future MTBE claim(s) provided that all of the members are available and no conflict has arisen in the interim. The Parties also agree that any decision and award shall incorporate this Agreement into the decision. The Panel may award costs and interest, if applicable, to the prevailing party as it deems appropriate. A judgment upon such award may be entered in any New York state or federal court, and Resolute and Gerling expressly agree to submit to the jurisdiction of any such court for purposes of having the judgment based on such award enforced. Any monetary award issued by the Panel shall be payable in U.S. Dollars.

18. <u>Confidentiality</u>.  This Agreement and the proceedings before the Panel, as well as the final decision and award, are and shall remain confidential; however, the Parties shall have the right to disclose this Agreement and/or the final decision and award to affiliates, successors, and assignees, and auditors, reinsurers or other governmental authorities to whom such disclosure is necessary or required.

19. <u>Governing Law for This Agreement</u>.  The Parties agree that this Agreement itself shall be governed by, and all disputes arising under or in connection with this Agreement shall be governed in accordance with, the substantive law of New York, excluding its conflict of laws rules.

IN WITNESS THEREOF, the Parties have caused this Agreement to be executed as of the date first written above.

CONOCOPHILLIPS COMPANY, for itself and as successor to TOSCO CORPORATION

By: _____
         Clyde W. Lea

Title:  Deputy General Counsel – Litigation & Arbitration

RESOLUTE MANAGEMENT LTD., as agent for GERLING

BY: _____

Title:  Asst. General Counsel