**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------X

HDI GLOBAL SE, f/k/a HDI-GERLING
INDUSTRIE VERSICHERUNG AG,

                         Petitioner,

       v.

PHILLIPS 66 COMPANY,

                       Respondent.

-------------------------------------------------------------------X

Civil Action No.  1:20-cv-631

---

## MEMORANDUM OF LAW IN SUPPORT OF PETITIONER'S MOTION TO VACATE THE THIRD PARTIAL FINAL ARBITRATION AWARD

---

CLYDE & CO US LLP
The Chrysler Building
405 Lexington Avenue
New York, New York 10174

*Attorneys for Petitioner*

## PRELIMINARY STATEMENT

This matter arises out of an arbitration between Petitioner HDI Global SE, f/k/a HDI-Gerling Industrie Versicherung AG ("Petitioner") and Respondent Phillips 66 Company ("Respondent").    Petitioner respectfully submits this Memorandum of Law and the accompanying declaration of Michael A. Knoerzer, dated January 22, 2020 ("Knoerzer Declaration"), with exhibits thereto in support of its Petition and Motion for an order vacating an October 27, 2019 arbitration award issued in that arbitration.  The basis for this motion is that the award is in manifest disregard of the parties' unambiguous written agreement and in manifest disregard of applicable New York law.

Petitioner acknowledges that arbitrators are entitled to great deference in their decisions and that arbitration awards may only be vacated upon the narrowest of grounds.  Petitioner further acknowledges that, even where arbitrators misperceive the facts or misapply the law, arbitration awards will generally not be vacated.  Despite the broad latitude and deference accorded to arbitrators, there is one thing the law does not let arbitrators do: namely, rewrite the parties' written agreements.

As the United States Supreme Court famously declared long ago in *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960), arbitrators do not sit to dispense their "own brand of industrial justice," they are confined to interpretation and application of the terms of the agreement placed before them.  When arbitrators interpret the parties' unambiguous written contracts in a manner so as to rewrite the agreement, or such that portions of the agreement are rendered mere surplusage, then the arbitrators are said to have committed manifest disregard of the parties' contract.  Likewise, when the arbitrators evince an understanding of well-settled and governing principles of law, but plainly opt to disregard those governing

1

principles in favor of their own notions of policy, they commit manifest disregard of the law. It is well-settled law in this Circuit that arbitration awards will be vacated for manifest disregard of the parties' contract or explicit and clearly applicable law. The arbitration award that is the subject of this motion plainly is in manifest disregard of the parties' contract and the explicit and clearly applicable law and must be vacated.

## STATEMENT OF FACTS

### A.   The Policy

Petitioner issued excess liability insurance policy No. 509/DL253098 to the Tosco Corporation ("Tosco") effective August 1, 1998 through July 31, 1999 (the "Policy"). At the time the Policy was issued, Tosco was a refiner of gasoline and a seller of other petroleum products with over 5,000 retail marketing locations.[1] Tosco was purchased by Phillips Petroleum Company in 2001, and (as Petitioner understands) is now controlled by Respondent Phillips 66, its successor-in-interest (hereinafter, Tosco and its successors are referred to as "Respondent").

The Policy provides for coverage for bodily injury, property damage and advertising liability losses which are above a coverage attachment point of $102,000,000. For purposes of calculating when Respondent's losses reach this attachment point, the Policy allows Respondent to aggregate related losses which arise from the same event, condition, cause, defect, hazard or failure to warn.[2]

---

[1] Exhibit 1, Award ¶ 2. All exhibits referenced herein are attached to the Knoerzer Declaration.

[2] Ex. 2, Policy at Section III(f). "Where a series of and/or several actual or alleged losses, injuries, damages or liabilities occur which are attributable directly, indirectly, or allegedly to the same actual or alleged event, condition, cause, defect or hazard or failure to warn of such, all such actual or alleged losses, injuries, damages or liabilities shall be added together and treated as one occurrence irrespective of the period or area over which the actual or alleged losses, injuries, damages or liabilities occur or the number of such actual or alleged losses, injuries, damages or liabilities."

The Policy also contains an exclusion (the "Pollution Exclusion")[3] which broadly excludes coverage with respect:

    (a) to any liability for Personal Injury, Property Damage or Advertising Liability arising out of the discharge of pollutants into or upon land or real estate, the atmosphere, or any watercourse or body of water whether above or below ground or otherwise into the environment, or

    (b) to liability, loss, cost or expense of any Insured or others arising out of any direction or request, whether governmental or otherwise, that any Insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants.

Within the Pollution Exclusion is a provision which unambiguously provides that the Respondent shall have no coverage for pollution losses, whether the loss is due to its own pollution activities or the pollution activities of another person:

> This Exclusion (k) applies whether or not such discharge of pollutants: (i) results from the Insured's activities or the activities of any other person or entity; (ii) is sudden, gradual, accidental, unexpected or unintended; or (iii) arises out of or relates to industrial operations or the waste or by products thereof.

The Policy also contains an "Exception" to the broadly worded Pollution Exclusion:

    (1)    Paragraph (1) of this Exclusion (k) does not apply to:

        a.      product pollution liability . . .

In interpreting the Policy, the Panel defined "product pollution liability" to mean:

> liability for personal injury or property damage arising out of the end-use of goods or products manufactured, sold, tested, handled or distributed by the Insured or others trading under its name if such use occurs after possession of such goods or products has been relinquished to others by the Insured or by others trading under its name and if such use occurs away from premises owned, rented or controlled by the Insured; provided such goods or products shall be deemed to include any container thereof other than a vehicle, watercraft or aircraft.[4]

---

[3] *See* Ex. 2 at Exclusion (k)

[4] Ex. 5, Interim Summary Judgment Decision at 30-31.

The Product Pollution Liability exception is referred to herein as the "End Use Exception."

The Policy also contains an arbitration provision which, in relevant part provides as follows:

> Any dispute arising under this Policy shall be finally and fully determined in London, England under the provisions of the English Arbitration Act of 1950, as amended and supplemented, by a Board composed of three arbitrators . . .[5]

## B.    The Claims Facing Respondent

Beginning in the late 1990s, Respondent began to be named as a defendant in a number of suits brought nationwide by states, cities, municipalities and other public entities (hereinafter, "the MtBE Plaintiffs") alleging that Respondent and other manufacturers, refiners, distributors, and sellers of gasoline (hereinafter, "the MtBE Defendants") caused damage to groundwater by allowing an additive to their gasoline, methyl tertiary butyl ether, or "MtBE" to leak into the local groundwater.  MtBE is a man-made oxygenate which was added to gasoline in the 1990's to reduce carbon monoxide emissions from vehicle exhaust.  While MtBE-infused gasoline may have been cleaner for the air, the MtBE Plaintiffs alleged that discharges of such gasoline had a deleterious effect upon groundwater, with small amounts of MtBE capable of rendering large amounts of drinking water non-potable.  Worse still, according to the MtBE Plaintiffs, MtBE-infused gasoline migrated more quickly and over greater distances than did gasoline without MtBE.

By letter dated July 8, 1999, Tosco notified Petitioner of its potential MtBE-related liabilities and further notified Petitioner that Tosco considered these liabilities to constitute a single occurrence under the Policy such that Tosco's losses and settlements for its MtBE related

---

[5] Ex. 2 at Section V.(o).

exposures could be combined as a single occurrence under the Policy. Given the $102,000,000

attachment point of the Policy, Respondent did not immediately request that Petitioner contribute

any indemnity or defense payments for its MtBE liabilities, but instead pursued coverage from

its other insurers whose policies attached at lower levels.

As the MtBE litigations multiplied, a Multi-District Litigation was established in the

United States District Court for the Southern District of New York (Scheindlin, J.) to provide

uniform and efficient judicial management. At the outset of the MDL, it became apparent that

the fungible nature of MtBE-infused gasoline made it difficult for the MtBE Plaintiffs to identify

which particular MtBE Defendant's gasoline was found at a specific pollution site. Seeking to

capitalize on the MtBE Plaintiffs' difficulty, the MtBE Defendants moved to dismiss MtBE

Plaintiffs' claims in the MDL on the grounds that the MtBE Plaintiffs could not prove causation.

In a 2001 decision, Judge Scheindlin explained the difficulties facing the MtBE Plaintiffs:

> [P]laintiffs allege that their wells are contaminated with MTBE, identification of
> the manufacturer or manufacturers who produced the offending product is
> impossible, and MTBE is a fungible product. Plaintiffs further allege that
> gasoline containing MTBE, once released into the environment, lacks
> characteristics or "a chemical signature" that would enable identification of the
> refinery or company that manufactured the product. Even when a source of an
> MTBE plume (i.e., a leaky UST) is identified, due to defendants' practice of
> trading, bartering, or otherwise exchanging their product with each other as well
> at the chemical characteristics of MTBE, the identity of the manufacturer or
> manufacturers of the offending gasoline cannot be determined. . . . Plaintiffs
> further allege that the defendants in this action are manufacturers that together
> control a very substantial share of the market for gasoline containing MTBE in
> the relevant states.
>
> The traditional theory of alternative liability is not a viable option in these actions.
> However, plaintiffs' allegations may, after further discovery, support the
> application of market-share liability under both New York and California law.[6]

---

[6] *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 175 F. Supp. 2d 593, 621-22
(S.D.N.Y. 2001) (internal citations to record omitted).

Subsequently, in August 2006, Judge Scheindlin issued a decision permitting MtBE Plaintiffs to pursue market share liability.[7] This was a seismic event for the oil and gas industry, resulting in potential liability to the MtBE Defendants not because they polluted a particular site, but upon the allegation that MtBE was a defective product and that their sales of that product created strict liability and damages based upon each defendant's share of the market (*i.e.*, "market share liability"). Not long after Judge Scheindlin's decision, the MtBE Defendants, including Respondent, settled the MDL litigation as a group. After this settlement, Respondent notified Petitioner that its other available insurance was close to exhaustion and that Respondent would soon be seeking coverage under the Policy issued by Petitioner for Respondent's MtBE-related losses. Petitioner and Respondent thereafter engaged in discussions regarding various coverage issues relevant to the claim and, after it became apparent that the parties had disagreements about certain coverage provisions of the Policy, the parties mutually agreed to refer the matter to arbitration.

## C. The Parties Modify their Arbitration Agreement

As part of their mutual agreement to refer the matter to arbitration, the parties modified certain terms of the arbitration agreement contained in the Policy. On November 8, 2011, the parties executed a Confidential Agreement for Alternative Dispute Resolution of MTBE Claims (the "ADR Agreement"), which modified the arbitration provision in the Policy in certain important ways. The ADR Agreement established that arbitration would take place in New York and be governed by New York law. The ADR Agreement also contained a provision in which the parties explicitly set forth the standard that would apply with respect to enforceability of any arbitration award:

---

[7] *See In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 447 F. Supp. 2d 289, 293 (S.D.N.Y. 2006).

6

The parties expressly agree that the decision and award shall be non-appealable, final and binding as to coverage for alleged MTBE liabilities of Tosco for all current claims which have been asserted **absent** fraud or **manifest error**.[8]

The ADR Agreement also expressly contained the parties' agreement to jointly prepare "Terms of Reference" which would instruct the arbitration Panel as to the issues to be addressed and the manner in which they would be addressed. The Terms of Reference repeated the parties' agreement in the ADR Agreement that the Panel's awards would only be non-appealable, final and binding in the event that they were without "manifest error."

The parties executed the Terms of Reference on February 6, 2013, listing the specific issues to be determined by the Panel – including whether and to what extent Respondent's losses were excluded by the Pollution Exclusion or restored by the End Use Exception to the Pollution Exclusion.

### D.    The Arbitration

The Arbitration was commenced on January 25, 2013. A three member arbitration panel was constituted (the "Panel") which was comprised of a retired federal judge sitting as umpire, a practicing lawyer, and a lawyer who had formerly been a senior executive officer of a large insurance company.

Before any discovery could be conducted or evidence adduced, Respondent sought a preliminary award from the Panel concerning five legal issues, including a ruling concerning the interplay between the Pollution Exclusion and the End Use Exception. In making that motion, Respondent did not deny that the Pollution Exclusion would apply in the first instance to its claim under the Policy. As the Panel described in its decision on the motion, "[Respondent] makes no effort to claim its MTBE liabilities fall outside the pollution exclusion. It argues,

---

[8] Ex. 3, ADR Agreement ¶ 17 (emphasis added). Manifest error and manifest disregard have been deemed synonymous under New York law. *See Raiola v. Union Bank of Switzerland*, LLC, 230 F. Supp. 2d 355, 358 (S.D.N.Y. 2002) (equating manifest error with manifest disregard).

rather, that the [End Use] exception applies to all its otherwise covered liabilities, without any qualifications as to where, when and by whom the pollution took place."[9]

In response to this argument, Petitioner contended that Respondent's interpretation of the End Use Exception was so overbroad as to rewrite the Policy such that the Pollution Exclusion would be written out of the Policy. The Panel agreed with Petitioner's position in its decision, stating that "[Petitioner] correctly argues that the [End Use Exception] cannot be read so broadly as to encompass all liabilities covered by the pollution exclusion. It is fair to say that [Respondent's] reading comes close to doing just that."[10]  After briefing by both parties, the Panel denied Respondent's motion with respect to the Pollution Exclusion, but deferred until after discovery was complete the question of what Respondent need prove in order to establish the applicability of the End Use Exception.

The arbitration thereafter proceeded in multiple phases, with each phase addressing claims around the United States as they were being settled by Respondent. In Phase I, the Panel considered coverage of Respondent's settlement of the MDL litigation and other lawsuits settled by multiple defendants globally. Based upon the evidence that Respondent's liability in the MDL was derived not based on its polluting activities, but rather on the volume of the business it conducted in various markets, the Pollution Exclusion was not deemed to apply to bar coverage: "[t]here was no discussion about particular retail stations or particular releases of gasoline; the settlement was based on market share."[11]  However, on other grounds, the Panel unanimously denied in substantial part Respondent's claim under the Policy as respects the MDL settlement.

---

[9] Ex. 5 at 28

[10] *Id.* at 32.

[11] *See* First Partial Final Award at 33.

8

Phase II dealt with other of Respondents' settlements in which, as Petitioner understood, Respondent had again resolved on the basis that damages were predicated, not on Tosco having polluted particular sites, but because Respondent had introduced an allegedly defective product into various markets. Again, the Pollution Exclusion was on this basis not deemed to apply. After a hearing and discovery in Phase II, the Panel, again unanimously, granted in part and denied in part Respondent's claim for coverage of the Phase II MtBE cases.

Respondent's Phase III claims involved three MtBE lawsuits that Respondent settled in three different markets: the State of New Jersey, the State of Vermont, and the Orange County Water District (the "Phase III claims"). Two of these three matters (State of New Jersey, and Orange County Water District) were undeniably sought to impose liability upon the Respondent based on the polluting activities of the Respondent and/or based on the polluting activities of persons to whom the Respondent had distributed MtBE-infused gasoline. In other words, Respondent could be held liable if distributions and transfers of its MtBE gasoline could be traced to a contaminated site such as a plume from a leaking underground storage tank.[12]

Similar to the proceedings on the summary judgment motion, Respondent did not deny that the Pollution Exclusion applied to the Phase III claims,[13] but (also as on the summary judgment motion) Respondent argued that the End Use Exception should be applied so broadly as to render the Pollution Exclusion ineffective in any instance where a claim arose after the

---

[12] The State of Vermont claim settled before the plaintiff therein had fully developed its theory of liability.

[13] As the Panel noted, "Tosco once again does not challenge Gerling's argument that Paragraph 1 of the Pollution Exclusion applies regardless of whether the pollution results from the Insured's activities or the activities of any other person or entity, and that therefore coverage may be excluded based on product tracing to a refiner." Ex. 1, ¶ 81.

MtBE gasoline had left Respondent's possession – that is, where the pollution of Respondent's MtBE product was caused not by Respondent, but by the actions of third parties.[14]

Petitioner responded to Respondent's argument just as Petitioner had successfully done when the Panel had rejected Respondent's summary judgment motion. Petitioner pointed out that the Pollution Exclusion contains an unambiguous provision which excluded from coverage any liability of the Respondent for pollution "whether or not such discharge of pollutants: (i) results from the Insured's activities or the activities of any other person or entity." Petitioner quoted governing New York law to the Panel which required that this provision (which neither party argued was ambiguous) must be enforced as written.[15] Petitioner also argued – as it had successfully done on Respondent's summary judgment motion – that Respondent's interpretation of the End Use Exception was so overbroad as to result in the nullification of that portion of the Pollution Exclusion which made the identity of the actual polluter irrelevant.

On October 28, 2019, two of the three members of the Panel (hereinafter, "the Majority") issued its Third Partial Final Award (the "Award" or "PFA 3").[16]

In a ruling that cannot be considered consistent with its prior decision on Respondent's summary judgment motion, the Majority declared that the End Use Exception applies to Respondent's liability because that liability was not based upon Respondent's own pollution activities, but upon the activities of third parties, who polluted with MtBE gasoline which was traced back to Respondent as the manufacturer:

---

[14] Respondent's Phase III Reply Submission at 34 (arguing that the Exception applies to all of Tosco's Phase III liability "other than its 'leaker pays' liability for releases from Tosco stations").

[15] *See* Petitioner's memorandum in opposition to Respondent's motion for summary adjudication concerning the Pollution Exclusion at 74-75.

[16] PFA 3 indicates that it is a majority decision and not unanimous, but gives no indication as to which member is the dissenter, and as to which parts there has been dissent if not the whole.

> The Policy's Product Exception applies . . . to the entire settlement amount in *New Jersey*, **because that settlement released only claims based on Tosco's product liability for manufacturing MTBE gasoline traced to third parties responsible for the pollution alleged.**[17]

By this ruling in PFA 3, the Majority completely nullified the provision of the Pollution Exclusion which excluded Respondent's liability for pollution irrespective of "whether or not such discharge of pollutants: (i) results from the Insured's activities or the activities of any other person or entity." To the Majority, the fact that the MtBE gasoline pollution was caused by the activities of third parties meant the Pollution Exclusion could never apply. Contradicting its own prior ruling on the summary judgment motion, the Majority ruled that the End Use Exception effectively nullified that part of the Pollution Exclusion which declared that it was irrelevant whether it was the Respondent or some other party that did the polluting, finding that the End Use Exception applied once the Respondent had relinquished control over the MtBE-infused gasoline.

The Majority did not base its nullification of part of the Pollution Exclusion upon contract interpretation, but expressly justified its award based upon its own view of public policy and notions of economic efficiency.

According to the Majority, its nullification of a portion of the Pollution Exclusion by ruling that the Exclusion barred coverage only where Respondent did the actual polluting served a public policy ground. Specifically, the Majority stated that its holding in PFA 3 is "consistent with New York's Policy of encouraging polluters to exercise care in commercial activities having a potential to cause pollution," under which policy the Pollution Exclusion should only bar coverage for "forms of liability that are within the control of the manufacturer to control."[18]

---

[17] Ex. 1, ¶ 82 (emphasis added). The Majority applied the same reasoning to the *Orange County Water District* claim.

[18] *Id.* While this discussion in PFA 3 dealt explicitly with Respondent's liability in the *New Jersey*

Thus, on grounds of public policy, the Majority determined to give no effect to (and thus read out of the Policy) that part of the parties' agreement which provides that Respondent's coverage for pollution liability is excluded "whether or not such discharge of pollutants: (i) results from the Insured's activities or the activities of any other person or entity."

The Majority further supported its nullification of part of the Pollution Exclusion on the ground of economic efficiency.  In the Majority's view, it would be "wholly impractical" for the Respondent to be forced to meet its burden of proof under the End Use Exception.[19]  As the Majority put it: "It is wholly impractical, moreover, to require a refiner [such as the Respondent] to prove an end use that occurs out of its control and off its property."[20]  On this ground too, the Majority determined that no effect should be given to that part of the parties' agreement which says that Respondent's coverage for pollution liability is excluded "whether or not such discharge of pollutants: (i) results from the Insured's activities or the activities of any other person or entity."[21]

## ARGUMENT

### THE COURT MUST VACATE PFA 3 BECAUSE IT IS IN MANIFEST DISREGARD OF THE PARTIES' UNAMBIGUOUS WRITTEN AGREEMENT AND IN IN MANIFEST DISREGARD OF NEW YORK LAW

Petitioner acknowledges that an arbitration award will not be vacated merely because arbitrators have misapplied the law or misperceived the facts.  Instead, this motion is based upon

---

matter, the Panel subsequently applied these holdings in concluding that the exception applied to all but $160,000 of Respondent's liability in the *Orange County Water District* action.  Ex. 1 ¶ 84.

[19] Consistent with New York law, it was accepted by Respondent and the entire Panel that Respondent had the burden of proving the End Use Exception applied.

[20] Ex. 1, ¶ 82.

[21] On November 25, 2019, Petitioner moved for reconsideration of PFA 3 on the narrow grounds that the Majority committed manifest error.  As of the date of filing of the instant motion, the Panel has not ruled on Petitioner's motion for reconsideration.

12

the Majority's manifest disregard of the parties' written agreement and upon the Majority's manifest disregard of the law. An arbitration award that evinces a "manifest disregard of the law" must be vacated. *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 139 (2d Cir. 2007); *see also Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 388 (2d Cir. 2003). The Second Circuit Court of Appeals has identified two forms of manifest disregard which are relevant here: (1) where the arbitrator is in manifest disregard of the parties' agreement; and (2) where the arbitrator is in manifest disregard of the law. As addressed below, PFA 3 constitutes manifest disregard of both types.

**A.     PFA 3 is in Manifest Disregard of the Parties' Unambiguous Written Agreement.**

The United States Supreme Court long ago declared that, notwithstanding the deference and discretion afforded to arbitrators, they do not act without limitation – among the things they cannot do is disregard the parties' unambiguous written agreements in order to advance their own brand of "industrial justice." *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960); *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 651 (1986) (arbitrators may not "impose obligations outside the contract").

The principles enunciated by the United States Supreme Court regarding the limits of arbitrators' power have oft been cited by the Second Circuit Court of Appeals[22] and remain the law of this Circuit. In 2019, the Second Circuit Court of Appeals repeated the principle that manifest disregard of the law "encompasses situations where the arbitrator's award is in manifest disregard of the terms of the [parties'] agreement."[23] Thus, vacatur is warranted "when an arbitrator strays from interpretation and application of the agreement and effectively dispenses

---

[22] *See, e.g., Weiss v. Sallie Mae, Inc.*, 939 F.3d 105, 109 (2d Cir. 2019) (quoting *United Steelworkers*, 363 U.S. at 597; *AT & T*, 475 U.S. at 651).

[23] *Id.* (quoting *Schwartz v. Merrill Lynch & Co.*, 665 F.3d 444, 454 (2d Cir. 2011) (internal quotation marks omitted).

his own brand of industrial justice." *Weiss*, 939 F.3d at 109 (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010) (internal alterations omitted)).[24]

In PFA 3 the Majority, by declaring that Respondent's settlement of its pollution liabilities would not be excluded under the Pollution Exclusion because the settlements "released only claims based on Tosco's product liability for manufacturing MTBE gasoline traced to third parties responsible for the pollution alleged," rewrote the Pollution Exclusion by nullifying that portion of it which provided that any liability that the Respondent faced for pollution was excluded, "whether or not such discharge of pollutants: (i) results from the Insured's activities or the activities of any other person or entity." As the Second Circuit Court of Appeals has declared, an arbitrator's interpretation of a contract that contradicts an unambiguous and express term of a contract constitutes manifest error.[25] As a matter of law, PFA 3 must be vacated.[26]

Nor do the Majority's views on public policy or economic efficiency excuse the manifest error in PFA 3.

While the Majority suggested that its nullification of a portion of the Pollution Exclusion could be justified by New York public policy which only seeks to exclude insurance coverage for the persons who actually did the polluting, the Pollution Exclusion unambiguously provides

---

[24] The law in this Circuit is followed by other Circuits as well. *See Raymond James Fin. Servs., Inc. v. Fenyk*, 780 F.3d 59, 64 (1st Cir. 2015) ("an arbitration ruling ordinarily is unenforceable only if it imposes the arbitrators' 'own view of sound policy' instead of adhering to the agreement that governs the parties' relationship"); *Walker v. Ameriprise Fin. Servs., Inc.*, 787 F. App'x 211, 213 (5th Cir. 2019) ("It is only when an arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice that his decision may be unenforceable").

[25] *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 222 (2d Cir. 2002) ("Under our heightened standard of deference, vacatur for manifest disregard of a commercial contract is appropriate only if the arbitral award contradicts an express and unambiguous term of the contract or if the award so far departs from the terms of the agreement that it is not even arguably derived from the contract.").

[26] It is noteworthy that the parties themselves agreed in the ADR Agreement, and instructed the arbitrators in the Terms of Reference, that no award containing manifest error would be deemed by the parties to be enforceable.

that it excludes coverage for Respondent's pollution liability irrespective of who did the polluting. Public policy is not a proper basis to justify rewriting an insurance policy. As the New York Court of Appeals has declared, New York law does not permit policy concerns to override the express language of an insurance agreement. *Glob. Reins. Corp. v. Century Indem. Co.*, 30 N.Y.3d 508, 518 (2017) ("rather than adopting a blanket rule based on policy concerns, the court must look to the language of the policy above all else.").

Nor are the Majority's views on economic efficiency a proper ground for nullifying a portion of the Pollution Exclusion. One of the reasons the Majority sought to justify its nullification of the Pollution Exclusion was its unilateral declaration that it would be "wholly impractical, moreover, to require a refiner [such as the Respondent] to prove an end use that occurs out of its control and off its property." Even had Respondent advanced this argument and any evidence could be adduced to support the Majority's finding, the law would not permit the Majority to simply disregard an unambiguous contract provision merely because of the majority's own notions of "economic efficiency,"[27] or because Respondent (a sophisticated contracting party) may believe that it entered into a "bad deal."[28]

That the Majority's award in PFA 3 is in manifest disregard of the parties' unambiguous written agreement is beyond reasonable argument – indeed, it appears from PFA 3 that the Majority sought to justify its rewriting of the Policy by resort to its own notions of public policy

---

[27] *Glob. Reins.*, 30 N.Y. 3d at 519 ("Courts are not permitted to disregard the precise terminology that the parties used and assume, based on their own familiar notions of economic efficiency, that any clause bearing the generic marker of a 'limitation on liability' or 'reinsurance accepted' clause was intended to be cost-inclusive").

[28] *Glob. Crossing Bandwith, Inc. v. OLS, Inc.*, 566 F. Supp. 2d 196, 204 (W.D.N.Y. 2008) ("While defendants, with the benefit of hindsight, may have made a bad bargain, it is not the function of this Court to rewrite the parties' agreement"). Of course, an insurance policy that requires the insured to establish the existence of certain facts before an exception to a pollution exclusion can be enforced should not be considered a "bad deal."

and economic efficiency.  In this way, PFA 3 constitutes manifest disregard of the Policy and must be vacated.  *See Weiss*, 939 F.3d at 109 (manifest disregard of the law "encompasses situations where the arbitrator's award is in manifest disregard of the terms of the [parties'] agreement") (quoting *Schwartz v. Merrill Lynch & Co.*, 665 F.3d 444, 454 (2d Cir. 2011)); *see also Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997). Because vacatur of an arbitration award is warranted "when an arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice" and because this is what the Majority plainly has done in PFA 3, that award must be vacated.

**B.     PFA 3 is in Manifest Disregard of the Law and Must Also be Vacated on That Ground.**

The Court of Appeals for the Second Circuit has declared that an arbitration award will be deemed to be in manifest disregard of the law and will be vacated where it is established that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well-defined, explicit, and clearly applicable to the case.  *Porzig*, 497 F.3d at 139; *see also Duferco*, 333 F.3d at 389-90.  The record shows that the Majority plainly knew of the governing legal principles regarding insurance policy construction,[29] yet refused to apply them in favor of their own views of public policy and economic efficiency.

---

[29] Petitioner cited these principles to the Panel in, among other places, its brief in opposition to Respondent's 2013 motion for summary judgment.  *See* Petitioner's brief in opposition to Respondent's motion for summary judgment at 74-75 (citing *Adorable Coat Co. v. Conn. Indem. Co.*, 157 A.D.2d 366, 369 (1st Dep't 1990) ("A court may not create policy terms by implication or rewrite an insurance contract."); *Bretton v. Mutual of Omaha Ins. Co.*, 110 A.D.2d 46 (1st Dep't 1985), *aff'd*, 66 N.Y.2d 1020 (1985) ("An insurer is entitled to have its contract of insurance enforced in accordance with its provisions and without a construction contrary to its express terms."); *De Vanzo v. Newark Ins. Co.*, 44 A.D.2d 39, 43 (2d Dep't 1974) ("A court may not, of course, rewrite a contract to accord with its instinct for the

As the Panel itself noted on numerous occasions, the Policy provision on "Governing Law and Interpretation," Section V(q), instructed the arbitrators that the interpretation of the Policy:

> shall be governed and construed in accordance with the internal laws of the State of New York, except insofar as such laws pertain to regulation by the Insurance Department of the State of New York of insurers doing insurance business or issuance or delivery of policies of insurance within the State of New York; provided, however, that the provisions, stipulations, exclusions and conditions of the Policy are to be construed in an evenhanded fashion as between the Insured and the Underwriters . . . .

This provision was not altered by the ADR Agreement or the Terms of Reference, but was reinforced by these additional agreements of the parties.[30] Further, when it denied Respondent's 2013 motion for summary judgment, the entire Panel expressly rejected as inconsistent with New York law the Respondent's interpretation of the End Use Exception to the extent it would nullify portions of the Pollution Exclusion.[31]

Despite the entire Panel's express recognition of these principles of New York law when it denied Respondent's 2013 summary judgment, the Majority's decision in PFA 3 abandoned the well-defined, explicit, and clearly applicable provisions of New York law and instead rewrote the parties' Policy according to the Majority's own notions of public policy and economic efficiency. By choosing to rely upon its "own industrial brand of justice" to nullify a key provision of the Pollution Exclusion, the Majority improperly rendered a portion of the Pollution Exclusion surplusage in contravention of explicit, well defined, and clearly applicable

---

dispensation of equity under the facts of a case; we would rapidly approach the status of paternalism if this principle were dominant.") (internal citations omitted)).

[30] *See* ADR Agreement ¶ 15 ("The issues stated herein shall be decided in accordance with the Governing Law and Interpretation clause of the Policy (section V(q)"); Terms of Reference at 3 (same).

[31] *See* Summary Judgment Decision at 32 (declaring that the End Use Exception "cannot be read so broadly as to encompass all liability covered by the pollution exclusion").

New York law.  PFA 3 is therefore in manifest disregard of New York law and must be vacated.

*Porzig*, 497 F.3d at 139; *see also Duferco*, 333 F.3d at 389-90.

## CONCLUSION

Petitioner respectfully submits that for all of the foregoing reasons the Court should enter

an order vacating PFA 3 and granting Petitioner such other relief as may be just and equitable.


Dated:   New York, New York
         January 22, 2020


Respectfully submitted,

CLYDE & CO US LLP

By: _____
    Michael A. Knoerzer
    Thomas Carruthers
    Alex Bein
    The Chrysler Building
    405 Lexington Avenue
    New York, New York 10174
    T: (212) 710-3900
    F: (212) 710-3950
    Michael.Knoerzer@clydeco.us

*Attorneys for Petitioner*